Brandon S. Reif (SBN 214706)
Rachel D. Dardashti (SBN 292126)
**REIF LAW GROUP, P.C.**
315 S. Beverly Drive, Suite 315
Beverly Hills, CA 90212
Telephone: (310) 494-6500
Email: docket@reiflawgroup.com
breif@reiflawgroup.com
rdardashti@reiflawgroup.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNE L. THART, an individual and trustee of THE ANNE L. THART LIVING TRUST DATED JULY 1, 1998; RUSSELL CHADWICK MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; AMY MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; JOSEPH A. PROCOPIO, an individual and trustee of THE JOSEPH A. PROCOPIO SR. FAMILY TRUST; GLENN T. PINDER, an individual and sole member of PINDER ENTERPRISES, LLP, | CASE NO.: 2:24-cv-10876<br><br>**COMPLAINT**<br><br><br><br>JURY TRIAL DEMAND |
| Plaintiffs, | |
| vs. | |
| COLLIERS INTERNATIONAL GROUP, INC., a Canadian corporation; MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; KEVIN | |

LONG, an individual; BRENT SMITH, an individual; DOUGLAS SCHEEL, an individual; TROY SCHEEL, an individual; MOUNTAIN WEST COMMERCIAL LLC, a Utah limited liability company; MEGAN DESTITO, an individual; CAMS REALTY, LLC, a Utah limited liability company; KGL ADVISORS, LLC, a Utah limited liability company; and DOES 1-10, inclusive,

          Defendants.

Plaintiffs Anne L. Thart, individually and as Trustee of the Anne L. Thart Living Trust Dated July 1, 1998 ("Thart"), Russell Chadwick McAllister and Amy McAllister, individually and as Trustees for the McAllister Family Trust ("McAllister"),  Joseph A. Procopio, Sr., individually and as Trustee of the Joseph A. Procopio, Sr. Family Trust ("Procopio"), and Glen Pinder, individually and as sole member of Pinder Enterprises, LLP ("Pinder") (collectively, Thart, McAllister, Procopio, and Pinder are "Plaintiffs") allege against Defendants Colliers International Group, Inc. ("Colliers"), Millcreek Commercial Properties, LLC ("Millcreek"), Millrock Investment Fund 1, LLC ("Millrock"), Kevin Long ("Long"), Brent Smith ("Smith"), Douglas Scheel ("Doug"), Troy Scheel ("Troy"), Mountain West Commercial Real Estate, LLC ("Mountain West"), Megan Destito, CAMS Realty, LLC ("CAMS"), KGL Advisors, LLC ("KGL") and Does 1-10, inclusive (collectively, "Defendants"):

## I.    SUMMARY OF CLAIMS

1.    Millions of dollars in financial harm were inflicted on vulnerable and susceptible Plaintiff investors, primarily elderly and retired 'main street' retail consumers who entrusted their retirement "nest eggs" to the Defendants based on promises of tax deferral, reliable passive income, and capital preservation.  In summary, the Defendants misappropriated millions of dollars in investor funds from the Plaintiffs in unlawful securities offerings of fractional interests of securitized real estate.

2.    Defendants are a syndicate of real estate enterprises that engaged in point-of-sale and ongoing misconduct regarding an investment property in Crockett, Texas (the "Property"). Colliers' name and brand was prominently displayed on the marketing materials to induce the Plaintiffs' purchase of the investment.

3.    Plaintiffs will prove that the Defendants derogated their fiduciary duties and acted recklessly and negligently by:

a.    Selling securities as the fractional interested in securitized real estate without licensure or exemption in violation of the federal securities laws;

3

b.      Failing to disclose, misrepresenting and/or concealing material facts to Plaintiffs about the Properties, about Defendants' syndicate and about Defendants' conflicts of interest, and about the true nature of the investment quality of the investments (*e.g.* investment objectives, risk tolerance, time horizon, risk of loss of tax deferral benefits, true lease and property values, and the quality of the Properties and the tenants);

c.      Failing to possess the requisite level of expertise in offering and managing single-tenant tenancy in common ("TIC") properties for retail investors;

d.      Failing to perform reasonable due diligence on the investment quality and fair market value of the Property and lease rates, the quality of the tenant and the necessity to procure securities licenses to offer and sell the Properties under federal securities laws;

e.      Failing to properly and reasonably manage the Property after the purchase date, including failing to minimize and manage risk at the most vulnerable times to preserve the assets, and the rampant failure to keep the investors fully informed, let alone reasonably and timely informed, of all the material events, including Defendants' misconduct, failures, negligence, derogation of duties and fraud;

f.      Failing to procure, maintain and pay for the reasonable and necessary expenses, insurance and carrying costs of the Property;

g.      Prioritizing Defendants' own pecuniary gain and profit ahead of the best interest of the Plaintiff investors;

h.      Unlawfully commingling accounts, funds and assets including those held in escrow or trust for others, failing to perform proper accounting to Plaintiffs for accounts, funds and assets, and failing to return funds and assets to the Plaintiffs;

i.      Using coercive, financial duress, undue influence and predatory

and abusive tactics to induce or force the Plaintiffs to waive rights, surrender claims and to be compliant with the Defendants' desires at times when the Defendants believed that the Plaintiffs knew or had begun to discover just some of the misconduct alleged herein; and

j.    All other misconduct that will be uncovered in the discovery phase of this action that which the Defendants have continued to conceal and failed disclose to the Plaintiffs.

4.    Plaintiffs seek rescission of the investments, economic and noneconomic damages for all damages proximately caused by the Defendants' misconduct, disgorgement of profits, fees and commissions, all applicable statutory remedies and penalties, accounting for attorneys' fees, costs, prejudgment interest, and other remedies available at law, by statute or equitably.

## II.    <u>PARTIES</u>

### A.    **Plaintiffs**

5.    Plaintiffs are each owners of undivided tenancy in common interests in the Property.

6.    Anne Thart is sixty-eight (68) years old and lives in Lancaster, California. In October 2022, Thart sold two single family homes she owned as investments located in Lancaster, California and deposited the funds with an intermediatory, Southern California Exchange Services run by Defendant Megan Destito. Thart invested all the proceeds from the sale, $699,628.45 to purchase 7.3605% interest in the Property in November 2022.

7.    Russell Chad and Amy McAllister are a married couple living in Washington, Utah. They have been married for 36 years. Chad is 54 and Amy is 52 years old. They own a cabinet company, which provides cabinet and closet solutions. In 2023, McAllister was induced to sell a building he owned and planned to use as a warehouse for his business and purchase an interest in Crockett by Defendants Doug and Troy, his real estate agents. On January 25, 2023, McAllister invested $2,000,000 for a 19.7121% interest in the Property.

8.      Joeseph Procopio is married to Julie Procopio and lives in Crownsville, Maryland.  Joseph is a loan officer and Julie is a realtor.  In 2023, Joseph and Julie sold real property they owned and placed the proceeds of the sale with qualified intermediary Eastern Starker 1031 Exchange LLP ("Eastern Starker").  Connie Greenawalt, their contact at Eastern Starker, convinced them to trust Scott Rutherford of Elevated 1031 Exchange to recommend Millcreek Commercial Properties, LLC as an investment sponsor and the Crockett Property, in particular.  In May 2023, Procopio exchanged $374,989.98 into the Crocket Property.

9.      Glenn Pinder is eighty-seven (87) years old and lives in Murray, Utah.  He is a devout member of the Church of Later Day Saints and spent most of his career as an owner of a sports equipment business.  In 2004, he retired and sold his business. He continued to own the commercial property where the business operated, but sold it in 2022.  After the sale, he was interested in reinvesting the proceeds to generate income. Andrew Bell, his wife's grandson, was working at Millcreek and recommended a 1031 exchange into the Crocket Property for 3.0771% interest ($260,000 in cash).

10.     Based on his trusted relationship with Millcreek via Bell, Pinder followed the recommendation. He executed a Purchase and Sale Agreement for the Property on June 7, 2022.  Pinder did not know that, at the time, neither Millcreek nor Millrock owned any interest in the Property.  After several addendums, Pinder's purchase of his interests in the Property closed on or about October 11, 2022.

11.     All the Plaintiffs saw that Colliers' name and trademark was prominently displayed on the marketing materials giving them comfort that the Crocket Property was a legitimate and safe transaction.

**B.      Defendants**

12.     Colliers International Group, Inc. (Colliers), a Canadian corporation, is a leading diversified professional services and investment management company. According to its website, Colliers operates in 68 countries and employs "22,000 enterprising professionals work collaboratively to provide expert real estate and investment advice to

clients." Colliers acted as the broker of record, prepared marketing materials, prominently displayed the Colliers' name and brand on the marketing materials and provided material support for the transactions in exchange for the receipt of commissions in connection with the sales of the TIC properties to Plaintiffs. At all relevant times, Colliers was not registered or licensed with the United States Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA") or any other agency or self-regulatory organization that regulates the sales of securities, including fractional sales of real estate for investment purposes.

13. Millcreek Commercial Properties, LLC is a Utah limited liability company based in Pleasant Grove, Utah. At all relevant times, Millcreek was not registered or licensed with the SEC, FINRA or any other agency or self-regulatory organization that regulates the sales of securities, including fractional sales of real estate for investment purposes.

14. Millrock Investment Fund 1, LLC based in Pleasant Grove, Utah. At all relevant times, Millrock was not registered or licensed with the SEC, FINRA or any other agency or self-regulatory organization that regulates the sales of securities, including fractional sales of real estate for investment purposes. Millrock was listed as the owner of the interests in the Property sold to each of the Plaintiffs.

15. Kevin G. Long is an individual that acted as a real estate broker, sales agent, manager, CEO and founder of Millcreek. Long has a history of targeting elderly customers who are readying for retirement by applying sales pressure tactics to solicit his targets to buy fractional interests in securitized real estate that he sells to the public. Plaintiff is informed and believes, and on that basis, alleges that Long is a resident of Utah.

16. Brent Smith is an individual that acted as a real estate broker and sales agent at Millcreek and Colliers in connection with the sales of TIC investments to Plaintiffs. Plaintiff is informed and believes, and on that basis, alleges that Smith is a resident of Utah.

17. Doug Scheel is an individual that acted as a real estate broker and sales agent at Mountain West Commercial in connection with the sales of TIC investments to

Plaintiffs. Plaintiff is informed and believes, and on that basis, alleges that Doug is a resident of Utah.

18. Troy Scheel is an individual that acted as a real estate broker and sales agent at Mountain West Commercial in connection with the sales of TIC investments to Plaintiffs. Plaintiff is informed and believes, and on that basis, alleges that Troy is a resident of Utah.

19. Doug and Troy personally induced the McAllisters to sell a commercial property they owned (which Doug had previously helped them purchase) and purchase interests in the Property by way of a 1031 exchange. Doug and Troy stated that they had personally invested in Millcreek properties, could vouch for their professionalism and knowledge and stated that there was no risk because the McAllisters could sell their interests at any time. When asked if they received compensation in connection with the sale of the Property to the McAllisters they falsely stated that they did not.

20. Mountain West Commercial LLC is a real estate broker licensed in the state of Utah, which acted as a broker in connection with the sales of the TIC investments to Plaintiffs. Doug and Troy held their real estate licenses with Mountain West, which acted as their broker. Mountain West processed and participated in receiving commissions for the sale of the Property to the McAllisters.

21. Southern California Exchange Services is a qualified intermediary and exchange accommodator with its principal place of business in Camarillo, California. SCES acted as a sales agent and accommodator in connection with the sale of the TIC investments to Thart.

22. Megan Destito is an individual and principal of SCES that acted as a sales agent and accommodator in connection with the sales of TIC investments to Thart. Plaintiffs are informed and believe, and on that basis, allege that Destito is a resident of California.

23. CAMS Realty, LLC is a Utah limited liability company with its principal place of business in Pleasant Grove, Utah. It is a division of Mountain West Commercial.

Mary Street is the managing member of CAMS Realty. Joseph Cooley is the principal broker for CAMS Realty and Mountain West Commercial. CAMS Realty and Mary Street received fees for "managing" the TIC interests, but rather than serve the interests of the investors, such as Plaintiffs, Street worked to protect the interests of Colliers, Millcreek, Long and the other Defendants.  Material misrepresentations and omissions by Street and CAMS Realty lulled Plaintiffs so that they would not discover the wrongdoing alleged herein.

24. As of December 3, 2024, Millcreek Commercial's website millcreekcommercial.com states: "Millcreek Commercial has ceased operations.  Our friends at KGL Advisors have agreed to assist Millcreek Commercial clients. The Millcreek agents that moved to KGL Advisors can assist you with Tenant in Common Investments from that brokerage." Plaintiffs are informed and believe, and on that basis allege, that KGL Advisors LLC is a new entity taking over operations of Millcreek Commercial with the same employees and agents.  KGL Advisors was created to obscure the assets of Millcreek Commercial from pending lawsuits, while continuing substantially similar operations. KGL Advisors' website includes the same blog posts that were previously on the Millcreek Commercial website, including one dated April 30, 2019 announcing a marketing alliance with Elevated 1031 Exchange, even though KGL Advisors was not created or registered until November 11, 2024 as set forth on the Utah Secretary of State website. Plaintiffs are informed and believe, and on that basis allege, that KGL Advisors is an alter ego of Millcreek Commercial such that it must be held liable for jointly and severally for Millcreek Commercial's wrongdoing.

25. On December 7, 2024, Kevin Long informed certain investors of Millcreek Commercial's closure. He represented: "…Millcreek Commercial Properties, LLC, is currently insolvent and the difficult decision has been made to close down the business and dissolve the entity. Millcreek was the marketing arm of an investment fund and when that fund decided to stop developing and marketing real estate products due to various market evolutions, the viability of Millcreek's business was decimated. We tried to continue on the

business for the last few months but it has become apparent that there is not a path forward to solvency. Millcreek Commercial has no liquid assets and limited creditors outside their real estate lease obligation. The entity will be formally dissolved as of December 31, 2024. We do not anticipate any revenue for distribution."

26.    At all material times, Long, including his employees, including Brent Smith, non-parties Andrew Bell and Trevor Webb and agents, including Douglas Scheel, Troy Scheel and Megan Destito and other employees and agents of Millcreek Commercial and Colliers International, were close business associates, including through joint marketing, communications, social media, and transactional commission payments.

27.    Plaintiffs are informed and believe, and on that basis, allege, that Douglas Scheel, Troy Scheel, and Megan Destito, each of them, entered into a Professional Referral Agreement with Millcreek Commercial whereby Millcreek agreed to pay each of them a referral fee for the sale of tenant in common interests to buyers procured by Doug, Troy or Destito including Plaintiffs.

28.    Defendants, and each of them, are alter egos of each other, partners, joint venturers and co-conspirators such that it is reasonable and appropriate to piece the corporate veil and to hold the Defendants jointly and severally liable for all the misconduct alleged herein. Failure to pierce the corporate veil, in light of Defendants' collective wrongdoing, would result in an injustice to Plaintiffs and prevent them from obtaining the justice they deserve in this matter.

29.    Defendants, and each of them, are jointly and severally liable for violations of securities laws as control persons and aidors and abettors pursuant to 15 U.S. Code §§ 77o, 78t.

### III.    THE SCHEME

30.    In or about 2022, Colliers, Millcreek Commercial and their agents began marketing and selling TIC interests in the Properties to the Plaintiffs with Colliers' name and brand prominently displayed on the marketing materials. In its capacity as sales agent, sponsor, partner and broker, Colliers agreed to list, market and sell the Properties to retail

investors, to create and distribute marketing materials and due diligence packages, including the Offering Memorandum for the securitized real estate units, to provide GIS, graphic design and general support, to pay pre-negotiated draws to new agents selling Millcreek Properties, to provide office space and direct support for the sales force agents offering, marketing and selling the Millcreek Properties and to support a new agent mentoring program created by Kevin Long, all efforts to increase the sale of the Properties and the Millcreek Properties. In addition, Colliers acted as the broker holding real estate agent licenses for Millcreek employees, including Long, Smith, Bell, Trevor and others. In exchange, Colliers received commissions and good will in connection with the acquisition of the Properties and the sale of interests in the Properties to investors, including Plaintiffs.

31.    Long, Millcreek and Colliers masterminded the marketing of the Property to investors, such as Plaintiffs. Millcreek and its agents, Long, Bell, Smith and others, emailed prospective investors about the Pulse Healthcare Systems portfolio in 2022 and 2023 stating: "These properties are perfect for whole building buyers, buyers in a 1031 exchange, and investors looking for a safe, secure and stable investment." The same email solicitation including a section titled "Why invest in medical commercial real estate properties?" with the following reasons:

- "Medical office buildings usually have lower vacancy rates than other types of commercial properties.
- Medical property generally produce a steady cash flow for investors.
- Healthcare is a 'recession resilient' product."

32.    Likewise, Millcreek, Colliers, and Long sent emails to the McAllisters claiming "Our expertise is providing shared ownership opportunities in top-tier commercial real estate properties that **guarantee** a consistent stream of passive income. Our properties aren't just recession-resilient—they are also *fully-managed*. This means you can enjoy the perks of monthly rent without the burden of daily operations!" (emphasis in original).

33.    Millcreek, Colliers, and Long sent emails to the McAllisters stating "We

specialize in offering co-ownership opportunities for premium real estate that deliver true passive income. Our meticulously selected properties are not only recession-resilient but also come with the assurance of full management—this means you can enjoy the benefits of passive real estate ownership without the stress of day-to-day operations."

34.    In addition to emails, Millcreek, Long and Colliers created podcasts, webinars and blog posts to tout the benefits of a 1031 exchange into tenant in common interests in commercial real estate.

35.    On March 18, 2020, Millcreek posted a blog on their website entitled "7 Reasons to Consider Millcreek Commercial."   In the post, Millcreek represented: "Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction.  These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform."  Millcreek also stated: "Millcreek Commercial is not a brokerage.  We own the properties that we syndicate. Our team of experts review hundreds of opportunities every month. Only the best make it into our portfolio."

36.    The blog also stated: "Millcreek Commercial typically stays in our deals for the long term…our business model is for one of our partners or a family member to stay in a deal for the long term. This commitment provides our partners added assurance that we believe in and are committed to our products." Each of these representations were repeated to Plaintiffs in phone calls.  Millcreek and its agents represented that Millcreek owned the Property and would do so for the long term, completed extensive due diligence to ensure that the Property and its tenant were high quality and convinced Plaintiffs that Colliers' involvement guaranteed that the Property was a good investment. Plaintiffs relied on these representations in deciding to invest and purchase interests in the Property.

37.    In fact, the owner of the Property was Millrock not Millcreek.  Neither Millrock, Millrock or any family member remained an owner of the Property long term. Plaintiff is informed and believe and on that basis allege, that Millcreek, Millrock, Colliers and other Defendants did very little, if any, due diligence on tenant Pulse Physician

Organization despite their representations.

38.    On October 27, 2021, Millcreek posted a blog on its website millcreekcommercial.com entitled "Investing Isn't Scary | 3 Fear-free Solutions for Commercial Real Estate Investors." In the blog, Millcreek claimed: "Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income."  Millcreek also represented: "Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment." In sum or substance, the blog post includes the same representations made by each of the Defendants in the sales process to Plaintiffs – the investment would not lose money, the investment was "recession resilient" and the Property and tenant underwent rigorous due diligence prior to the offering.

39.    Defendants Doug, Troy, Destito, Mountain West, Colliers, Millcreek and Millrock assured Plaintiffs that they were experts in commercial real estate and had completed valuations of the Property to assure that the value of the property was commensurate with the price at which it was sold to Plaintiffs. Plaintiffs, and each of them, relied on defendants' expertise and their assurance that the valuation of the Property was commensurate with the listing price.

40.    Plaintiffs are informed and believe, and on that basis allege, that the only basis for the price was Defendants desire to cover commissions, marketing fees and a substantial profit.  There was no business reason to support the valuation of the Property.  In fact, after Plaintiffs learned of Pulse's default they obtained a broker opinion of value to properly evaluate the rental market and learned that the value of the Property was only $1,818,750

- \$2,121,875.  The Property was sold to Plaintiffs based on a \$9,500,000 valuation.

41.    Millrock, Millcreek and Colliers also used a direct to customer marketing approach, in which they contracted directly with real estate agents, accommodators and other fiduciaries with pre-existing relationships with customers to recommend and sell Millcreek properties to them.  These contracts were known as "Professional Referral Agreements".  In exchange for their recommendations, these fiduciaries received a 3% commission in connection with the sale to Plaintiffs McAllister and Thart, which was not disclosed to Plaintiffs before the sales.  Plaintiffs are informed, and believe, and on that basis allege that Doug, Troy, Destito and Mountain West each were parties to the Professional Referral Agreements and received commissions in connection with the sales.

42.    Doug, Troy, Destito and Mountain West each omitted material information as stated herein regarding the Property and falsely stated that the investment was safe, had little to no risk, the Property could be sold at any time and vouched for the professionalism and knowledge of Millcreek, Millrock and Colliers.  Moreover, they each claimed that they had invested in Millcreek properties and may invest in the Property sold to Thart and McAllister. They also stated that the Property would be professionally managed and Plaintiffs would not have to personally deal with the Property.

43.    After the sale to Plaintiffs, CAMS Realty and Street were installed as lease administrators and property managers to manage the Property.  CAMS Realty and Mary Street received fees for "managing" the TIC interests, but rather than serve the interests of the investors, such as Plaintiffs, Street worked to protect the interests of Colliers, Millcreek, Long and the other Defendants.  Material misrepresentations and omissions by Street and CAMS Realty lulled Plaintiffs so that they would not discover the wrongdoing alleged herein.  When Plaintiffs sought to visit the Property to confirm its condition, Street refused and failed to provide keys to the Property to Plaintiffs to access their investment.

## IV.  <u>THE PROPERTY</u>

44.    The Crockett, Texas Property is located at 2000 Renaissance Way, Crockett, TX 75835. The Crocket Property was marketed as a freestanding ambulatory surgery

center listed at $9,505,147.83, sprawling across 11.074 square feet with a 5.75% cap rate. Defendants' marketing materials listed Pulse Physician Organization, PLLC as the tenant and Achy Legs Clinics, LLC and Specter Innovations, LLC as the lease guarantors. The Property's Offering Memorandum states "Pulse Healthcare System is made up of nine clinic locations in the state of Texas. …The clinics are equipped with the best technology and treatment options to ensure that patients are feeling better without delay." The Offering Memorandum states that Pulse has agreed to minimum rent of $44,350,000 per month with an initial lease term of 15 years and 11% rent increases every year. It also boasts Crockett, Texas's potential, highlighting its expanding economy and cultural significance.

45.     In the due diligence period and before execution of the Purchase and Sale Agreement to purchase TIC interests in the Properties, Defendants failed to disclose that the Pulse had not paid any rent and that the purported "rental income" was highly inflated due to funds paid to tenants for equipment, which were subsequently added to the sales price of the property.

46.     Under a triple-net lease, which was marketed to Plaintiffs, the tenant pays for taxes, maintenance costs and insurance. Plaintiffs specifically invested in the TICs to avoid these costs and responsibilities and expenses. Due to Defendants' conduct, Plaintiffs are now burdened with the need to pay for taxes, maintenance costs, utilities, management/lease administration fees and insurance.

## IV.     THE TENANT IN COMMON TRANSACTIONS

47.     Defendants marketed TIC interests to potential buyers who wished to take advantage of the 1031 exchange program. 1031 exchanges must take place over a constrained time frame, by law. From the date the original property is sold, the purchase, closing and exchange of the new property must be completed within 180 days after sale of the initial transaction.

48.     TIC investments are securities as defined by 15 U.S.C. § 77b (a)(1). In the early 2000s,

NASD (now known as FINRA) issued Notice to Members or Regulatory Notices 03-71, 05-18 and 10-22 advising that tenant in common transactions were securities as defined by federal securities laws. The NTMs advised that those selling TIC investments must be properly licensed and must comply with NASD rules including rules addressing suitability, due diligence, splitting commissions, supervision and record keeping. Despite this guidance, Defendants were not properly licensed to sell securities and did not comply with federal securities laws or FINRA rules in conjunction with selling the TIC investments to Plaintiffs.

49.    All the Properties are deemed interstate commerce under the federal securities laws either because Texas situs properties were sold to out-of-state investors or, in other instances, out-of-state properties were sold to out-of-state investors.

50.    Plaintiffs in this action purchased TIC interests for the desired purpose of deferring capital gains tax and to obtain an income-generating property.

51.    The lease connected with each TIC property was designed to be the income stream for investors targeted by Defendants, including Plaintiffs.

52.    Despite their duty to conduct reasonable due diligence, Defendants negligently or willfully failed to investigate tenants and guarantors for their properties and disregarded signs and indicators that did not support the Defendants' advertised claims to induce sales of the TIC Properties.

### A.    Pressurized Sales Practices by Defendants

53.    Defendants employed a variety of sales pressure tactics to solicit and induce the Plaintiffs to purchase the TIC investments. Defendants created a false sense of urgency, claimed a limited supply of inventory of certain TICs, and used high pressure sales tactics to rush and influence the Plaintiffs to make investment decisions without reasonable time and without being fully informed by the Defendants.

54.    Through emails, phone calls, and other communications, Defendants solicited Plaintiffs by stating that Millcreek's properties were highly sought after and presented on a "first come, first served" basis".

55.    Defendants coaxed possible investors by stating "rest assured that our portfolio is rock solid. We rigorously vet every property that we offer", as set forth on the *1031 Exchange* page of Millcreek's website.

56.    Defendants relied on an army of referral sources, including real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents, to identify and refer potential qualified investors. On information and belief, Defendants secretly paid this army of referrals compensation or referral fees for the leads.

57.    In connection with each of Plaintiffs' purchase in the Properties, commissions and similar compensation payments were made to third parties in each transaction.

58.    Defendants failed to provide Plaintiffs with essential and necessary documentation and pertinent information to allow Plaintiffs to complete their due diligence before identifying the properties for 1031 exchange purposes or executing Purchase and Sales Agreements. By doing so, Defendants deprived Plaintiffs the opportunity to thoroughly and reasonably evaluate the risks associated with the investments. Examples include lease agreements, financial projections and tenant payment histories that which prevented the Plaintiffs from making fully informed investment decisions. When these facts are combined with the false statements, the sales pressure tactics, the false sense of inventory unavailability, and invented time pressures, Defendants created the environment that deprived the Plaintiffs of their ability to make fully informed investment choices and exposed them to undue financial risk.

## B.    Defendants' Point of Sale Misrepresentations

59.    Plaintiffs entrusted the purchase of the Properties with their irreplaceable retirement money to Defendants. Plaintiffs entrusted the Defendants as their exclusive managers of passive investment securitized real estate investments, as well as entrusted the Defendants to act in their best interest as agents, asset managers and the custodians of the assets and their money to manage the Properties, vet the tenants, pay for operations, insurance and taxes, to actively manage the Properties and to keep the Plaintiffs fully informed of material events.

60. In the Offering Memorandum, Defendants made numerous misrepresentations to encourage Plaintiffs to purchase their interests in the Property, including:

    a. "Pulse Healthcare System is made up of nine clinic locations across the state of Texas. The twelve healthcare providers at Pulse put one-on-one relationship with their patients at the core of what they do. … Pulse prioritizes state-of-the-art resources. The clinics are equipped with the best technology and treatment options to ensure that patients are feeling better without delay."

    b. "Pulse Healthcare includes a well-performing vascular surgery portfolio."

    c. "4 additional locations Ideally situated to meet the demand for vascular surgery."

    d. "15-Year Sale Leaseback on Triple Net (NNN) Leases."

    e. "Full Corporate Guarantee from Pulse Healthcare."

    f. "Pandemic, Recession and Internet Resistant Tenant with 8 clinics throughout the Greater Houston area."

    g. "Landlord Responsibilities None"

    h. "Insurance / Taxes/CAM/Utilities Responsibility of Tenant"

61. Defendants made numerous misrepresentations in their efforts to sell their properties to Plaintiffs without regard to the Plaintiffs goals, financial position or objectives. The misrepresentations Defendants made to Plaintiffs, prior to Plaintiffs' purchase of the investment included, but are not limited to, the following:

    a. That the TIC investment would preserve principal;

    b. That the TIC investment would provide an annualized return on equity;

    c. That the TIC investment would be operated on a turnkey or high-level basis, such that no further involvement would be required by Plaintiffs;

    d. That the TIC investment would be managed by a property manager;

    e. That Plaintiffs could sell their TIC interest at any time; and

    f. That the TIC investment had no risk and was recession-proof.

62.     Defendants claimed that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather "benefit from a steady stream of passive income". Defendants did not disclose that the so-called guarantors were not credit-worthy and that the leases values were inflated based on "equipment fees" financed by Plaintiffs without their informed consent.

63.     Further, Defendants failed to disclose that:

   a.  An investment in the Millcreek TIC Properties, including the Property, was not a safe, stable and reliable investment that would generate dependable income, but was risky and unsuitable for any Plaintiff, particularly in light of the tenants' financial condition.

   b.  The tenants of the properties were insolvent, unprofitable, financially unsustainable.

   c.  Defendants did not conduct any actual due diligence on proposed tenants and did not have any reliable financial information showing that tenants were successful or solvent.

   d.  Plaintiffs were not purchasing real estate with value commensurate with their investment.  The actual cost of the buildings was substantially less than the price that Plaintiffs were required to pay for their TIC interests, and the fair market value of the buildings as real estate would be only a fraction of the amount of the Plaintiffs' collective TIC Investment.

   e.  The professionals that introduced Millcreek to Plaintiffs each received substantial commissions.

64.     Defendants failed to disclose material information to the Plaintiffs, such as the fact that the tenant did not operate a surgery center from the Property.

65.     Plaintiffs recently discovered that the Millrock purchased the Property from the "tenant" for $2,000,000 and leased it back to the tenant.  Then, without a disclosure to

the Plaintiffs, it was represented to Plaintiffs that the value of the Property was over $9,000,000. Colliers' name and brand was prominently disclosed on this untrue representation. Defendants engaged in ongoing misconduct, including attempts to cover up their misconduct and wrongdoing. For example, Defendants falsely claimed the tenants were solvent and falsely claimed that the tenants were current on rental payments and that the guarantees would ensure that all payments would be timely made. These falsities intended to misrepresent, deceive, mislead and/or defraud the Plaintiffs.

66.    Plaintiffs, reasonably relying on the misrepresentations and omissions of Defendants, entered contracts to purchase their interests in the Properties. As a result of the Defendants' misconduct, the Plaintiff suffered financial losses, including overpayment for the Properties, ongoing expenses due to non-payment of rents, and damages resulting from the scheme perpetuated by Defendants including adverse tax treatment, unearned fees, undisclosed transaction costs and fees and unauthorized commingling of funds and unauthorized distributions to others.

67.    Each Plaintiff purchased their investment in the Properties by signing a purchase and sale agreement. In each case, the purchase and sale agreements failed to fairly and accurately disclose the condition of the Properties, the credit-worthiness of the tenants, the mark-up of the price of the Properties to support financial incentives to tenants, the value and income from comparable commercial leases in the area, or the inherent conflict of interests between Millcreek, Millrock, Long, Colliers, the real estate agents and accommodators, each of whom received significant commissions from the sale of the TIC investments to Plaintiffs. At the same time, the purchase and sale agreements falsely claimed to disclose all relevant facts to Plaintiffs.

68.    Defendants diverted and misappropriated funds and assets for their own benefit and through undisclosed related-party transactions.

69.    All Defendants were complicit in Millcreek's scheme, facilitated the scheme or failed to expose the scheme because all the Defendants received compensation for their part(s) of the transactions.

70.    Defendants CAMS Realty, Mountain West, Millcreek and Millrock failed to provide the Plaintiffs with accurate and timely accountings of the Properties they co-owned.

71.    Plaintiffs have suffered a loss of their entire investment, less only the residual value of their TIC interests.  They are further harmed by unpaid property taxes, owners' association dues, management fees and mechanics liens, and in some cases, are subject to building or use restrictions that severely limit their ability to sell the Property.

## C.    Default by Tenant and Promises by Defendants

72.    In October 2023, the tenant, Pulse Physician Organization, PLLC, failed to pay rent for the Property.  Defendants Millrock, Millcreek, Long, Smith, Colliers, CAMS Realty and other Defendants initially claimed that the delay was due to the sudden death of Pulse's CFO.  Then, it was blamed on issues with the tenant's billing systems.  Long assured Plaintiffs that the lease was "guaranteed" by a profitable doctor's practice known as Achy Legs Clinics, LLC as well as Spectre Innovations, LLC, the holding company for all Pulse locations.

73.    On November 15, 2023, Long acknowledged in an email to investors that the investors were concerned that Pulse and its principal Dr. Aggwarala "has not followed through on his plans to open the surgery center." Thereafter, on November 16, 2023, Plaintiffs confirmed that despite the representations in the Offering Memorandum the Property had never been an operational surgery center.  This was an untimely material disclosure that Long, Millcreek, Millrock, Colliers and other Defendants should have disclosed in a timely manner.

74.    In the same November 15, 2023 email Long stated: "Mary Street is an awesome professional, fiduciary and advocate for the owners.  Neither she nor I were aware that the facility was not operating as a surgery center.  Mary's role is to administer the lease – not manage the property.  It is her job to make sure the lease is enforced."  This representation directly contradicted statements made by each of the Defendants in the sales process, on which Plaintiffs relied, that the Property would be *fully* managed. Indeed, each

Plaintiffs Purchase and Sale Agreement represented that they would receive and execute a Property Management Agreement at closing.

75.    On April 30, 2024, Long admitted in an email:

- "The Millrock Investment Fund purchased the Crockett Surgery Center from Spectre Innovations, LLC on October 11, 2022.

- As part of this transaction we paid $75,000 for the existing clinic equipment and ***provided $2,000,000 for equipment and startup costs for surgery equipment.***

- We executed a long term lease with Pulse Physicians at closing
    - Spectre Innovations, LLC guaranteed the lease. This is important because Spectre owns the Tomball Surgery Center.
    - Achy Legs, LLC guarantees the lease. This is valuable because this is the company that holds the surgical practice.

- Millrock transferred all of our interest in this real estate and the lease to all of you in Tenant in Common real estate transactions.

- Spectre/Pulse was contractually obligated (and in fact paid $2 million) to open a surgery center. They have not." (emphasis added).

76.    This email from Long was the first time Long, Millcreek, Millrock, Colliers and other Defendants disclosed to Plaintiffs that their funds were used to pay $2,000,000 to Pulse for equipment and startup costs. Plaintiffs had not been informed that Pulse was a startup enterprise before this writing in April 2024. They were sold the Property on the promise that the tenant was secure and stable with a successful operating history.

77.    In June 2024, Pulse filed for bankruptcy protection in the Southern District of Texas Federal Bankruptcy Court.

78.    After the lease default, Plaintiffs learned that Pulse, Achy Legs and Spectre's assets had been secured by a UCC lien in July 2022 filed by another creditor. The fact that Long, Millcreek, Colliers, Millrock and other Defendants had not disclosed this secured lien when Pulse was presented as the Property's tenant is actionable misconduct. Had

Plaintiffs known that the same assets securing the lease were securing other unrelated debts, Plaintiffs would not have invested in the Property.

79.    This is not the first time that Defendants have engaged in a conspiracy to conceal, misrepresent and/or defraud hard working, 'main street' retail investors by claiming that properties they were selling were leased by reputable, profitable companies that turned out to be untrue representations by the Defendants. Defendants engaged in a pattern of fraud, deceit and misrepresentation to falsely portray and report that tenants were safe, stable and profitable to induce the Plaintiff investors to purchase interests in the Property at steep undisclosed markup prices.

80.    At least  twelve tenants in Millcreek properties have defaulted on their leases and filed for bankruptcy since 2022.  All of the tenants were start-ups that were presented as established companies with a strong track record.  After the defaults, the investors in the properties were all required to "fend for themselves" to manage the properties, find new tenants and/or sell the properties at prices significantly less than the "value" presented to them by Millrock, Millcreek, Colliers and the other defendants.

## V.    <u>JURISDICTION AND VENUE</u>

81.    Jurisdiction and venue are proper in this Court based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

82.    15 U.S.C. § 78aa affords nationwide jurisdiction against defendants for claims alleging violation of the Securities Exchange Act of 1934. *See e.g. Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1414-1415 (9th Cir. 1989) (holding worldwide service provisions justifies conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts); *Marsiash v. Morrill*, 496 F.2d 1138, 1142–43 (2d Cir.1974) (service of process under § 27 of Securities Exchange Act requires examination of defendant's contacts with United States); *Steinberg & Lyman v. Takacs*, 690 F.Supp. 263, 265–66 (S.D.N.Y.1988) (same).

83.    Moreover, this Court has supplemental jurisdiction over all other claims, including the state law claims for relief, alleged herein pursuant to 28 U.S.C. §1367.

84.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District in that the relationships and conduct at issue in this case were entered into with and affected Plaintiff-residents of this District.  Specifically, at all relevant times, Thart was a resident of this District and Defendants directed conduct, communications, omissions and misrepresentations her to induce them to invest their retirement funds in the investments at issue and purchase interests in the Property.

85.     Defendants, and each of them, engaged in a conspiracy directed at each of the Plaintiffs where more than one overt act was conducted in this District. Accordingly, the venue is proper against each and every Defendant.

# VI.    CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### (Federal Securities Fraud Under Section 10(b) of the Securities Exchange Act and Rule 10(b)(5) by Plaintiffs Against All Defendants and Does 1-10)

86.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

87.     Investment in TIC interests was a security as defined by 15 U.S.C. § 77b (a)(1) and NTM 03-71 and 05-18.

88.     Defendants made material misstatements and omissions of fact in connection with the purchase and sale of securities, including but not limited to, false representations regarding the financial condition, risks, and performance of the investment. Plaintiffs specifically incorporate herein all allegations identifying representations by these Defendants as well as all allegations establishing that such representations were materially false.

89.     Defendants engaged in manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, including but not limited to, creating an illusion of

profitability and omitting adverse information.

90.    Defendants engaged in acts, practices and courses of business that operated or would operate as a fraud or deceit upon any person, including Plaintiffs, in connection with the sale of the securities, TIC interests, to Plaintiffs and other investors.

91.    Defendants acted with scienter in making these misstatements, omissions, and engaging in manipulative and deceptive practices. The information Defendants misrepresented was material to Plaintiffs' evaluation of whether to purchase TIC interests in the Properties. Plaintiffs would not have invested had they known the facts.

92.    Plaintiffs justifiably relied on Defendants' misstatements, omissions, and manipulative practices in deciding to invest in the securities.

93.    As a direct and proximate result of Defendants' violations of the Securities Exchange Act of 1934, Plaintiffs have suffered losses.

94.    Plaintiffs are entitled to recover damages for their losses caused by Defendants' violations of the Securities Exchange Act of 1934. Plaintiffs seek rescission of the investments, economic and noneconomic damages for all damages proximately caused by the Defendants' misconduct, disgorgement of profits, fees and commissions, all applicable statutory remedies and penalties, accounting for attorneys' fees, costs, prejudgment interest, and other remedies available at law, by statute or equitably.

95.    Plaintiffs have incurred recoverable attorneys' fees as allowed by law, and prejudgment interest on the amounts due and withheld.

96.    Plaintiff Thart seek trebled damages under Cal. *Civil Code* § 3345 because the Defendants knew or should have known that their conduct was directed to senior citizens and because Defendants' conduct caused elder Plaintiffs, senior citizens substantial loss of property set aside for retirement and for personal and family care and maintenance and because they Plaintiffs suffered substantial physical, emotional, and economic damage resulting from the Defendants' conduct.

97.    Defendants acted intentionally, with malice, fraud or oppression and in reckless disregard of Plaintiffs' rights, and to take advantage of Plaintiffs. Therefore,

Plaintiffs are entitled to recover an award of punitive and exemplary damages, pursuant to Cal. *Civil Code* §3294, to punish Defendants for their unlawful conduct.

## SECOND CAUSE OF ACTION

**(Financial Elder Abuse by Plaintiff Anne Thart Against Defendants Millrock, Millcreek, Colliers, Long, Smith, Destito and CAMS Realty and Does 1-10)**

98. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

99. Plaintiff Thart qualifies as senior citizens under California law because, all times relevant, they were 65 years old or older.

100. Defendants are liable to the Plaintiffs because Defendants violated California's financial elder abuse statute which defines "financial abuse" to occur when a person or entity "(i) takes, secretes, appropriates, obtains, or retains, any interest in any real or personal property, for a wrongful use; (ii) assists in doing any of the above-described acts; or (iii) does any of the above-described acts through undue influence and duress." Defendants are liable under (i) and/or (ii) of this statute for causing the misconduct and/or assisting each other Defendant in their misconduct.

101. Financial elder abuse exist for all the reasons set forth in this action, including but not limited to the following facts: Defendants put their own interest ahead of Plaintiffs' financial well-being; Defendants engaged in undisclosed conflicts of interest and did not minimize these conflicts; Defendants pursued an unduly high-risk and high-cost investment strategy; Defendants did not recommend less risky, less costly alternative strategies even though that was the strategy Plaintiffs wanted and believed they were receiving from Defendants. Plaintiffs relied on Defendants' representations about the products and services. Defendants omitted key facts regarding the products and services and misstated, mispresented, concealed and/or omitted the risks in the recommended investment products and services.

102. A conclusive presumption of financial abuse exists under Cal. Welf. & Inst. Code § 15610.30(b) because the Defendants knew or should have known that their

malfeasance was likely to be harmful to the elderly California residents.

103.    Defendants and their co-conspirators and aiders and abettors exerted undue influence over the elder Plaintiffs at the time of these wrongful takings, including but not limited to, because the Plaintiffs had substantially less financial and operational sophistication compared to the expertise the Defendants stated they had.

104.    Defendants financial elder abuse proximately cause Plaintiffs' harm

105.    Plaintiff Thart seeks attorneys' fees and costs of suit under Cal. Welf. & Inst. Code §§ 15657.5(a) and damages for emotional distress, seeks emotional distress and pain and suffering damages under Cal. Civil Code § 3333.2 and Cal. Welf. & Inst. Code § 15657.5(b)(1).

106.    Plaintiff Thart seeks trebled damages under Cal. Civil Code § 3345 because the Defendants knew or should have known that their conduct was directed to senior citizens and because Defendants' conduct caused elder Plaintiffs, senior citizens substantial loss of property set aside for retirement and for personal and family care and maintenance and because they Plaintiffs suffered substantial physical, emotional, and economic damage resulting from the Defendants' conduct.

107.    As a proximate and foreseeable consequence of the misconduct, Plaintiffs suffered harm.

108.    Plaintiff Thart seeks rescission plus economic damages, non-economic damages, trebled damages, punitive damages under Cal. Civil Code §3294, interest, a civil penalty, attorneys' fees, costs of suit and other relief that which will sought at time of trial.

109.    Plaintiff Thart are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

110.    Defendants acted intentionally, with malice, fraud or oppression and in reckless disregard of Plaintiff Thart's rights, and to take advantage of Plaintiff Thart. Therefore, Plaintiff Thart is entitled to recover an award of punitive and exemplary damages, pursuant to Cal. *Civil Code* §3294, to punish Defendants for their unlawful

conduct.

### **THIRD CAUSE OF ACTION**

**(Financial Elder Abuse by Plaintiff Pinder Against Defendants Millrock, Millcreek, Colliers, Long, Smith and CAMS Realty and Does 1-10)**

86. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

87. Plaintiff Pinder qualifies as a elder adult under Utah law because, all times relevant, he was 65 years old or older.

88. Defendants are liable to the Plaintiff Pinder because Defendants violated Utah's financial elder abuse statute which defines "financial exploitation" to occur when a person or entity "is in a position of trust and confidence, or has a business relationship, with the vulnerable adult or has undue influence over the vulnerable adult and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, the vulnerable adult's funds, credit, assets, or other property with the intent to temporarily or permanently deprive the vulnerable adult of the use, benefit, or possession of the vulnerable adult's property, for the benefit of someone other than the vulnerable adult…" See Utah Code 76-5-111.4(b)(2).

89. Utah Code 26B-6-213 provides: "A vulnerable adult who suffers harm or financial loss as a result of exploitation has a private right of action against the perpetrator."

90. Financial elder abuse exist for all the reasons set forth in this action, including but not limited to the following facts: Defendants put their own interest ahead of Plaintiffs' financial well-being; Defendants engaged in undisclosed conflicts of interest and did not minimize these conflicts; Defendants pursued an unduly high-risk and high-cost investment strategy; Defendants did not recommend less risky, less costly alternative strategies even though that was the strategy Plaintiffs wanted and believed they were receiving from Defendants. Plaintiffs relied on Defendants' representations about the products and services. Defendants omitted key facts regarding the products and services and misstated, mispresented, concealed and/or omitted the risks in the recommended

investment products and services.

91.    Defendants and their co-conspirators and aiders and abettors exerted undue influence over the elder Plaintiffs at the time of these wrongful takings, including but not limited to, because the Plaintiffs had substantially less financial and operational sophistication compared to the expertise the Defendants stated they had.

92.    Defendants financial elder abuse proximately cause Plaintiffs' harm.

93.    Plaintiff Pinder seeks attorneys' fees and costs of suit under Utah Code 26B-6-213(3) and damages for emotional distress, seeks emotional distress and pain and suffering damages.

94.    Defendants acted intentionally, with malice, fraud or oppression and in reckless disregard of Plaintiff Pinder's rights, and to take advantage of Plaintiff Pinder. Therefore, Plaintiff Pinder is entitled to recover an award of punitive and exemplary damages to punish Defendants for their unlawful conduct.

## FOURTH CAUSE OF ACTION

**(Breach of Fiduciary Duty by Plaintiffs Against Defendants Millcreek, Colliers, Long, Smith, Mountain West, Doug and Troy Scheel and CAMS Realty and Does 1-10)**

95.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

96.    Each of the Defendants owed the Plaintiffs fiduciary duties as their agents in the facets of the sales process of securities and real estate for which they had primary and secondary and tertiary responsibilities, as well as in their capacities as managers of Plaintiffs' interests in real property and as custodians of funds that belonged to the Plaintiffs  and funds belonging to Plaintiffs that were held to pay expenses and other obligations of the investment deals.

97.    Defendants owed Plaintiffs a fiduciary duty of care and loyalty due to circumstances of the relationships between the parties including the following:

98.    Defendants, and each of them, had or held themselves out as having superior

skill, knowledge, training, and experience concerning all aspects of the transactions that are the subject matter of this Statement of Claim.

99.     Defendants, and each of them, expected that Plaintiffs would place particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely upon their judgment and skill with respect to the transactions that are the subject matter of this Statement of Claim.

a. Defendants Colliers, Millcreek, Long, Smith, Bell, Raymes, Rutherford and Commercial Broker Connect acted in the capacity of licensed real estate brokers or agents, or otherwise performed duties on behalf of the Plaintiffs consistent with acting in that capacity and for which a real estate license is required.

b. Defendants, and each of them, acted in the capacity of licensed securities agents or performed duties on behalf of the Plaintiffs consistent with acting in that capacity and for which a securities license is required and for which the law imposes fiduciary duties.

c. Defendants Colliers, Millcreek, Millrock, Long, Smith, Bell, Raymes, Rutherford, Greenawalt, Eastern Starker, KGL Advisors and Commercial Broker Connect otherwise acted as agents of the Plaintiffs in matters concerning the investment in TIC Properties.

d. Defendants, and each of them, received substantial compensation from Plaintiffs or from the funds paid by Plaintiffs in connection with Plaintiffs' investments, including funds associated with the receipt and management of the proceeds of Plaintiffs' investments.

e. By virtue of Plaintiffs' age, experience, and abilities, Defendants and Plaintiffs were in an unequal bargaining position in circumstances where all parties would necessarily intend that Plaintiffs would put particular trust and reliance in Defendants.

100.    Defendants breached the duty to disclose material information regarding the

investments, including the risks, the creditworthiness and lack of operating history of the tenants, the failure to conduct adequate due diligence on the tenants, conflicts of interests, fees charged reducing the funds actually invested, and all other material facts alleged hereinabove. Further, Defendants breached the duty to disclose by failing to disclose notable and significant facts that would alter any reasonable persons evaluation of the TIC investments.

101.    Defendants' breaches of fiduciary duty directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at  trial.

102.    Plaintiffs seek rescission of the investments, economic and noneconomic damages for all damages proximately caused by the Defendants' misconduct, disgorgement of profits, fees and commissions, all applicable statutory remedies and penalties, accounting for attorneys' fees, costs, prejudgment interest, and other remedies available at law, by statute or equitably.

103.    Plaintiffs are further entitled to a full recovery of interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

104.    Plaintiff Thart seeks trebled damages under Cal. *Civil Code* § 3345 because the Defendants knew or should have known that their conduct was directed to senior citizens and because Defendants' conduct caused elder Plaintiffs, senior citizens substantial loss of property set aside for retirement and for personal and family care and maintenance and because they Plaintiffs suffered substantial physical, emotional, and economic damage resulting from the Defendants' conduct.

105.    Defendants acted intentionally, with malice, fraud or oppression and in reckless disregard of Plaintiffs' rights, and to take advantage of Plaintiffs. Therefore, Plaintiffs are entitled to recover an award of punitive and exemplary damages, pursuant to Cal. *Civil Code* §3294, to punish Defendants for their unlawful conduct.

**FIFTH CAUSE OF ACTION**

**(Aiding and Abetting Breach of Fiduciary Duty by Plaintiffs Against Defendants Millrock and Colliers and Does 1-10)**

106.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

107.   For the Defendants in which a fiduciary duty was/is not owed, these Defendants aided and abetted breach of fiduciary duty.

108.   Defendants Millrock and Colliers, with knowledge of Millcreek, Long, Smith, Mountain West, Doug and Troy Scheel and CAMS Realty's fiduciary duty owed to Plaintiffs, knowingly and substantially assisted Millcreek, Long, Smith, Mountain West, Doug and Troy Scheel and CAMS Realty in the breach of their fiduciary duties.

109.   Defendants Millrock and Colliers provided substantial assistance to Millcreek, Long, Smith, Mountain West, Doug and Troy Scheel and CAMS Realty by actively participating and promoting the wrongful conduct, including but not limited to, providing support, advice, and resources to facilitate the breach of fiduciary duty.

110.   Defendants Millrock and Colliers participated and substantially assisted in tortious conduct by distributing sales materials concerning the Property, referring Plaintiffs to the Property, recommending investment in the TIC Property, and providing assurances to Plaintiffs concerning their participation.

111.   As a direct and proximate result of Defendant Millrock and Colliers' aiding and abetting Millcreek, Long, Smith, Mountain West, Doug and Troy Scheel and CAMS Realty's breach of fiduciary duty, Plaintiffs have suffered damages proximately caused by Millrock and Colliers' conduct.

112.   Plaintiffs are entitled to hold Defendants Millrock and Colliers liable for the damages caused by their knowing and substantial assistance in Millcreek, Long, Smith, Mountain West, Doug and Troy Scheel and CAMS Realty's breach of fiduciary duty.

113.   Plaintiffs seek rescission of the investments, economic and noneconomic damages for all damages proximately caused by the Defendants' misconduct,

disgorgement of profits, fees and commissions, all applicable statutory remedies and penalties, accounting for attorneys' fees, costs, prejudgment interest, and other remedies available at law, by statute or equitably.

114.    Plaintiff Thart seeks trebled damages under Cal. *Civil Code* § 3345 because the Defendants knew or should have known that their conduct was directed to senior citizens and because Defendants' conduct caused elder Plaintiffs, senior citizens substantial loss of property set aside for retirement and for personal and family care and maintenance and because they Plaintiffs suffered substantial physical, emotional, and economic damage resulting from the Defendants' conduct.

115.    Defendants acted intentionally, with malice, fraud or oppression and in reckless disregard of Plaintiffs' rights, and to take advantage of Plaintiffs. Therefore, Plaintiffs are entitled to recover an award of punitive and exemplary damages, pursuant to Cal. *Civil Code* §3294, to punish Defendants for their unlawful conduct.

## <u>SIXTH CAUSE OF ACTION</u>

### (Conversion by Plaintiffs Against All Defendants and Does 1-10)

116.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

117.    Defendants, without authorization or legal right, wrongfully exercised control over Plaintiffs' funds by diverting and misusing them for their own benefit.

118.    Defendants received a portion of the proceeds of Plaintiffs' TIC investments with knowledge that such funds were identified to the particular Properties and with the Plaintiff TIC Owners of that property.

119.    Defendants converted Plaintiffs' funds for their own use and intentionally deprived Plaintiffs of their rightful ownership and possession of said funds.

120.    Defendants' actions were willful, intentional, and in conscious disregard of Plaintiffs' rights.

121.    Defendants knowing and intentionally diverted the Plaintiffs' funds to other purposes, including primarily payments to or for the benefit of himself.

122. Defendants' diversion of funds constitutes a conversion or fraudulent misappropriation of Plaintiffs' property, including but not limited to the funds themselves, Plaintiffs' equitable interest in the benefit of the funds, and Plaintiffs' collective interest in application of the funds consistent with the investment agreements.

123. As a direct and proximate result of Defendants' conversion of Plaintiffs' funds,

Plaintiffs have suffered damages.

124. Plaintiffs seek economic and noneconomic damages for all damages proximately caused by the Defendants' misconduct, disgorgement of profits, fees and commissions, all applicable statutory remedies and penalties, accounting for attorneys' fees, costs, prejudgment interest, and other remedies available at law, by statute or equitably.

125. Plaintiffs are entitled to the return of their converted funds or, alternatively, the fair market value of the converted funds as of the date of conversion. Plaintiffs request judgment against Defendants in an amount equal to the value of the converted funds, plus interest, costs, and any other relief deemed just and proper by this Court.

126. Plaintiffs are further entitled to damages for the loss of use, interest, and any other consequential damages resulting from Defendants' conversion.

127. Plaintiff Thart seeks trebled damages under Cal. *Civil Code* § 3345 because the Defendants knew or should have known that their conduct was directed to senior citizens and because Defendants' conduct caused elder Plaintiffs, senior citizens substantial loss of property set aside for retirement and for personal and family care and maintenance and because they Plaintiffs suffered substantial physical, emotional, and economic damage resulting from the Defendants' conduct.

128. Defendants acted intentionally, with malice, fraud or oppression and in reckless disregard of Plaintiffs' rights, and to take advantage of Plaintiffs. Therefore, Plaintiffs are entitled to recover an award of punitive and exemplary damages, pursuant to Cal. *Civil Code* §3294, to punish Defendants for their unlawful conduct.

## SEVENTH CAUSE OF ACTION

### (Constructive Fraud by Plaintiffs Against All Defendants and Does 1-10)

129.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

130.   Defendants, each of them, were fiduciaries of Plaintiffs and acted in the capacity of real estate agents and brokers, securities brokers, accommodators entrusted with Plaintiffs' retirement funds, and held themselves out to have superior knowledge of real estate and investment matters.

131.   Defendants, each of them, acted on behalf of Plaintiffs for the purposes of purchasing their interests in the Crocket Property.

132.   Defendants knew or should have known of the risks associated with an investment in the Crocket Property, the creditworthiness and lack of operating history of the tenants, funds provided to the tenants, actual cost of the property, cost of improvements to the property, the failure to conduct adequate due diligence on the tenants, limited ability to market or sell interests in the property, limited ability to lease the property to other tenants on the same or similar terms, including price per square foot, inflated price per square foot agreed to by tenants in comparison to market rates, conflicts of interests of Defendants and fees charged reducing the funds actually invested.

133.   Defendants mislead Plaintiffs by providing them information that was inaccurate and incomplete.

134.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

135.   Plaintiffs are entitled to recover damages for their losses caused by Defendants' fraudulent conduct.

136.   Plaintiffs seek economic damages, non-economic damages, costs of suit and other relief to be proven at the time of trial.

137.   Plaintiff Thart seeks trebled damages under Cal. *Civil Code* § 3345 because the Defendants knew or should have known that their conduct was directed to senior

citizens and because Defendants' conduct caused elder Plaintiffs, senior citizens substantial loss of property set aside for retirement and for personal and family care and maintenance and because they Plaintiffs suffered substantial physical, emotional, and economic damage resulting from the Defendants' conduct.

138.    Defendants acted intentionally, with malice, fraud or oppression and in reckless disregard of Plaintiffs' rights, and to take advantage of Plaintiffs. Therefore, Plaintiffs are entitled to recover an award of punitive and exemplary damages, pursuant to Cal. *Civil Code* §3294, to punish Defendants for their unlawful conduct.

## **EIGHTH CAUSE OF ACTION**

### **(Professional Negligence by Plaintiffs Against All Defendants and Does 1-10)**

139.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

140.    Defendants, and each of them, owed of duty of care to Plaintiffs to act as a reasonably careful professional in a manner consistent with members of their profession including the duty to fairly and completely disclose all relevant information effecting the price and value of the Properties, the duty to properly manage and distribute the investment proceeds, provide accurate and timely financial statements.

141.    Defendants breached their duties to Plaintiffs.

142.    Defendants' breaches include, but are not limited to, failing to fairly and accurately the risks associated with an investment in the Crocket Property, the creditworthiness and lack of operating history of the tenants, funds provided to the tenants, actual cost of the property, cost of improvements to the property, the failure to conduct adequate due diligence on the tenants, limited ability to market or sell interests in the property, limited ability to lease the property to other tenants on the same or similar terms, including price per square foot, inflated price per square foot agreed to by tenants in comparison to market rates, conflicts of interests of Defendants and fees charged reducing the funds actually invested.

143.    As a direct and proximate result of Defendants' breaches, Plaintiffs have

suffered damages.

144.    Plaintiffs are entitled to recover damages for their losses caused by Defendants' breaches. Plaintiffs seek economic and noneconomic damages for all damages proximately caused by the Defendants' misconduct, disgorgement of profits, fees and commissions, all applicable statutory remedies and penalties, accounting for costs, prejudgment interest, and other remedies available at law, by statute or equitably.

## NINTH CAUSE OF ACTION

### (Negligent Misrepresentation Against all Defendants and Does 1-10)

145.    Defendants had a duty to inspect and disclose fully and fairly all facts that materially affected or related to the condition of the Crocket Property, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

146.    Defendants made false representations to Plaintiffs as detailed above.

147.    Defendants may have honestly believed that the representations regarding the condition of the Crocket Property, the viability of the investment, and the legitimacy of the tenant and corporate guarantor were true when they made the representations.

148.    Defendants intended that Plaintiffs rely on these representations.

149.    Plaintiffs' reasonably relief on Defendants' representations.

150.    Plaintiffs' reliance on Defendants' representations was a substantial factor in causing their harm.

151.    Plaintiffs seek economic and noneconomic damages for all damages proximately caused by the Defendants' misconduct, disgorgement of profits, fees and commissions, all applicable statutory remedies and penalties, accounting for costs, prejudgment interest, and other remedies available at law, by statute or equitably.

## TENTH CAUSE OF ACTION

### (Violation of Unfair Competition Law Against All Defendants and Does 1-10)

152.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

153.    Defendants' conduct, as described herein above, violated Business &

Professions Code 17200 et seq and 17500 et seq.

154.  Defendants' material misrepresentations and omissions described herein constitute unlawful, unfair and false practices within the meaning of the Unfair Competition Law and Unfair Advertising Law. Defendants' conduct has directly and proximately caused harm to Plaintiffs, as well as to other similarly situated investors.

155.  Defendants' actions were unfair and unlawful because they engaged in deceptive practices, including the deliberate withholding of material information, failure to provide full and complete disclosures, and engaging in a patterned behavior of misconduct, as set forth above.

156.  Defendants' deceptive business practices include misrepresentations and omissions of material facts, which are likely to deceive a reasonable investor. Defendants' actions are not only in violation of common law principles, but also contravene the Unfair Competition Law and Unfair Advertising Law.

157.  Plaintiffs are entitled to injunctive relief and restitution for Defendants' violation of the Unfair Competition Law and Unfair Advertising Law.

## VII. **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment against the Defendants, joint and severally:

1.  Rescission of the transactions at issue;

2.  Economic and noneconomic damages according to proof;

3.  Trebled damages according to proof at trial per Civil Code 3345;

4.  Restitution relief, including the return of all fees, commissions, transaction costs, disgorgement, and the like, for all the services and products;

5.  Declaration and final order or injunction rescinding the sale of the Properties to the Plaintiffs;

6.  For pre-judgment interest;

7.  For punitive and exemplary damages according to proof; and

COMPLAINT

8.      For such other further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial in the above-entitled action.

Dated: December 18, 2024                **REIF LAW GROUP, P.C.**

_Brandon S. Reif_
_____
Brandon S. Reif
Rachel D. Dardashti

Attorneys for Plaintiffs

COMPLAINT