Brandon S. Reif (SBN 214706)
Marc S. Ehrlich (SBN 198112)
Rachel D. Dardashti (SBN 292126)
**REIF LAW GROUP, P.C.**
315 S. Beverly Drive, Suite 315
Beverly Hills, CA 90212
Telephone: (310) 494-6500
Email: docket@reiflawgroup.com
breif@reiflawgroup.com
mehrlich@reiflawgroup.com
rdardashti@reiflawgroup.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNE L. THART, an individual and trustee of THE ANNE L. THART LIVING TRUST DATED JULY 1, 1998; RUSSELL CHADWICK MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; AMY MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; JOSEPH A. PROCOPIO, an individual and trustee of THE JOSEPH A. PROCOPIO SR. FAMILY TRUST; GLENN T. PINDER, an individual and sole member of PINDER ENTERPRISES, LLP, | CASE NO.: 2:24-cv-10876-CV-E **SECOND AMENDED COMPLAINT** **DEMAND FOR JURY TRIAL** District Judge: Hon. Cynthia Valenzuela Magistrate Judge: Hon. Charles F. Eick Complaint Filed: 12/18/2024 |
| Plaintiffs, | |
| vs. | |
| COLLIERS INTERNATIONAL GROUP, INC., a Canadian corporation; COLLIERS INTERNATIONAL INTERMOUNTAIN, LLC, a Delaware limited liability company; MILLCREEK | |

1

COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; KEVIN LONG, an individual; BRENT SMITH, an individual; DOUGLAS SCHEEL, an individual; TROY SCHEEL, an individual; MOUNTAIN WEST COMMERCIAL, LLC, a Utah limited liability company; MEGAN DESTITO, an individual; CAMS REALTY, LLC, a Utah limited liability company; KGL ADVISORS, LLC, a Utah limited liability company; SOUTHERN CALIFORNIA EXCHANGE SERVICES, LLC, a California limited liability company; and DOES 1-10, inclusive,

Defendants.

SECOND AMENDED COMPLAINT

## I. <u>INTRODUCTION</u>

1.      This case is about a group of real estate professionals who sold five retail investors fractional "tenancy-in-common" ("TIC") interests in a single, distressed medical building in Crockett, Texas — and who each made their own specific, identifiable misrepresentations to close the sale. This is the operative Second Amended Complaint ("SAC"), filed pursuant to the Court's July 7, 2026 Order (Doc. #152) granting the Millrock and Mountain West Defendants' motions to dismiss the First Amended Complaint ("FAC") with leave to amend. This SAC differentiates, defendant by defendant, the specific misrepresentations, omissions, and conduct at issue, and adds the particularized scienter allegations the Court found lacking.

2.      Defendant Millrock Investment Fund 1, LLC purchased the Crockett Property directly from its tenant's affiliate and guarantor, Spectre Innovations, LLC, for $2,000,000, and then sold fractional TIC interests in that same property to Plaintiffs based on a stated valuation of $9,500,000 — a nearly 375% markup with no supporting business justification other than the commissions, fees, and profits it generated for Defendants.

3.      Defendant Millcreek Commercial Properties, LLC — an entity organized by Defendant Kevin Long— authored and disseminated the marketing materials, blog posts, and mass e-mails that formed the basis for Plaintiffs' investment decisions, each falsely assuring investors that Millcreek's properties were "safe, secure and stable," "recession resilient," and backed by rigorous due diligence.

4.      Defendant Colliers International Group, Inc. lent its name and brand to the transactions, and its subsidiary, Defendant Colliers International Intermountain, LLC, lent its broker-of-record status to the transactions in exchange for commissions, while neither entity was ever registered or licensed to sell securities.

5.      Defendants Douglas Scheel and Troy Scheel, acting as the McAllisters' own real estate agents and licensees of Defendant Mountain West Commercial, LLC, personally and repeatedly told the McAllisters — in an in-person meeting on January 6,

3

SECOND AMENDED COMPLAINT

2023, and in prior telephone calls — that the investment carried no risk, that the McAllisters could sell their interest at any time, that the Property would be professionally managed, and that Doug and Troy would receive no compensation for the sale. Each statement was false: Troy, at least, had already signed a written Professional Referral Agreement with Millcreek dated September 1, 2022 — more than four months before the January 6, 2023 meeting — obligating Millcreek to pay him a 3.0% referral fee on exactly this kind of transaction.

6.      Defendant Megan Destito, through her company SCES, made parallel misrepresentations to Thart in the course of acting as her 1031 exchange accommodator.

7.      Defendant CAMS Realty, LLC and its managing member, Mary Street, were installed after the sale as the Property's purported "property manager," collected escalating fees as the investment deteriorated, and concealed from Plaintiffs that CAMS Realty considered itself merely a "lease administrator" with no on-site presence — directly contradicting the pre-sale representations that the Property would be fully managed.

8.      In October 2023, Pulse stopped paying rent. Defendant Long, in a series of e-mails between November 2023 and April 2024, admitted that (i) Pulse had never operated a surgery center at the Property, (ii) Millrock had funneled $2,000,000 of the purchase price back to Pulse, mischaracterized as "FFE" (furniture, fixtures and equipment), to fund Pulse's start-up and equipment costs, and (iii) neither Long nor CAMS Realty's Mary Street had verified that a surgery center was ever operating at the Property. In June 2024, Pulse filed for bankruptcy, and Plaintiffs lost more than 75% of the value of their investments.

9.      The Court's July 7, 2026 Order dismissed the FAC without prejudice on two independent grounds: (1) the FAC's group pleading against "Defendants" collectively as to the Millrock Defendants' alleged misrepresentations failed to satisfy Rule 9(b) and the PSLRA's requirement that Plaintiffs identify the who, what, when, and where of each Defendant's alleged misconduct; and (2) Plaintiffs failed to plead scienter, independent of

falsity, as to the Mountain West Defendants. The Court expressly held that Plaintiffs had adequately alleged material misrepresentations by Doug Scheel and Troy Scheel. This SAC cures both deficiencies.

## II. JURISDICTION AND VENUE

10. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

11. Section 27 of the Exchange Act, 15 U.S.C. § 78aa, affords nationwide service of process and confers personal jurisdiction over any Defendant with minimum contacts with the United States. *See Sec. Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315–16 (9th Cir. 1985); *Warfield v. Alaniz*, 569 F.3d 1015, 1029 (9th Cir. 2009). Each Defendant is a resident of, or an entity organized and headquartered within, the United States, and each Defendant transacted business, and committed the acts alleged herein, within the United States.

12. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same case or controversy as Plaintiffs' federal securities claims.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Plaintiff Thart is, and at all relevant times was, a resident of this District, and Defendants directed conduct, communications, misrepresentations, and omissions at her within this District to induce her to invest her retirement funds in the Property.

## III.   PARTIES

### A. Plaintiffs

14. Anne Thart is sixty-nine years old and lives in Lancaster, California. In October 2022, Thart sold two single-family investment properties for $699,628.45 and deposited the proceeds with Defendant SCES, a qualified intermediary run by Defendant

SECOND AMENDED COMPLAINT

Destito. Before investing, Thart personally visited and reviewed Millcreek's website, including its blog posts and marketing pages describing the Millcreek investment platform, and relied on the representations she found there in deciding to invest. In November 2022, with Destito's assistance, Thart invested the full proceeds to purchase a 7.3605% interest in the Property.

15.     Russell Chadwick McAllister and Amy McAllister are a married couple of 36 years living in Washington, Utah, ages 54 and 52 respectively. They own a cabinet and closet-solutions business. In 2023, Defendants Doug and Troy Scheel — the McAllisters' own real estate agents — induced them to sell a commercial warehouse property and reinvest the proceeds in the Property. Before investing, the McAllisters personally visited and reviewed Millcreek's website, including its blog posts and marketing pages, and relied on the representations they found there in deciding to invest. On January 25, 2023, the McAllisters invested $2,000,000 for a 19.7121% interest in the Property.

16.     Joseph Procopio is married to Julie Procopio and lives in Crownsville, Maryland; Joseph is a loan officer and Julie is a realtor. In 2023, the Procopios sold real property and placed the proceeds with qualified intermediary Eastern Starker 1031 Exchange LLP. Their contact there, Connie Greenawalt, referred them to Scott Rutherford of Elevated 1031 Exchange, who recommended Millcreek and the Property. Before investing, Procopio personally visited and reviewed Millcreek's website, including its blog posts and marketing pages, and relied on the representations he found there in deciding to invest. In May 2023, Procopio invested $374,989.98 in the Property.

17.     Glenn Pinder is ninety years old, lives in Murray, Utah, and is a devout member of the Church of Jesus Christ of Latter-day Saints. He retired in 2004 after selling his sports equipment business, and sold the commercial property where the business had operated in 2022.  Kevoin Long recommended that Pinder reinvest the proceeds in the Property. Before investing, Pinder personally visited and reviewed Millcreek's website, including its blog posts and marketing pages, and relied on the

SECOND AMENDED COMPLAINT

representations he found there in deciding to invest. Pinder executed a Purchase and Sale Agreement for the Property on June 7, 2022, not knowing that at the time neither Millcreek nor Millrock owned any interest in the Property. After several addenda, Pinder's purchase of a 3.0771% interest ($260,000) closed on or about October 11, 2022.

18.     Each Plaintiff personally reviewed Millcreek's website — including the blog posts and webpages described in Section IV.D below and the Offering Memorandum — before investing, and observed that Colliers' name and trademark were prominently displayed on the marketing materials for the Property, all of which gave each of them comfort that the transaction was legitimate and safe.

**B. Defendants**

19.     Colliers International Group, Inc. ("CIGI") is a Canadian corporation and the ultimate parent of a diversified professional services and investment management company that, according to its own website, operates in 68 countries with approximately 22,000 employees. CIGI is the corporate office for the Colliers organization and establishes governing policies applicable to its subsidiaries and affiliated brokerages, including marketing guidelines that Colliers-branded subsidiaries, such as Colliers International Intermountain, LLC, were required to follow in preparing marketing materials such as the Offering Memorandum. CIGI's name and trademark, and the overall Colliers brand, were prominently displayed on the marketing materials for the Property, giving Plaintiffs comfort that the transaction was legitimate and safe (Section III.A above). CIGI was never registered or licensed with the SEC, FINRA, or any other securities regulator.

20.     Colliers International Intermountain, LLC ("Intermountain"), doing business as "Colliers International – Utah" and "Colliers Utah," is, on information and belief, a subsidiary of CIGI. Intermountain, not CIGI directly, employed Long as an Executive Vice President, held Long's, Smith's, and Millcreek's sales agents' real estate licenses, was the actual party to the Memorandum of Understanding governing the commission structure described in Section IV.A below, acted as the broker of record for the sale of

SECOND AMENDED COMPLAINT

TIC interests in the Property to Plaintiffs, prepared and disseminated the marketing materials — including the Offering Memorandum — and received commissions in exchange for material support of the transactions, all subject to the governing policies and marketing guidelines CIGI imposed on it as CIGI's subsidiary. Intermountain controlled Millcreek, also known as "the Kevin Long Team at Colliers," and had the power to direct Millcreek's policies and decision-making, principally through Long. Intermountain was never registered or licensed with the SEC, FINRA, or any other securities regulator.

21.    Millcreek Commercial Properties, LLC ("Millcreek") is a Utah limited liability company based in Pleasant Grove, Utah. Millcreek was never registered or licensed to sell securities. Millcreek was organized by Long and incorporated the same principals as Millrock, and acted as Millrock's marketing agent for the tenant-in-common interests Millrock syndicated, developed, and sponsored — including the Property.

22.    Millrock Investment Fund 1, LLC ("Millrock") is based in Pleasant Grove, Utah, and was never registered or licensed to sell securities. Millrock was the sponsor, syndicator, and developer of the Property's TIC interests and was listed as the owner of the interests sold to each Plaintiff. Millrock controlled Millcreek and had the power to direct Millcreek's policies and decision-making.

23.    Kevin G. Long ("Long") is the principal real estate broker, sales agent, manager, CEO, and founder of Millcreek. At all relevant times, Long was also a sales agent associated with Intermountain, holding the title Executive Vice President of Colliers International Intermountain, LLC (d/b/a Colliers International – Utah). Long controls Millcreek, Millrock, and KGL Advisors, directs their actions, and prepares and approves their communications, websites, and training materials.

24.    Brent Smith ("Smith") is a resident of Utah who acted as a sales agent at both Millcreek and Millrock in connection with the sale of TIC interests to Plaintiffs. Smith was an owner of both Millcreek and Millrock; Smith's family, including a family trust, is the majority owner of Millrock and its single largest investor. Smith and his family received profits from both Millcreek and Millrock. Smith also held the title

SECOND AMENDED COMPLAINT

"Investor Relations Partner" for Millcreek.

25.    Douglas Scheel ("Doug") is a resident of Utah who acted as a real estate broker and sales agent at Mountain West in connection with the sale of TIC interests to Plaintiffs, and personally served as the McAllisters' own real estate agent.

26.    Troy Scheel ("Troy") is a resident of Utah who acted as a real estate broker and sales agent at Mountain West in connection with the sale of TIC interests to Plaintiffs, and personally served as the McAllisters' own real estate agent.

27.    Mountain West Commercial, LLC ("Mountain West") is a real estate brokerage licensed in the State of Utah. Doug and Troy held their real estate licenses with, and acted as agents of, Mountain West. Mountain West processed and received commissions in connection with the sale of the Property to the McAllisters.

28.    Megan Destito ("Destito") is, on information and belief, a resident of California and the principal and owner of SCES. Destito acted as Thart's sales agent and 1031 exchange accommodator in connection with Thart's investment in the Property.

29.    Southern California Exchange Services, LLC ("SCES") is a qualified intermediary and exchange accommodator with its principal place of business in Camarillo, California. SCES acted as Thart's sales agent and accommodator in connection with her investment in the Property.

30.    CAMS Realty, LLC ("CAMS Realty") is a Utah limited liability company with its principal place of business in Pleasant Grove, Utah, and is a division of Mountain West. Mary Street is CAMS Realty's managing member, and Joseph Cooley is the principal broker for CAMS Realty and Mountain West. CAMS Realty and Street were paid fees for "managing" the TIC interests in the Property.

31.    KGL Advisors, LLC ("KGL") was organized by Long, who is its sole owner and principal broker. As of December 3, 2024, Millcreek's website stated that Millcreek had "ceased operations" and that "[o]ur friends at KGL Advisors have agreed to assist Millcreek Commercial clients," and that the Millcreek agents who moved to KGL could continue to assist with TIC investments from that brokerage. KGL was not created or

SECOND AMENDED COMPLAINT

registered with the Utah Secretary of State until November 11, 2024, yet its website reproduces blog content originally posted on Millcreek's website years earlier, including a post dated April 30, 2019. Plaintiffs allege, on information and belief, that KGL is a mere continuation and alter ego of Millcreek, organized to shield Millcreek's assets from pending investor lawsuits — including this one and Devlin v. Colliers, No. 1:24-cv-00457 (D. Idaho) — while continuing substantially the same business with the same personnel.

32.    On December 7, 2024, Long informed investors by e-mail that Millcreek "is currently insolvent" and would be "formally dissolved as of December 31, 2024," representing that Millcreek had "limited creditors." That statement was false: Millcreek had by then been named and served in numerous investor lawsuits nationwide, including this one. Following KGL's formation, Long filed a notice of dissolution for Millcreek representing that it had no members — even though Millcreek originally had four — and directed Millcreek's counsel to withdraw from pending litigation.

33.    Defendants, and each of them, acted as alter egos, agents, employees, partners, joint venturers, and co-conspirators of one another in furtherance of the scheme alleged herein, such that it would be an injustice to Plaintiffs to permit Defendants to escape liability behind the corporate form, particularly where Long has caused the entity that received the commissions and fees at issue (Millcreek) to be declared insolvent and dissolved while continuing the same business through KGL.

## IV.    FACTUAL BACKGROUND

### A. Formation of the Colliers-Millcreek-Millrock Enterprise

34.    Long, together with Lew Cramer and Brandon Frugal, in or about 1998, founded CBC Advisors, LLC, a Utah real estate brokerage, which was later acquired by CIGI and its affiliates and renamed Colliers International Intermountain, LLC. As part of that acquisition, Intermountain retained Long's services as an associate broker and salesperson.

35.    On or about April 27, 2017, Long organized and filed Certificates of

10

SECOND AMENDED COMPLAINT

Organization with the Utah Secretary of State for Millrock Investment Fund 1, LLC and Millrock Investment Fund 1 Management, LLC.

36.    On or about September 26, 2019, Long organized Millcreek. Millcreek's Certificate of Organization names four members: GTR Holdings, LLC, Smart Cove, LLC, Long Holdings LLC, and KGL Real Estate Development PLLC. Utah Secretary of State filings show these entities were controlled by Brent Smith, Spencer Taylor, Jerald Adam Long, and Kevin Long. Smith and Taylor are brothers-in-law; Jerald Adam Long is Kevin Long's son.

37.    In 2019–2020, Millrock developed and syndicated its first TIC investment, a hotel, investing millions of dollars in its development. To sell interests in the hotel, Millrock entered into a perpetual listing agreement with Intermountain and contracted with Millcreek to market the investment to the public. The hotel failed, generating substantial losses for Millrock and for the investors who had purchased interests in it as a purportedly safe and reliable investment. In 2020, Millrock transferred those investors' interests into another TIC investment, Pine Bluff, a surgery center in Arkansas — locking in millions of dollars in losses that Millrock sought to offset by continuing to sell additional TIC investments, including the interests later sold to Plaintiffs.

38.    Millrock, Millcreek, and Intermountain devised a specific division of labor memorialized in a Memorandum of Understanding ("MOU"), attached hereto as Exhibit A: Millrock would develop, syndicate, and sponsor each investment, select and purchase the property, and be listed as the owner when interests were sold to investors; Millcreek would market the TIC investments, maintain a website and blog, hire and train sales agents, and employ an "investor relations partner" to interact with investors post-sale; and Intermountain would act as broker of record for both the acquisition of each property and the sale of interests to investors, including Plaintiffs, subject to CIGI's governing policies and marketing guidelines. All of Millcreek's sales agents, including Long, Spencer Taylor, Jerald Adam Long and Trevor Webber held their real estate licenses through Intermountain. In fact, Jerald Adam Long was the Chief Operating Officer of

Colliers Utah (i.e., Intermountain).

39. Smith and Long jointly controlled and operated both Millrock and Millcreek. Long simultaneously acted as the principal Intermountain agent responsible for the Intermountain-Millcreek-Millrock relationship and the sale of TIC interests to investors.

40. The MOU is dated September 3, 2020 — more than two years before Millrock's October 2022 acquisition of the Property — and is a memorandum from Long to J. Adam Long and Lew Cramer, copied to Smith, setting forth the "Basic Concepts" of the Millrock-Millcreek-Colliers relationship. The MOU states that the Smith family and the Long family created Millrock to acquire debt-free, single-tenant, net-lease properties and to "market them for resale by syndicating them as real estate investments to middle class investors for their IRAs and 401Ks," to be "sold as Tenant In Common real estate with no debt." The MOU further states that Millrock "retains The Kevin Long Team (via Colliers) as their exclusive agent for all acquisitions," guaranteeing the Kevin Long Team a minimum 2% commission on every acquisition, processed through Colliers; that the listing agreement pays Colliers, in favor of the Kevin Long Team, a 4% commission on all sales, of which up to 3% may be paid to a cooperating or referring broker; and that Millcreek is compensated by the fund under a separate agreement tied to the fund's sales volume. The MOU also states that Colliers is identified as the broker on all brokerage marketing materials "in accordance with state law" and provides standard support for all acquisition activities, including development of due diligence packages. Long testified under oath in a deposition that Millcreek was synonymous with "the Kevin Long Team at Colliers."

**B. The Crockett Property and the Roles Each Defendant Played in the Scheme**

41. The Property is located at 200 Renaissance Way, Crockett, TX 75835, and was marketed as a freestanding ambulatory surgery center listed at $9,505,147.83, spanning 11,074 square feet at a 5.75% cap rate. The marketing materials identified Pulse Physician Organization, PLLC as the tenant and Achy Legs Clinics, LLC and Spectre

SECOND AMENDED COMPLAINT

Innovations, LLC as lease guarantors.

42. Millrock purchased the Property directly from Spectre Innovations, LLC on October 11, 2022, for approximately $2,000,000, and simultaneously executed a long-term lease with Pulse as tenant. Millrock then sold fractional TIC interests in that same Property to Plaintiffs based on a stated valuation of $9,500,000 — as later admitted by Long in his April 30, 2024 e-mail (detailed in Section IV.O below). There was no business justification for this markup beyond funding Defendants' commissions, marketing fees, and profit.

43. In or about 2022, Intermountain and Millcreek, with CIGI's and Colliers' name and brand prominently displayed on the marketing materials, began marketing and selling TIC interests in the Property to Plaintiffs. In its capacities as sales agent, sponsor, partner, and broker, Intermountain agreed to list, market, and sell the Property to retail investors; to create and distribute marketing materials and due diligence packages, including the Offering Memorandum, subject to CIGI's governing marketing guidelines; to provide GIS, graphic design, and general support; to pay pre-negotiated draws to new selling agents; to provide office space and support for the sales force; and to support an agent-mentoring program created by Long — all to increase sales of the Property and other Millcreek-marketed properties. In exchange, Intermountain received commissions, a pipeline of ongoing business and  sales, new agents with substantial training at minimal cost and goodwill.

### C. The Tenancy-in-Common Interests Defendants Sold to Plaintiffs Were Securities

44. The tenancy-in-common interests that Defendants offered and sold to Plaintiffs were "securities" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), because they were investment contracts. Whether an instrument is a security turns on the economic reality of the transaction — on the terms of the offer, the plan of distribution, and the economic inducements held out to the investor in the promotional materials —

and not on the label the promoter attaches to it or the form of the paper the investor receives. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946); *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009); *Hocking v. Dubois*, 885 F.2d 1449, 1455–57 (9th Cir. 1989) (en banc) (fractional real estate interest offered together with a rental and management arrangement may be an investment contract).

45.    Although each Plaintiff ultimately received a deed to an undivided fractional interest in the Property, what Defendants actually offered and sold was not real estate that a buyer could occupy, lease, improve, or manage. It was a pre-packaged passive income investment: a fractional interest in a single building that was already encumbered, before any Plaintiff invested, by a fifteen-year triple-net master lease Millrock had negotiated and executed with a tenant Millrock alone selected; coupled with a corporate guarantee Millrock alone negotiated; coupled with a mandatory property management arrangement each Plaintiff was required to execute at closing; and marketed on the express promise of a monthly income stream requiring no effort of any kind from the investor. Every economically significant term of the investment was fixed by Defendants before it was offered, and every economically significant decision after the sale was reserved to Defendants.

46.    **Investment of money.** Each Plaintiff invested money in the Property. Thart invested $699,628.45 — the entire proceeds of the sale of two single-family investment properties — for a 7.3605% interest (¶ 14). The McAllisters invested $2,000,000, the entire proceeds of the sale of their commercial warehouse property, for a 19.7121% interest (¶ 15). Procopio invested $374,989.98 (¶ 16). Pinder invested $260,000 for a 3.0771% interest (¶ 17). In each case the funds were retirement or exchange proceeds committed through a Section 1031 exchange, and in each case the Plaintiff parted with the funds in exchange for nothing but the promised income stream.

47.    **Common enterprise.** Plaintiffs' investments were pooled in a single, indivisible enterprise. Each Plaintiff purchased an undivided fractional interest in one building (¶ 41), leased to one tenant under one lease that Millrock executed on October

14

SECOND AMENDED COMPLAINT

11, 2022 (¶ 42), producing one stream of rental income out of which all co-owners were to be paid according to their fractional percentages. No Plaintiff owned any identifiable portion of the Property, and no Plaintiff's return could rise or fall independently of any other co-owner's: the return on every interest was a function of the same tenant's performance under the same lease. Millrock sold interests in the Property to numerous co-owners aggregating 100% of the fee, over a period beginning in or about June 2022 and continuing until the last interest was sold. The interdependence was borne out in practice. When Pulse stopped paying rent in October 2023, every co-owner's income stopped at once (¶ 119); when the Property could not be re-leased, every co-owner became liable pro rata for property taxes, insurance, maintenance, and lease-administration fees (¶¶ 125–126); and when the investors sought to sell, they were required to market the Property as a whole rather than as separate parcels (¶ 125). Plaintiffs' fortunes were tied to one another and to the success of the enterprise Defendants assembled.

48. **Expectation of profits.** Defendants offered, and Plaintiffs expected, profits in the form of monthly income and the preservation of invested capital. The Offering Memorandum marketed the Property at a 5.75% capitalization rate (¶ 41). Millcreek's website promised investors would "not lose money, rather benefit from a steady stream of passive income" (¶¶ 58, 63). Millcreek's e-mails promised "a consistent stream of passive income" and "the perks of monthly rent" (¶ 60) and "true passive income" (¶ 61). Destito told Thart she would "buy an undivided interest in passive income" (¶ 96). Webber told Thart that "the cap rates listed are net which is equal to your monthly cashflow" (¶ 97(a)). Rutherford told Procopio the properties "provide cash flow immediately upon closing, so you are able to put your funds to work right away" (¶ 105). No Defendant offered the Property as a building to be used; every Defendant offered it as a yield.

49. Profits to be derived from the efforts of others: the pre-sale efforts. Every managerial decision that determined whether this investment would succeed or fail was

SECOND AMENDED COMPLAINT

made by Defendants before any Plaintiff was permitted to invest. Millrock selected the Property and purchased it (¶ 42). Millrock selected Pulse as the tenant and negotiated the lease term, the rent, and the escalations (¶ 42). Millrock negotiated the corporate guarantee from Pulse, Achy Legs Clinics, LLC, and Spectre Innovations, LLC (¶ 41). Millrock set the $9,500,000 offering valuation (¶¶ 42, 76). Intermountain assembled the due diligence package underlying the acquisition and the Offering Memorandum (¶ 115(c)). Millcreek prepared and disseminated the marketing (¶¶ 56–63). No Plaintiff had any role in, notice of, or ability to negotiate any of these terms. Plaintiffs were offered a completed transaction on a take-it-or-leave-it basis, and were pressed to accept it inside a Section 1031 identification deadline (¶¶ 81, 85, 106).

50.    **Profits to be derived from the efforts of others: the post-sale efforts.** Plaintiffs were equally powerless after closing. The Offering Memorandum represented that "Landlord Responsibilities" were "None" and that insurance, taxes, CAM, and utilities were the "Responsibility of Tenant" (¶ 71). Each Plaintiff's Purchase and Sale Agreement required a Property Management Agreement to be executed at closing (¶ 71), and CAMS Realty and Mary Street were installed in that role for the Property and for all Millcreek TIC properties (¶ 111). Plaintiffs had no authority to collect rent, enforce the lease, negotiate with the tenant, re-lease the space, or engage a broker. Under the Tenancy-in-Common Agreement and the Property Management Agreement executed at closing, exclusive authority over leasing, rent collection, lease enforcement, and day-to-day management of the Property was vested in the manager, and material decisions required the unanimous consent of all co-owners.

51.    **The marketing expressly promised that Plaintiffs would do nothing.** The passivity of the investment was not incidental to the offering; it was the offering. Defendants told Plaintiffs the properties were "fully-managed" so investors could "enjoy the perks of monthly rent without the burden of daily operations" (¶ 60) and "the benefits of passive real estate ownership without the stress of day-to-day operations" (¶ 61); that the investment was "nearly 100% hands off" (¶ 97(a)); that "you no longer have to take

SECOND AMENDED COMPLAINT

care of the tenant, trash or toilets" (¶ 97(b)); that there would be "little to no landlord responsibilities" (¶ 104(b)); that the investment was "hands-off" (¶ 96); and, at the point of sale, that the Property "would be professionally managed, such that the McAllisters would not need to personally deal with it" (¶ 84) and such that Thart "would not have to personally deal with it" (¶ 95). The MOU governing the enterprise confirms that this was the design: Millrock was formed to acquire net-lease properties and "market them for resale by syndicating them as real estate investments to middle class investors for their IRAs and 401Ks" (¶ 40).

52. **Plaintiffs' powerlessness was demonstrated in practice. P**laintiffs' complete dependence on Defendants was not theoretical. When Plaintiffs sought to visit the Property to confirm its condition, Street refused and would not provide keys to their own investment (¶ 111). When Thart engaged brokers to evaluate the Property for re-leasing after the default, each said an in-person inspection was required, and Street withheld the keys for approximately six months (¶ 121). When Thart sought to sell her interest, she was required to notify her co-owners so they could exercise a right of first refusal, and she then had to ask Millcreek to list the interest; Long initially agreed and then retracted, saying a listing would "open the floodgates" (¶ 124). An owner who cannot enter, inspect, lease, or sell the asset without the promoter's permission is not managing anything.

53. **Plaintiffs had neither the position nor the expertise to manage the Property.** Plaintiffs reside in Lancaster, California; Washington, Utah; Crownsville, Maryland; and Murray, Utah (¶¶ 14–17). The Property is a specialized ambulatory surgery center in Crockett, Texas, a rural East Texas community (¶¶ 41, 73(d)). Plaintiffs are a retired teacher, the owners of a cabinet and closet-solutions business, a loan officer, and a ninety-year-old retiree (¶¶ 14–17). None had any experience operating, leasing, or managing single-tenant medical real estate, and Defendants knew it — indeed, Defendants marketed to Plaintiffs precisely on the premise that no such experience would be required.

SECOND AMENDED COMPLAINT

54.    The efforts of Millrock, Millcreek, Intermountain, Long, Smith, and CAMS Realty were therefore the undeniably significant efforts affecting the failure or success of the enterprise, and Plaintiffs' expected returns depended entirely on them. *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973); *SEC v. Rubera*, 350 F.3d 1084, 1090–92 (9th Cir. 2003) (sale of equipment coupled with a management agreement relieving the purchaser of operational responsibility is an investment contract). Consistent with that economic reality, the securities industry has long understood tenancy-in-common interests marketed in this manner to be securities. See NASD Notice to Members 05-18 (2005); NASD Notice to Members 03-71 (2003). None of CIGI, Intermountain, Millcreek, or Millrock was ever registered or licensed with the SEC, FINRA, or any other securities regulator (¶¶ 19–22).

55.    Accordingly, the tenancy-in-common interests Defendants offered and sold to Plaintiffs were investment contracts and therefore securities, and the offer and sale of those interests was subject to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

### D. Millcreek's Website, Blog, and Marketing Misrepresentations

56.    Millcreek maintained a public website, millcreekcommercial.com, together with a blog, podcasts, and webinars, as part of its role — assigned to it under the MOU described in Section IV.A above — to market Millrock's TIC investments directly to retail investors. Each Plaintiff personally visited and reviewed Millcreek's website, including the specific blog posts and webpages described below, before deciding to invest in the Property, and relied on the representations contained there in deciding to invest.

57.    Millcreek's website included a page titled "1031 Exchange," which stated: "Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer." This statement was false: as detailed elsewhere in this SAC, Millrock and Millcreek conducted little to no due diligence on Pulse before offering the Property to Plaintiffs (see Section IV.O, below), and at least twelve tenants across other Millcreek-

SECOND AMENDED COMPLAINT

marketed properties have since defaulted and filed for bankruptcy (see Section IV.K below).

58.     Millcreek's website separately claimed that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors," and that "[i]nvestors with Millcreek Commercial properties can rest assured that they will not lose money, rather [']benefit from a steady stream of passive income.[']" Defendants did not disclose on the website, or otherwise, that the Property's purported guarantors, Achy Legs Clinics, LLC and Spectre Innovations, LLC, were not creditworthy, or that the Property's lease values were inflated based on the $2,000,000 in undisclosed "equipment fees" described in Section IV.O below, which Plaintiffs unknowingly financed through their investment without their informed consent.

59.     Millcreek, through Long, Smith, and non-party Andrew Bell, e-mailed prospective investors, including Plaintiffs, about the Pulse Healthcare Systems portfolio in 2022 and 2023, stating that the properties were "perfect for whole building buyers, buyers in a 1031 exchange, and investors looking for a safe, secure and stable investment," and that "[m]edical office buildings usually have lower vacancy rates than other types of commercial properties," that "[m]edical property generally produce[s] a steady cash flow for investors," and that "[h]ealthcare is a 'recession resilient' product" (the "Marketing Misrepresentations").

60.     On October 19, 2023, Millcreek, Intermountain, and Long sent an e-mail to the McAllisters stating: "Our expertise is providing shared ownership opportunities in top-tier commercial real estate properties that guarantee a consistent stream of passive income. Our properties aren't just recession-resilient—they are also fully-managed. This means you can enjoy the perks of monthly rent without the burden of daily operations!" (emphasis in original).

61.     On June 19, 2023, Millcreek, Intermountain, and Long sent a further e-mail to the McAllisters stating: "We specialize in offering co-ownership opportunities for premium real estate that deliver true passive income. Our meticulously selected

19

SECOND AMENDED COMPLAINT

properties are not only recession-resilient but also come with the assurance of full management—this means you can enjoy the benefits of passive real estate ownership without the stress of day-to-day operations."

62. On March 18, 2020, Millcreek posted a blog authored, reviewed, or approved by Long and Smith entitled "7 Reasons to Consider Millcreek Commercial," representing that "Millcreek Commercial is not a brokerage. We own the properties that we syndicate. Our team of experts review hundreds of opportunities every month. Only the best make it into our portfolio," and that "Millcreek Commercial typically stays in our deals for the long term… our business model is for one of our partners or a family member to stay in a deal for the long term." These same representations — that Millcreek owned the Property for the long term, had completed extensive due diligence, and that Colliers' involvement guaranteed a good investment — were repeated to Plaintiffs by telephone, and Plaintiffs relied on them in deciding to invest. In fact, Millrock, not Millcreek, owned the Property, and neither Millrock, Millcreek, nor any family member of either remained an owner for the long term; on information and belief, Millcreek, Millrock, Intermountain, and Long conducted little to no due diligence on tenant Pulse.

63. On October 27, 2021, Millcreek posted a blog, authored, reviewed, or approved by Long and Smith, entitled "Investing Isn't Scary | 3 Fear-free Solutions for Commercial Real Estate Investors," representing that "[i]nvestors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income," and that Millcreek "avoids a 'bad investment' … through purchasing properties with 'recession resilience.'" Plaintiffs allege, on information and belief, that Long and Smith prepared, revised, and/or approved each of Millcreek's blog posts and mass marketing e-mails to prospective investors, including those directed at Plaintiffs.

**E. The Offering Memorandum Misrepresentations Approved by Intermountain, Millcreek, Millrock, Long and Smith**

64. Intermountain, Millcreek, Millrock, Long, and Smith each reviewed and

SECOND AMENDED COMPLAINT

approved the contents of the Offering Memorandum for the Property before it was disseminated to Plaintiffs. Each of the representations in the Offering Memorandum described in this Section IV.E (collectively, the "Offering Memorandum Misrepresentations") was false or materially misleading when made, was material to a reasonable investor evaluating the Property, and induced Plaintiffs to purchase interests in the Property that they would not have purchased had the true facts been disclosed, as set forth below.

65.    The Offering Memorandum represented that "Pulse Healthcare System is made up of nine clinic locations across the state of Texas. The twelve healthcare providers at Pulse put one-on-one relationship with their patients at the core of what they do… Pulse prioritizes state-of-the-art resources" (the "Pulse Network Representation"). This representation was false when made: as Millrock, Long, and Smith later admitted (Section IV.O below), Pulse was in fact an unproven start-up that Millrock itself was required to fund with $2,000,000 to purchase machinery and equipment, and Pulse never opened or operated a surgery center at the Property at all. An entity that requires its own landlord to fund its equipment and start-up costs, and that never opens the facility it represented it would operate, is not the established, multi-location healthcare network the Offering Memorandum described. This representation was material because a tenant's operating history and network of existing, revenue-generating locations are central facts a reasonable TIC investor relies upon to assess the reliability of the rental income stream underlying a net-lease investment. Had Plaintiffs known Pulse was an unproven start-up rather than an established, multi-location healthcare provider, they would not have purchased interests in the Property.

66.    The Offering Memorandum represented that "Pulse Healthcare includes a well-performing vascular surgery portfolio" (the "Performance Representation"). This representation was false when made: because no surgery center ever operated at the Property, there was no vascular surgery practice — "well-performing" or otherwise — generating revenue to support the lease at all. This representation was material because a

tenant's business performance is the direct source of the rental income on which a NNN-lease TIC investment depends. Had Plaintiffs known that no vascular surgery practice was in fact operating at the Property, they would not have purchased interests in the Property.

67.    The Offering Memorandum represented that there were "4 additional locations [i]deally situated to meet the demand for vascular surgery" (the "Expansion Representation"). This representation was false or, at minimum, materially misleading when made: Pulse's inability to operate even the surgery center at the Property itself is inconsistent with the existence of an established, expanding practice with genuine unmet market demand for additional locations. This representation was material because network breadth and demonstrated demand for a tenant's services are proxies for revenue durability that a reasonable investor uses to assess the staying power of the tenant. Had Plaintiffs known that Pulse lacked significant operating history to support such expansion claims, they would not have purchased interests in the Property.

68.    The Offering Memorandum represented a "15-Year Sale Leaseback on Triple Net (NNN) Leases" (the "Sale-Leaseback Representation"). This representation was materially misleading: the term "sale leaseback" implies that an established business sold its own real estate and used the proceeds to lease it back, but here Millrock structured a purchase in which $2,000,000 of the purchase price — funded by Plaintiffs' investment — was routed back to Pulse to pay for Pulse's own equipment and start-up costs. Plaintiffs' capital, not Pulse's, financed Pulse's tenancy. This representation was material because a reasonable investor evaluating a "sale leaseback" credit assumes the tenant, not the investors whose money is being solicited, financed its own build-out and operations; who bears that financing risk goes to the heart of the investment's credit quality. Had Plaintiffs known that their own invested funds were being used to finance Pulse's start-up costs rather than an arm's-length sale-leaseback of an established operator, they would not have purchased interests in the Property.

69.    The Offering Memorandum represented a "Full Corporate Guarantee from

22

SECOND AMENDED COMPLAINT

Pulse Healthcare" (the "Guarantee Representation"). This representation was false or materially misleading when made: as Plaintiffs discovered only after Pulse's default (Section IV.O below), the assets of Pulse, Achy Legs Clinics, LLC, and Spectre Innovations, LLC — the very entities whose "full corporate guarantee" was represented to secure the lease — had already been encumbered by a UCC lien filed by another creditor in July 2022, before Plaintiffs' purchases. A guarantee backed by assets already pledged to a competing secured creditor is not a "full" guarantee in any meaningful sense, because those assets may be unavailable to satisfy the lease guarantee in the event of default — precisely the event that occurred here. This representation and the accompanying omission of the UCC lien were material because the strength and priority of a lease guarantee is a fundamental component of the credit analysis any reasonable investor performs before purchasing an income-producing NNN lease investment; investors specifically price and rely on "guaranteed" income streams because the guarantee is meant to backstop the risk of tenant default. Had Plaintiffs known that the guarantors' assets were already encumbered by a UCC lien senior to or competing with the lease guarantee, they would have understood the "Full Corporate Guarantee" language to be illusory or substantially impaired, and would not have purchased interests in the Property.

70.    The Offering Memorandum represented that the Property was a "Pandemic, Recession and Internet Resistant Tenant with 8 clinics throughout the Greater Houston area" (the "Recession-Resilience Representation"). On its face, and particularly when read together with the other representations in the Offering Memorandum, this representation told investors that the tenant's business model and the resulting income stream would withstand economic downturns and other market disruptions, implying little to no risk of interruption. Defendants reinforced this same message across every other channel of the marketing campaign: Millcreek's website and blog posts described the portfolio as "recession resilient" and promised investors would "not lose money" (Section IV.D above); Millcreek's mass e-mails to prospective investors, including

23

SECOND AMENDED COMPLAINT

Plaintiffs, stated that the properties suited "investors looking for a safe, secure and stable investment" and that "healthcare is a 'recession resilient' product" (Section IV.D above); and Doug and Troy told Chad McAllister  directly, at the January 6, 2023 meeting, that the investment carried "no risk" (Section IV.F below). Taken together, these repeated, mutually reinforcing statements across the Offering Memorandum, the website, blog posts, e-mails, and in-person sales pitches created a single, cumulative impression that the investment carried minimal risk of loss regardless of economic conditions. The Recession-Resilience Representation was false and misleading because Pulse was an unproven start-up dependent on $2,000,000 of investor-funded equipment financing, had no operating history through any economic cycle, and in fact stopped paying rent within approximately one year of Plaintiffs' purchases. This representation was material because risk of loss and income stability were the specific investment objectives Plaintiffs sought through the transaction, consistent with their goal of preserving retirement principal through a 1031 exchange. Had Plaintiffs known that the Property's tenant had no economic track record and was itself dependent on investor capital simply to open its doors, they would not have purchased interests in the Property.

71.    The Offering Memorandum represented that "Landlord Responsibilities" were "None" and that "Insurance / Taxes/CAM/Utilities" were the "Responsibility of Tenant" (collectively, the "Management Representations"). The Management Representations were reinforced by the point-of-sale statements described in Sections IV.F and IV.G below that the Property would be "professionally managed" such that Plaintiffs "would not have to personally deal with" the Property, and by each Plaintiff's Purchase and Sale Agreement, which provided for a Property Management Agreement to be executed at closing. The Management Representations were false when made and became demonstrably false in practice: as Long himself admitted in his November 15, 2023 e-mail, CAMS Realty's Mary Street served only as a "lease administrator," not a property manager, whose job was limited to enforcing the lease rather than managing the Property day-to-day; no CAMS Realty representative was ever present at the Property to

SECOND AMENDED COMPLAINT

confirm the tenant's compliance with the lease or whether a surgery center was even operating there (Section IV.J below). Once Pulse defaulted, Plaintiffs — not Millrock, Millcreek, CAMS Realty, or any other Defendant — were left personally responsible for property taxes, insurance, maintenance costs, and escalating lease-administration fees: precisely the landlord responsibilities and tenant-allocated costs the Offering Memorandum told them would never fall on them. The Management Representations were material because a central, stated purpose of Plaintiffs' investment was to obtain hands-off, passive income without the burdens of direct property ownership — the very benefit retail 1031 exchange investors seek in a fully managed TIC investment — and because the allocation of property expenses directly affects an investor's net return. Had Plaintiffs known that CAMS Realty would function only as a lease administrator with no on-site presence or true management role, and that Plaintiffs would personally bear all landlord responsibilities and expenses in the event of a tenant default, they would not have purchased interests in the Property.

72.    Each of the misrepresentations described in this section  was material to a reasonable investor's decision whether to purchase interests in the Property, whether considered individually or in the aggregate, because each concerned a fact — the tenant's operating history and creditworthiness, the source and structure of the Property's financing, the strength and priority of the lease guarantee, the Property's actual resilience to economic downturns, and the allocation of ongoing property expenses and management responsibility — that a reasonable investor would consider important in deciding whether to invest retirement or exchange proceeds in a purportedly safe, passive, income-generating TIC investment. Plaintiffs justifiably relied on these representations, and each Plaintiff would not have purchased an interest in the Property had Intermountain, Millcreek, Millrock, Long, and Smith disclosed the true facts set forth above.

73.    The Offering Memorandum also omitted several material facts that were necessary to make the Offering Memorandum not misleading, including:

SECOND AMENDED COMPLAINT

a. **Millcreek's negative track record with prior TIC offerings**. Before marketing the Property, Millrock had already developed and syndicated its first TIC investment, a hotel, which failed and generated substantial losses for the investors who had purchased interests in it as a purportedly safe and reliable investment; Millrock then transferred those investors' interests into a second TIC investment, Pine Bluff, locking in millions of dollars in losses (Section IV.A above). None of this history was disclosed in the Offering Memorandum. This omission was material because a reasonable investor evaluating a new Millcreek/Millrock-sponsored TIC offering would want to know that the sponsor's prior offerings had already failed or produced losses for other investors, since that history bears directly on the sponsor's underwriting judgment and on the reliability of its representations about the current offering. Had Plaintiffs known of Millrock's prior TIC failures, they would not have purchased interests in the Property.

b. **The lack of healthcare industry expertise among Millrock's and Millcreek's principals.** The Offering Memorandum did not disclose that Long, Smith, and Millrock's and Millcreek's other principals were real estate brokers and syndicators without healthcare industry, medical practice management, or healthcare real estate underwriting backgrounds, notwithstanding that the Property was marketed as a specialized healthcare investment involving representations about vascular surgery demand, healthcare tenant creditworthiness, and healthcare-sector recession resilience. This omission was material because a reasonable investor would weigh the credibility of sector-specific representations, such as those concerning Pulse's healthcare business and market position, differently depending on whether the sponsor had relevant expertise to evaluate them. Had Plaintiffs known that Millrock's and Millcreek's principals lacked healthcare industry expertise, they would have discounted the Offering Memorandum's healthcare-specific representations and would not have purchased interests in the Property.

c. **The limited scope of Defendants' due diligence generally.** Beyond the absence of any review of Pulse's financial records specifically, the Offering

SECOND AMENDED COMPLAINT

Memorandum did not disclose that Millcreek, Millrock, Intermountain, and Long conducted little to no due diligence of any kind on Pulse before offering the Property to Plaintiffs, including no meaningful investigation of Pulse's business plan, its prior operating history (or lack thereof), its principals, or its capacity to open and operate a surgery center. This omission was material because the extent of a sponsor's due diligence is a fact reasonable investors rely upon in assessing how much weight to give the sponsor's representations about a tenant. Had Plaintiffs known how limited Defendants' due diligence actually was, they would not have purchased interests in the Property.

d. **Challenges associated with the Property's location.** The Offering Memorandum did not disclose the specific challenges associated with operating a vascular surgery center at the Property's location in Crockett, Texas — a rural East Texas community substantially removed from the "Greater Houston area" the Offering Memorandum invoked — including the limited patient demand available to support the surgery center's projected revenue. Additional material omissions that materially reduce the value and ability to lease the Property include: that the building faces a residential area, it backs upon a private school location that is closed, the doctors who service the Crockett area generally only come to town one day a week, patient demand is so low that the hospital was closed for a year and the dialysis center is also struggling to find tenants. These omissions were material because the viability of a single-tenant medical facility depends directly on the tenant's ability to generate sufficient patient volume at that specific location, and a reasonable investor would want to know of any location-specific demand limitations before relying on projected income from that facility. Had Plaintiffs known of these location-specific challenges, they would not have purchased interests in the Property.

e. **The absence of any independent appraisal supporting the Property's price per square foot.** The Offering Memorandum did not disclose that the Property's $9,500,000 asking valuation was not supported by any independent appraisal, or that

SECOND AMENDED COMPLAINT

Millrock itself had purchased the Property for approximately $2,000,000 only shortly before marketing it to Plaintiffs at more than four times that price. Doug Scheel's own undisclosed April 2022 assessment that the Property's price per square foot was too high (Section IV.F below) corroborates that the valuation was unsupported. This omission was material because the price paid relative to independently supportable value is a fundamental component of any real estate investment decision. Had Plaintiffs known that no independent appraisal supported the Property's price per square foot, they would not have purchased interests in the Property.

f.    **The absence of any healthcare-specific underwriting protocol.** In addition to the individual principals' lack of healthcare expertise described in subparagraph (b) above, the Offering Memorandum did not disclose that neither Millrock nor Millcreek maintained any institutional underwriting protocol, healthcare-industry consultant, or medical real estate advisor to evaluate healthcare-sector tenants such as Pulse, notwithstanding that Millrock and Millcreek marketed themselves as sponsors of healthcare-sector TIC investments generally. This omission was material for the same reasons set forth in subparagraph (b) above, and because it shows the absence of healthcare expertise was systemic to Millrock's and Millcreek's business model rather than a one-off gap. Had Plaintiffs known that Millrock and Millcreek had no institutional healthcare underwriting capability, they would not have purchased interests in the Property.

g.    **The commissions and fees built into the Property's price.** The Offering Memorandum did not disclose that the price paid by Plaintiffs for their TIC interests included, and was inflated by, layered commissions and fees payable to Intermountain, Millcreek, and the referring brokers, including the 2% acquisition commission and 4% sale commission payable to Intermountain in favor of the Kevin Long Team, Millcreek's separate volume-based compensation, and the 3% referral fees payable to Doug, Troy, and (on information and belief) Destito (Section IV.A above and IV.G below). This omission was material because a reasonable investor would want to know what portion of

SECOND AMENDED COMPLAINT

the price they were paying was attributable to transaction costs and sales compensation, as opposed to the Property's actual value, particularly where, as here, the aggregate commissions and fees were substantial relative to the size of the offering. Had Plaintiffs known the extent of the commissions and fees built into the price, they would not have purchased interests in the Property.

h.    **Use of proceeds including the actual costs to develop and build out the Property for Pulse's use.** The Offering Memorandum did not disclose that $2,000,000 of the purchase price — funded by Plaintiffs' investment — was allocated to Pulse's equipment and start-up costs rather than to the acquisition of an established, income-producing asset (Section IV.O below). This omission was material because it directly affects how much of Plaintiffs' investment was actually spent acquiring real property with rental value, as opposed to funding a start-up tenant's build-out, which is a materially riskier use of investor capital than the Offering Memorandum's "sale leaseback" framing suggested. Had Plaintiffs known the true allocation of development and build-out costs, they would not have purchased interests in the Property.

i.    **Millrock's anticipated income and profit from the transaction.** The Offering Memorandum did not disclose Millrock's anticipated profit from purchasing the Property for approximately $2,000,000 and selling fractional interests in it to Plaintiffs and other investors in the aggregate for approximately $9,500,000. This omission was material because a reasonable investor would consider the sponsor's own anticipated profit margin highly relevant to evaluating whether the offering price reflected the Property's actual value or was instead inflated to generate outsized returns for the sponsor at investors' expense. Had Plaintiffs known Millrock's anticipated profit from the transaction, they would not have purchased interests in the Property.

j.    **The absence of any designated, on-site property manager for the Property.** The Offering Memorandum did not disclose that no individual or entity had been designated to serve as an on-site or hands-on property manager for the Property, and that CAMS Realty's and Mary Street's role, once retained, would be limited to lease

SECOND AMENDED COMPLAINT

administration rather than property management (Section IV.J below). This omission was material for the same reasons set forth above regarding the Management Representations: a central, stated purpose of Plaintiffs' investment was to obtain hands-off, passive income without the burdens of direct property management. Had Plaintiffs known that no designated property manager existed for the Property, they would not have purchased interests in the Property.

74. In or around January 2023, Doug and Troy reviewed the Offering Memorandum with Chad McAllister by telephone during the McAllisters' due diligence period and, based on that review, encouraged the McAllisters to invest. Based on Doug and Troy's recommendations, the McAllisters identified the Property for their 1031 exchange within 45 days after the sale of their commercial property.

75. Intermountain, Millcreek, Millrock, Long, and Smith reviewed and approved the Offering Memorandum before its dissemination, and each of them is the "maker" of the Offering Memorandum Misrepresentations within the meaning of *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), because each had ultimate authority over its content and whether and how to communicate it to Plaintiffs. Had any of them objected to any of the statements in the Offering Memorandum they would not have been distributed to Plaintiffs as stated.

76. Millrock purchased the Property from its intended guarantor for approximately $2,000,000 and, through the Offering Memorandum that Millrock, Millcreek, Long, and Smith approved, represented the Property's value as $9,500,000 to Plaintiffs — without disclosing the acquisition price or the absence of any independent appraisal supporting the markup. Millrock, Long, and Smith earned profits from purchasing the Property for approximately $2,000,000 and selling fractional interests in it, in the aggregate, for $9,500,000.

**F. Doug Scheel, Troy Scheel, and Mountain West's Point-of-Sale Misrepresentations to the McAllisters**

77. Doug and Troy personally induced the McAllisters to sell a commercial

SECOND AMENDED COMPLAINT

property Doug had previously helped them purchase, and to reinvest the proceeds in the Property by way of a 1031 exchange.

78.    On or about August 13, 2022, while the McAllisters were attending a funeral, Chad McAllister received a voicemail from Troy Scheel stating that there was a buyer interested in purchasing their commercial property.  At first, the McAllisters rejected the offer, but accepted once the offer was raised to $2,000,000.

79.    After accepting the offer for their commercial property, Chad and Amy wanted to use some of the sale proceeds to purchase property locally for their business and buy a new home.

80.    After the sale, Doug and Troy recommended that the McAllisters complete a 1031 exchange and told them they were experts in 1031 exchanges. This was the McAllisters' first experience with a 1031 exchange. Doug and Troy advised the McAllisters where to place their exchange funds, recommended specific investments and urged them to move forward with Millcreek.

81.    Doug and Troy immediately emphasized the deadlines involved and the significant tax consequences if the McAllisters failed to identify replacement property within the required period.

82.    When the McAllisters told Doug and Troy that they wanted to invest the proceeds in two separate properties, Doug and Troy repeatedly told them that investing all the proceeds in the Crockett Property would secure their financial future.  Doug and Troy emphasized that the investment was "safe", "secure" and a once in a lifetime opportunity that would provide reliable monthly income and set them up for retirement.

83.    When Amy expressed her concerns that they still needed a property to house their business, Doug and Troy responded that the McAllisters could obtain loans to purchase property later while allowing the investment to continue working for them.

84.    On or around January 6, 2023, at an in-person meeting at the Scheels' office in St. George, Utah, Doug and Troy told Chad McAllister that: (a) they had personally invested in Millcreek properties and could vouch for Millcreek's professionalism and

SECOND AMENDED COMPLAINT

knowledge; (b) there was no risk because the McAllisters could sell their interest in the Property at any time; (c) the Property would be professionally managed, such that the McAllisters would not need to personally deal with it; (d) when asked directly, that they would receive no compensation in connection with the sale of the Property to the McAllisters; and (e) Doug claimed he would be personally investing in the Crockett Property (collectively, the "January 6, 2023 Misrepresentations"). Doug and Troy made substantially the same statements to Chad McAllister by telephone on multiple occasions before the January 6, 2023 meeting and before the McAllisters identified the Property for their 1031 exchange. Following these assurances, Chad executed the Purchase and Sale Agreement for the Property at the January 6, 2023 meeting.

85.    Following the meeting, on January 6, 2023, Amy reviewed the Offering Memorandum on Millcreek's website.  Amy did not want to invest $2,000,000 in the Property without seeing it in person.  That same day, Chad told Troy that Amy wanted to visit the Property.  He responded, "There's no time for that."  He also ridiculed Chad stating "Who wears the pants in your marriage?" and "Are you going to allow your wife to ruin this opportunity for you?"

86.    Worried that she would miss out on the tax deferment and feeling pressure to agree, Amy then signed the Purchase and Sale Agreement later on January 9, 2023.

87.    Before she signed the Purchase and Sale Agreement, on January 9, 2023, the McAllisters received an email from Spencer Taylor stating: "The tenant is open, operating, and paying rent."  This statement was false as the tenant never operated from the Crockett Property.

88.    In or around April 2022 — approximately six months before Millrock closed its own purchase of the Property and approximately nine months before Doug pitched the Property to the McAllisters — Doug personally considered purchasing a TIC interest in the Property for his own account, and decided against doing so because he determined that the price per square foot being asked for the Property was too high relative to its value. Doug never disclosed this fact, his own decision not to invest, or the reasons for

SECOND AMENDED COMPLAINT

that decision, to the McAllisters at any point before their purchase, including at the January 6, 2023 meeting where he told them he could personally vouch for the professionalism and knowledge behind Millcreek's properties.

89. Doug's undisclosed April 2022 decision not to invest in the Property because of its excessive price per square foot directly undermines, and is inconsistent with, his and Troy's representations to the McAllisters that the Property was a sound, no-risk investment and that Doug personally vouched for it. Doug's own contemporaneous, professional assessment that the Property was overpriced corroborates Plaintiffs' separate discovery, described in Section IV.B above, that Millrock purchased the Property for approximately $2,000,000 and sold fractional interests in it to Plaintiffs based on a $9,500,000 valuation with no supporting business justification.

90. Each of the January 6, 2023 Misrepresentations was false: the Property was not risk-free — as Doug himself had already privately concluded in April 2022 when he declined to invest in it because of its price — it was not professionally managed such that the McAllisters could avoid personal involvement (see Section IV.J, below); and, as detailed in Section IV.M below, Doug and Troy did in fact receive a 3% commission on the sale.

91. On January 25, 2023, the McAllisters met with Doug in person to sign the final closing paperwork.  At the meeting, Amy told Doug that she did not want to sign because she was uncomfortable investing nearly $2,000,000 in a property she had never personally seen.  Doug chuckled while assuring Amy that the investment was safe, worth more than the amount the McAllisters were investing, and would be professionally managed.  He also told her that buys would be available if they ever wanted to sell their interest in the Property.

92. Doug further assured the McAllisters that the investment was a "no-brainer" and "the deal of a lifetime."  He also claimed that he was also going to personally purchase an interest in the Property. Doug's January 25, 2023 statements were also false as he had previously concluded.

SECOND AMENDED COMPLAINT

93.   Relying on these assurances, Amy reluctantly agreed to sign the closing documents.

94.   Mountain West, as Doug and Troy's broker, processed and received commissions in connection with the sale of the Property to the McAllisters, and is liable for the January 6, 2023 Misrepresentations made by its agents Doug and Troy within the course and scope of their agency.

### G. Megan Destito's and SCES's Misrepresentations to Thart

95.   Destito and SCES made substantially the same category of misrepresentations to Thart between approximately August and December 2022 that Doug and Troy made to the McAllisters — namely, that the investment was safe with little to no risk, that the Property could be sold at any time, that Destito and SCES vouched for the professionalism and knowledge of Millcreek, Millrock, and Colliers, that Destito and/or SCES had invested or might invest in Millcreek properties, and that the Property would be professionally managed such that Thart would not have to personally deal with it.

96.   On August 4, 2022, on a call with Thart, Megan Destito stated that in investing with Millcreek Thart would "buy an undivided interest in passive income." Destito also represented that the TIC investment was "hands-off" and "risk-free."

97.   On August 9, 2022, Trevor Webber, a Millcreek and Intermountain real estate agent, emailed Thart with a copy to Destito pitching Millcreek and its TIC investments, including the Crockett property.  In the email he represented:

a.   "The great thing is the properties are NNN so nearly 100% hands off which gives you a lot of freedom. And since the tenant pays everything, the cap rates listed are net which is equal to your monthly cashflow."

b.   "**About Millcreek** We are a team that works within Colliers International, one of the largest commercial real estate companies in the world. Millcreek's goal is to get rid of the barriers that prevent people from getting into commercial real estate by providing hassle-free investment properties w/low investment minimums…You hold

deed interest with all the rights that come w/ real estate ownership. The difference is you no longer have to take care of the tenant, trash or toilets."

    c.    "Our buildings are purchased debt-free & meet the following criteria:

    i.    Single-Tenant w/long-term lease (15-20 years)

    ii.    Corporate guarantee to protect you financially

    iii.    NNN lease – *tenant takes care of maintenances, taxes & insurance*"

98.    Trevor Webber's email also included a link to Millcreek's blog post The 5 Benefits of a TIC Agreement (https://www.millcreekcommercial.com/the-5-benefits-of-a-tic-agreement/) which stated: "There are many benefits to owning commercial real estate through a TIC agreement. Owning quality commercial real estate at a lower expense, diversification, larger property access, passivity, and lower minimum investments. It provides a secure investment with a predictable rate of return."  The blog also stated: "Investing through a TIC is less of a commitment than if you were to invest in a whole building your first go-around. Our properties are triple-net, backed by a corporate guarantee, have a single-tenant, long-term lease, and are recession-resilient, giving you a stable and profitable opportunity to invest in commercial real estate."

99.    Thart reviewed the blog "The 5 Benefits of TIC Agreement" after receiving Webber's email.  Thart relied on the statements in the blog as well as the statements by Destito and Webber in deciding to invest in the Property.

100.    Each of the statements by Destito and Webber were false. The Property was not risk-free, the "corporate guarantee" did not protect Thart financially and could not due to the previously filed UCC lien, and the investment was not hands-off or professionally managed such that Thart could avoid personal involvement (see Section IV.J, below).

101.    Troy Scheel personally signed a written Professional Referral Agreement with Millcreek, dated September 1, 2022 (Exhibit B), under which Millcreek agreed to pay Troy a 3.0% referral fee on TIC properties he referred for sale, with a 3.0% fee on the buyer's equity portion where the property was purchased with financing in place. In

SECOND AMENDED COMPLAINT

the same Agreement, Millcreek represented that it was "authorized to sell properties on behalf of the Millrock Investment Fund and affiliated entities" and that it had "taken reasonable care to ensure that information provided on the website and/or to Professional is complete, accurate, and true." Plaintiffs allege, on information and belief, that Doug, Destito, and Mountain West were parties to substantially similar referral or compensation arrangements with Millcreek, given that Doug jointly represented the McAllisters with Troy and Mountain West received and processed commissions on the McAllisters' purchase. None of these referral fees was disclosed to Plaintiffs before their purchases.

### H. Long's, Millcreek's and Intermountain's Agent, Misrepresentations to Pinder

102.   In or about June 2022, Pinder spoke telephonically with Kevin Long, an agent of Millcreek and Intermountain.  Pinder was considering a 1031 exchange after selling a commercial building he owned.  Long stated that Millcreek was a reputable firm with a good track record and expertise in tenant in common investments.  He claimed that medical buildings were "solid" and that the tenant was an expanding medical group with strong financials.  Pinder understood from the pitch that there were multiple doctors as part of the clinic and there was little to no risk. Soon thereafter, Pinder executed a Purchase and Sale Agreement to purchase an interest in the Property.

103.    These statements were false. Millcreek did not have a good track record and other investments it had syndicated had previously failed.  The investment had substantial risk and was not recession resilient.  The "clinic" consisted of one doctor simultaneously opening several new clinics.  Moreover, the tenant's financials could not support the massive expansion that was planned.

### I. Rutherford's, Millcreek's Agent, Misrepresentations to Procopio

104.   On April 14, 2023, Millcreek agent, Scott Rutherford, emailed Procopio and represented that Millcreek properties had the following benefits:

a. "High-grade commercial properties under <u>corporate-guaranteed</u> lease terms for steady monthly cash flow

SECOND AMENDED COMPLAINT

   b. NN/NNN leases (little to no landlord responsibilities) with 10-25 year initial lease terms plus options terms

   c. Proven track record and customizable approach…"

105.   He continued: "the attached properties provide cash flow immediately upon closing, so you are able to put your funds to work right away…As you can see, Millcreek's mantra of "safety, security and stability" (I would add "simplicity") is the priority with each property, with strong returns and some of the most attractive lease terms in decades.  Our goal is to provide you with solutions which simultaneously simplify your search process and provide great asset value and cash flow.'"

106.   Rutherford also encouraged Procopio to immediately execute a purchase and sale agreement before reviewing due diligence stating that Millcreek properties were in "VERY high demand".

107.   Rutherford's statements were false about the Property.  The Property was not a high-grade commercial property, the asset value and returns were not strong and it was not a "safe, secure or stable" investment.  Rutherford and Millcreek knew these statements were false when made.  They were aware that Millrock's purchase price for the Property was $2,000,000 and was resold for $9,500,000 without any commensurate increase in value.  They were aware of past failures in Millcreek and Rutherford's efforts to syndicate and develop tenant in common investments, including the bankruptcy of HSH properties, the failure of the hotel and numerous lawsuits naming Rutherford personally for fraud in connection with Noah's Ark tenant in common investments he sold.  None of these previous failures, which establish that Millcreek did not have a "proven track record" were disclosed to Procopio.

108.   Rutherford and Millcreek were also aware that Millcreek had attempted to sell interests in the Property for nearly one year without fully selling all positions and sales had markedly slowed for all tenant in common properties they sold. Such that the claim that the properties were in "VERY high demand" was untrue.

109.   Moreover, Millcreek's claim of immediate cash flow was also false because

SECOND AMENDED COMPLAINT

any distributions received by Procopio were made from other investor funds.

110.   On August 28, 2023, Rutherford (along with others) was indicted for securities fraud in connection with the Noah's Ark tenant in common investments.  He later pled guilty to wire fraud.

### J. CAMS Realty's and Mary Street's Post-Sale Concealment

111.   After Plaintiffs' purchases, CAMS Realty and Street were installed as the Property's lease administrators and property managers, and served in that capacity for all Millcreek TIC properties sold to investors, including the Property. CAMS Realty and Street received fees for "managing" the TIC interests, but worked to protect the interests of Intermountain, Millcreek, and Long rather than the interests of Plaintiffs. When Plaintiffs sought to visit the Property to confirm its condition, Street refused and would not provide keys to Plaintiffs to access their own investment.

112.   After Pulse defaulted, CAMS Realty's fees doubled even as Plaintiffs' investments lost more than 75% of their value. By the time the McAllisters and Procopio purchased their interests in January and May 2023, respectively, CAMS Realty was aware that Millcreek-marketed tenant HSH Management had defaulted on its lease in December 2022 and filed for bankruptcy shortly thereafter, but failed to advise the McAllisters or Procopio of the resulting risk of default, increased fees, taxes, and management burdens, or the difficulty of re-leasing at the represented rate. CAMS Realty's role as lease administrator for the Property, retained only after each Plaintiff's purchase, separately obligated it to disclose this same risk on an ongoing basis to Thart and Pinder once known, regardless of purchase timing.

113.   Although the pre-sale representations were that the Property would be professionally and fully managed such that Plaintiffs would have no day-to-day involvement, and although each Plaintiff's Purchase and Sale Agreement provided for a Property Management Agreement to be executed at closing, Long admitted in a November 15, 2023 e-mail that "Mary Street is an awesome professional, fiduciary and advocate for the owners… Mary's role is to administer the lease — not manage the

SECOND AMENDED COMPLAINT

property. It is her job to make sure the lease is enforced." No CAMS Realty representative was ever present at the Property to confirm the tenant's compliance with the lease or whether a surgery center was in fact operating there.

### K. Smith's, Long's, and Millrock's Financial Motive and Scienter

114.    Plaintiffs allege the following particularized facts — independent of the falsity of the statements described above — giving rise to a strong inference that Millrock, Long, and Smith acted with scienter:

a.    Smith's family, including a family trust, is the majority owner of Millrock and its single largest investor; Smith and his family received profits directly from both Millcreek's and Millrock's operations, giving Smith a direct and substantial personal financial stake in inflating and marketing the Property's value.

b.    Millrock purchased the Property for approximately $2,000,000 and, soon thereafter, sold fractional interests in it to Plaintiffs collectively valued at $9,500,000 — a markup Millrock, Long, and Smith approved through the Offering Memorandum without disclosing the acquisition price to Plaintiffs or obtaining any independent valuation to support it.

c.    Long's and Smith's sales practices toward Plaintiffs followed a consistent pattern across each of the four separate transactions at issue: a Millcreek- or Intermountain-affiliated agent — Doug and Troy Scheel (McAllisters), Destito (Thart), Long (Pinder), and Rutherford (Procopio) — used nearly identical language ("recession resilient," "safe, secure and stable," "little to no risk," a "solid" or "proven" track record) to describe the Property or comparable Millcreek properties to five different investors within a compressed roughly one-year window (Sections IV.F, IV.G, IV.H, and IV.I above). This uniformity supports an inference that Long and Smith, who trained and mentored Millcreek's sales agents under the MOU (Section IV.A above), distributed and approved this script company-wide with knowledge that it did not reflect the Property's actual risk profile.

SECOND AMENDED COMPLAINT

d.      Millrock's first TIC investment — a hotel developed in 2019–2020 — had already failed by 2020, more than two years before Pinder's earliest purchase of an interest in the Property in October 2022, and well before Thart's (November 2022), the McAllisters' (January 2023), and Procopio's (May 2023) purchases (Section III.A above). Millrock rolled the resulting losses into the Pine Bluff investment rather than disclosing them to new investors, including Plaintiffs. Because the hotel's failure predates every Plaintiff's purchase, Millrock, Long, and Smith had a specific, pre-existing financial incentive — known to them before any Plaintiff invested — to keep new investor capital flowing into new offerings, including the Property, to avoid exposing the fund's mounting losses.

e.      Long's own November 15, 2023 and April 30, 2024 e-mails admit that Millrock diverted $2,000,000 of the purchase price back to Pulse, mischaracterized as "FFE," to fund Pulse's start-up costs — meaning Millrock, as the party to that transaction, necessarily knew before the sale to Plaintiffs that Pulse was an unproven start-up rather than the established, income-generating tenant represented in the Offering Memorandum that Millrock, Long, and Smith approved.

f.      Millcreek-marketed tenant HSH Management defaulted on its lease in December 2022 and filed for bankruptcy within the following one to two months, after having been presented to investors as an established, creditworthy tenant. HSH's default predates the McAllisters' January 25, 2023 and Procopio's May 2023 purchases of interests in the Property (Section III.A above), such that Long and Smith — who prepared, reviewed, or approved Millcreek's marketing materials generally — knew of this concrete instance of tenant default and its consequences before the Property was marketed to, and purchased by, the McAllisters and Procopio. Long and Smith were separately alerted to a broader pattern of tenant defaults across Millcreek's portfolio, including at least ten additional properties, both before and after the Property's marketing to Plaintiffs.

g.      Smith was copied on Long's September 3, 2020 Memorandum of

SECOND AMENDED COMPLAINT

Understanding (Exhibit A), which set out in specific, quantified detail the commission architecture governing every subsequent Millrock acquisition and sale — a guaranteed 2% acquisition commission and a 4% sale commission processed through Intermountain, and volume-based compensation to Millcreek — more than two years before the Property transactions at issue. Smith therefore had specific, contemporaneous, documented knowledge of the financial incentive structure that made accurately marketing the Property's condition and value directly adverse to his own and Millrock's financial interests.

### L.  Millcreek's and Intermountain's Scienter

115.    Plaintiffs allege the following particularized facts — independent of the falsity of the statements described above — giving rise to a strong inference that Millcreek and Intermountain acted with scienter:

a.    Intermountain had a direct, quantified financial stake in Millrock's and Millcreek's sales volume. Under the MOU (Exhibit A), Intermountain was guaranteed a minimum 2% commission on every acquisition and a 4% commission on every sale processed through the Kevin Long Team, and the MOU itself projected that a $13,000,000 fund value would generate approximately $104,000,000 in annual transaction volume processed through Intermountain. Intermountain therefore had a substantial, ongoing financial incentive to facilitate the continued sale of Millrock's TIC offerings, including the Property, regardless of their accuracy.

b.    Intermountain employed Long — who signed the MOU and who Plaintiffs allege prepared, reviewed, or approved the Offering Memorandum Misrepresentations described in Section IV.E above — as an Executive Vice President of Colliers International Intermountain, LLC (d/b/a Colliers International – Utah). Intermountain, Millcreek, Millrock, Long, and Smith each reviewed and approved the Offering Memorandum before it was disseminated to Plaintiffs (Section IV.E above). As Long's employer, Intermountain is charged with Long's knowledge of the Offering Memorandum's contents under ordinary principles of respondeat superior and agency

41

SECOND AMENDED COMPLAINT

law.

c.      The MOU obligated Intermountain itself — not merely Millrock or Millcreek — to "provide[] standard support for all acquisition activities including the development of due diligence packages," meaning Intermountain was contractually responsible for assembling the due diligence materials underlying the Property acquisition and the Offering Memorandum. Despite this express undertaking, the package Intermountain helped assemble did not include, or did not disclose to Plaintiffs, Pulse's financial records, the UCC lien recorded against Pulse's, Achy Legs', and Spectre's assets in July 2022, or any independent appraisal supporting the Property's valuation (Sections IV.E and IV.K above). Because Intermountain contractually undertook the specific function of assembling this package, its production of a package omitting these material, discoverable facts is not a mere failure to look harder — it is evidence that Intermountain either knew the package it helped assemble and disseminate was materially incomplete, or was deliberately reckless in disregarding that fact.

d.      Intermountain acted as broker of record across Millrock's entire TIC platform, not merely the Property transaction, providing due diligence support, marketing approval, and sales agent training across that platform (Section IV.A above) — an active, ongoing institutional role inconsistent with serving as a passive, unwitting brand licensor. Millrock's first TIC investment (a hotel, developed 2019–2020) failed and generated substantial losses by 2020 — before any Plaintiff's purchase of an interest in the Property (Section III.A above) — after which Millrock transferred those investors' interests into a second TIC investment, Pine Bluff, to avoid disclosing the loss (Section IV.A above). As the broker of record across this entire multi-year, multi-transaction relationship, Intermountain had institutional knowledge of Millrock's prior TIC failure before the Property was marketed to, and purchased by, every Plaintiff.

e.      Millcreek's compensation from Millrock was tied directly to the fund's sales volume under a separate agreement described in the MOU, giving Millcreek a direct financial incentive to generate sales of the Property irrespective of the accuracy of its

SECOND AMENDED COMPLAINT

marketing claims.

f.      Millcreek's own principals — Smith and Long — are the same individuals whose scienter is independently alleged in Section IV.K above, including Smith's status as Millrock's majority owner and Long's documented history and role in approving the Offering Memorandum. Millcreek's knowledge is coextensive with the knowledge separately pled as to Smith and Long.

g.      Millcreek expressly represented, in its Professional Referral Agreement with Troy Scheel (Exhibit B), that it had "taken reasonable care to ensure that information provided on the website and/or to Professional is complete, accurate, and true." Notwithstanding that express representation, Millcreek's website contained the false statements described in Section IV.D above (including the "rock solid" and "corporate guarantee" claims). Millcreek's own written assurance of accuracy, made contemporaneously with the dissemination of statements Plaintiffs allege were false, supports an inference that Millcreek either knew the representation was false when made or was recklessly indifferent to its truth.

h.      Long caused Millcreek to declare itself insolvent, dissolve, and transition its agents and business to a newly formed entity, KGL Advisors, LLC, while directing Millcreek's counsel to withdraw from pending litigation, shortly after Millcreek was named as a defendant in other investor lawsuits arising from its TIC sales practices, including Devlin v. Colliers, No. 1:24-cv-00457 (D. Idaho) (Section III.B above). Conduct taken to wind down and shield an entity's assets after exposure to litigation supports an inference of consciousness of wrongdoing.

i.      Long, an agent of Millcreek and Intermountain (Section III.B above), used substantially the same scripted representations with Pinder — that the Property or properties like it were "solid", had a "good track record," and carried "little to no risk" — that Doug, Troy, Destito, and Rutherford separately used with the McAllisters, Thart, and Procopio (Sections IV.F, IV.G, and IV.I above). This uniformity across four independent agents, each contacting a different Plaintiff in a

43

SECOND AMENDED COMPLAINT

different state, supports an inference that Millcreek equipped its agents with a company-wide script that Millcreek's own principals, Long and Smith, knew did not reflect the Property's or Millcreek's other properties' actual risk profile or track record (Section IV.K above). Bell separately exploited a pre-existing family relationship of trust — he is Pinder's wife's grandson — to facilitate Pinder's introduction to Long and Millcreek, paralleling Doug Scheel's exploitation of his pre-existing brokerage relationship with the McAllisters (Section IV.M below).

j.    CIGI, as the corporate parent that established the governing policies and marketing guidelines Intermountain and Millcreek were required to follow in preparing and disseminating the marketing materials described in Section IV.D above and the Offering Memorandum described in Section IV.E above, had the ability to review and approve the content those guidelines produced, and permitted its name and brand to be prominently displayed on that content (Section III.B above). CIGI's provision of the marketing guidelines under which the false representations described above were prepared, combined with its brand's prominent placement on those materials, supports an inference that CIGI was a culpable participant in, or at minimum failed to act in good faith to prevent, the dissemination of those materials under its brand, as further alleged in the Sixteenth Cause of Action below.

### M. Doug Scheel's, Troy Scheel's, and Mountain West's Scienter

116.    Plaintiffs allege the following particularized facts — independent of the falsity of the January 6, 2023 Misrepresentations — giving rise to a strong inference that Doug, Troy, and Mountain West acted with scienter:

a.    Doug and Troy told the McAllisters at the January 6, 2023 meeting, in response to a direct question, that they would receive no compensation for the sale. Troy, at least, had already signed a written Professional Referral Agreement with Millcreek on September 1, 2022 (Exhibit B) — more than four months before the January 6, 2023 meeting and more than three weeks before the McAllisters'

SECOND AMENDED COMPLAINT

January 25, 2023 purchase — obligating Millcreek to pay him a 3.0% referral fee for exactly this kind of referral. Troy's affirmative, particularized denial of compensation he had already contractually secured months earlier is direct evidence that the denial was knowingly false when made, not merely negligent or mistaken; Plaintiffs allege, on information and belief, that Doug had a substantially similar undisclosed compensation arrangement.

b.    Doug had personally helped the McAllisters purchase the very commercial property that Doug and Troy then persuaded the McAllisters to sell in order to fund the Property investment — giving Doug and Troy a pre-existing relationship of trust that they exploited for a commission they simultaneously denied receiving.  Doug and Troy received commissions of approximately $120,000 in connection with the sale of their commercial property in addition to the commissions they received from the purchase of the tenant in common investment.

c.    Doug and Troy repeated the same categorical assurances (no risk, resalable at any time, no compensation, full management) to Chad McAllister by telephone on multiple occasions before the McAllisters had even identified the Property, indicating a rehearsed sales practice rather than an isolated, good-faith misstatement.

d.    Mountain West, as Doug and Troy's broker, processed and received commissions on the sale and is charged with knowledge of its own agents' compensation arrangements under ordinary principles of respondeat superior and agency law.

e.    In April 2022 — approximately nine months before the January 6, 2023 meeting — Doug personally evaluated purchasing a TIC interest in the Property for his own account and decided against it because he concluded the price per square foot was too high. Doug's undisclosed, contemporaneous, first-hand assessment that the Property was overpriced, reached in his professional capacity

SECOND AMENDED COMPLAINT

as a real estate broker, is direct and particularized evidence that Doug knew, or was deliberately reckless in disregarding, that the Property was not the sound, no-risk investment he represented to the McAllisters only months later.

**N. Destito and Southern California Exchange Services's Scienter**

117.    Plaintiffs allege the following particularized facts — independent of the falsity of the statements described above — giving rise to a strong inference that Destito and SCES acted with scienter:

a.    Destito occupied a dual, conflicted role with respect to Thart's investment: she simultaneously served as the principal of SCES, the qualified intermediary and exchange accommodator holding the proceeds from Thart's $699,628.45 property sale in a 1031 exchange, and (on information and belief) as an undisclosed, commissioned referral source for Millcreek, standing to receive a referral fee if Thart purchased an interest in the Property. A qualified intermediary's role is to serve as a neutral custodian and facilitator of a 1031 exchange; Destito's undisclosed financial stake in directing Thart's exchange proceeds specifically toward the Property placed her own compensation in direct conflict with her duty of neutrality, and Destito never disclosed that conflict to Thart before Thart's purchase.

b.    As the accommodator holding Thart's exchange funds, Destito had direct knowledge of the exact amount of Thart's proceeds ($699,628.45) and of the fact that those funds represented the sale of two single-family investment properties Thart owned outright — information giving Destito particularized knowledge of Thart's financial circumstances and the significance of the funds at stake.

c.    Destito knew that Thart was sixty-eight years old at the time of the transaction, and knew that Thart was relying on Destito's purportedly neutral role as her accommodator in deciding whether to trust Destito's assurances about the Property. Destito's decision to withhold her financial stake in the transaction from a client she knew to be an elderly retiree entrusting her retirement proceeds to Destito's judgment is consistent with a deliberate decision to preserve a referral fee she knew Thart would be

46

less likely to proceed with had it been disclosed.

118.   SCES, as Destito's company and the entity that actually held and disbursed Thart's exchange funds to complete the Property purchase, is charged with Destito's knowledge of the undisclosed referral conflict under ordinary principles of respondeat superior and agency law, and processed the disbursement of Thart's funds notwithstanding that conflict.

### O. Discovery of the Fraud: Tenant Default and Defendants' Admissions

119.   In October 2023, Pulse failed to pay rent on the Property. Millrock, Millcreek, Long, Smith, Intermountain, and CAMS Realty initially attributed the delay to the sudden death of Pulse's CFO, and later to issues with Pulse's billing systems. Long assured Plaintiffs that the lease was "guaranteed" by Achy Legs Clinics, LLC and Spectre Innovations, LLC.

120.   On November 15, 2023, Long acknowledged by e-mail to investors that Pulse and its principal, Dr. Aggwarala, "has not followed through on his plans to open the surgery center." On November 16, 2023, Plaintiffs confirmed that, contrary to the Offering Memorandum's representations, the Property had never actually operated as a surgery center.

121.   Following the default, Thart contacted several real estate agents and brokers to provide expertise to re-lease the Property.  Each agent stated that they needed to visit the Property in person to conduct an evaluation.  However, for months, Mary Street would not provide keys to the Property to allow it to be toured.  Finally, after about six months, Street provided keys to the TIC owners.

122.   On April 30, 2024, Long admitted by e-mail: "The Millrock Investment Fund purchased the Crockett Surgery Center from Spectre Innovations, LLC on October 11, 2022 … As part of this transaction we paid $75,000 for the existing clinic equipment and provided $2,000,000 for equipment and startup costs for surgery equipment. We executed a long term lease with Pulse Physicians at closing … Spectre/Pulse was contractually obligated (and in fact paid $2 million) to open a surgery center. They have

47

not." This was the first time Long, Millcreek, Millrock, Intermountain, or any other Defendant disclosed to Plaintiffs that Plaintiffs' invested funds had been used to pay Pulse $2,000,000 for equipment and start-up costs, or that Pulse was a start-up rather than an established, income-generating tenant.

123.   In June 2024, Pulse filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas. After the default, Plaintiffs learned that the assets of Pulse, Achy Legs, and Spectre had been encumbered by a UCC lien filed by another creditor in July 2022 — before Plaintiffs' purchases — which was never disclosed to Plaintiffs by Long, Millcreek, Millrock, Intermountain, or any other Defendant.

124.   Relying on Defendants' representations that her interest in the Property could be resold, Thart contacted Kevin Long, Spencer Taylor and Mary Street numerous times to resell her interest in the Property.  Thart informed other investors she intended to sell so that they may exercise their right of first refusal.  She did not receive any offers from her co-owners.  Thereafter, she spoke with Spencer Taylor and Kevin Long about listing her interest for sale publicly.  After initially, stating that Millcreek would list the interest for sale, Long retracted the agreement claiming that it would "open the floodgates."

125.   Since the default and Pulse's bankruptcy, the Crockett investors have hired numerous real estate agents to sell the Property at a valuation of less than $2,000,000. The Crockett investors have received no offers to purchase the Property and continue to pay expenses including property tax, insurance and administration costs out of pocket.

126.   As a direct and proximate result of the foregoing, Plaintiffs have lost substantially all of the value of their investments in the Property, and remain burdened with property taxes, insurance, maintenance costs, and management/lease-administration fees that Defendants represented Plaintiffs would never have to pay.

### P. Loss Causation

127.   The facts Defendants misrepresented and concealed are the same facts

SECOND AMENDED COMPLAINT

whose eventual disclosure and materialization destroyed the value of Plaintiffs' investments. Plaintiffs did not merely pay an inflated price; the specific risks Defendants hid from them are the specific risks that came to pass, in the manner and within the timeframe that a reasonable person in Defendants' position would have foreseen.

128.   Defendants concealed, among other things: (a) that Pulse was an unproven start-up with no operating history at the Property rather than the established, nine-location, twelve-provider healthcare network the Offering Memorandum described (¶¶ 65–67); (b) that $2,000,000 of the price Plaintiffs paid was routed back to Pulse to fund Pulse's own equipment and start-up costs, so that Plaintiffs' capital, and not the tenant's, financed the tenancy (¶¶ 68, 73(h)); (c) that the assets of the three entities whose "Full Corporate Guarantee" was represented to secure the lease had already been encumbered by a UCC lien recorded in July 2022 in favor of a competing creditor (¶ 69); (d) that Millrock had acquired the Property for approximately $2,000,000 and was reselling fractional interests in it at a $9,500,000 valuation unsupported by any independent appraisal (¶¶ 42, 73(e), 73(i), 76); (e) that no property manager had been designated and that CAMS Realty's role would be limited to lease administration with no on-site presence (¶¶ 71, 73(j)); and (f) that the sponsor's prior TIC offerings had already failed, and that Millcreek-marketed tenants, including HSH Management, had already defaulted and filed for bankruptcy (¶¶ 37, 73(a), 114(d), 114(f)).

129.   The start-up tenant risk materialized. In October 2023 — approximately one year after the first Plaintiff closed and approximately five months after the last — Pulse stopped paying rent (¶ 119). On November 15, 2023, Long acknowledged in writing to investors that Pulse and its principal "ha[d] not followed through on his plans to open the surgery center" (¶ 120). On November 16, 2023, Plaintiffs confirmed that, contrary to the Offering Memorandum, the Property had never operated as a surgery center at all (¶ 120). The concealed fact — that the tenant was a start-up incapable of opening the facility — was the direct cause of the rent default, which was the direct cause of the collapse of the income stream Plaintiffs purchased.

49

SECOND AMENDED COMPLAINT

130. The investor-funded build-out risk materialized and was disclosed. On April 30, 2024, Long disclosed for the first time that Millrock had purchased the Property from Spectre Innovations, LLC on October 11, 2022, had paid $75,000 for existing clinic equipment, and had "provided $2,000,000 for equipment and startup costs for surgery equipment," and that "Spectre/Pulse was contractually obligated (and in fact paid $2 million) to open a surgery center. They have not." (¶ 122.) That disclosure revealed both that Plaintiffs' own capital had financed the tenant's operations and that the tenant's credit had never been independent of the investment — the precise fact whose concealment made the "sale leaseback" and "Full Corporate Guarantee" representations misleading (¶¶ 68–69).

131. The illusory guarantee risk materialized. In June 2024, Pulse filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas (¶ 123). Only then did Plaintiffs learn that the assets of Pulse, Achy Legs, and Spectre had been encumbered by a UCC lien filed by another creditor in July 2022, before Plaintiffs' closings (¶ 123). The guarantee Defendants represented would backstop a tenant default proved unavailable at the precise moment it was needed — which is the harm the concealment of the lien created.

132. The overvaluation materialized independently of the tenant default. Since the default and Pulse's bankruptcy, the Crockett investors have engaged numerous real estate agents to market the Property at a valuation of less than $2,000,000 — approximately twenty-one percent of the $9,500,000 valuation on which Plaintiffs purchased — and have received no offers at all (¶ 125). A property acquired and offered at a price supported by independent valuation would retain substantial value notwithstanding a tenant default, because the value of a net-lease asset resides in the real estate as well as in the lease. The Property's inability to attract any offer at a fraction of the offering price demonstrates that Plaintiffs' loss is attributable not only to the tenant's failure but independently to the concealed disparity between what Millrock paid for the Property and what Defendants charged Plaintiffs for it (¶¶ 42, 76), and to the location-

specific limitations Defendants did not disclose (¶ 73(d)).

133. The management misrepresentation materialized. Because CAMS Realty served only as a lease administrator with no on-site presence, no Defendant ever confirmed whether a surgery center was operating at the Property (¶¶ 113, 122), and the tenant's failure to open went undetected until the rent stopped. Once Pulse defaulted, Plaintiffs — not Millrock, Millcreek, CAMS Realty, or any other Defendant — became personally responsible for property taxes, insurance, maintenance, and escalating lease-administration fees, and CAMS Realty's fees doubled even as the investments lost more than seventy-five percent of their value (¶¶ 71, 112, 126). Plaintiffs remain burdened with those costs today (¶¶ 125–126).

134. Foreseeability and the absence of an intervening cause. Each of these outcomes was a foreseeable consequence of the facts Defendants concealed. A landlord that must fund its tenant's equipment and start-up costs foreseeably risks a tenant that never opens; a guarantee backed by previously encumbered assets foreseeably fails on default; and a single-tenant medical building sold at nearly five times its acquisition price in a rural market foreseeably cannot be resold at that price. Plaintiffs' losses were not caused by any general downturn in commercial real estate, by any industry-wide or macroeconomic event, by any change in market interest rates, or by any intervening act of Plaintiffs or of any third party unconnected to the concealed facts. The Property was, and remains, a building whose tenant never opened, whose guarantors' assets were already pledged elsewhere, and whose price was never supported by its value.

135. But for Defendants' misrepresentations and omissions, Plaintiffs would not have purchased interests in the Property (¶¶ 65–73, 90, 100, 103, 107), and the risks that destroyed their investments would not have been borne by them. Defendants' misrepresentations and omissions were both the but-for and the proximate cause of Plaintiffs' economic loss, which comprises the loss of substantially all of their invested principal, the income they were promised and never received, and the property taxes, insurance, maintenance costs, and lease-administration fees Plaintiffs have paid and

continue to pay (¶¶ 125–126).

### Q. Plaintiffs' Emotional Distress

136.    As a result of Defendants' conduct, Plaintiffs suffered both financially and emotionally, as follows:

a.    **The McAllisters.** The loss of $2,000,000 put tremendous strain on the McAllisters' marriage and negatively affected their emotional well-being and mental health.  Chad McAllister's emotional distress became so severe that he experienced suicidal thoughts and voluntarily admitted himself to a mental health facility for treatment.  The McAllisters continue to grapple with the emotional fallout, which resulted from their misplaced trust in Defendants, particularly Doug and Troy Scheel, and the lost of their retirement.

b.    **Anne Thart**.  Anne Thart raised her three children as a single mother with a small teacher's income.  She was keenly aware of the need to save for retirement since her pension could not sustain her in retirement.  She spent significant time away from her children and effort investing in rental homes to create income for her retirement.  Due to Defendants' conduct, she has lost her retirement savings resulting in shock, emotional numbness, low heart rate and atrial fibrillation.  She is constantly anxious and stressed regarding her financial situation and feels defeated because she no longer can fund a scholarship for young single mothers as she had planned.

c.    **Glenn Pinder.** Glenn Pinder worked all his life to secure a future for his family.  The investment was meant to secure his retirement, fund any unexpected expenses and provide an inheritance for his heirs. The loss of his investment has severely limited his ability to leave an inheritance for his heirs causing him great distress.  Further, the financial instability at his advanced age has made him anxious about future expenses, economic downturns and unforeseen circumstances.

d.    **Joe Procopio.** The loss of the investment and his retirement savings caused Procopio anxiety, stress, and worry. He has had to extend his working career to make up for the loss.  He regularly struggles with sleeplessness and feels like he can no longer

SECOND AMENDED COMPLAINT

trust people.

### R. Respondeat Superior – Each Entity Defendant is Liable for Its Agents' Conduct

137.    At all relevant times, each of the individual Defendants named below acted as an employee, agent, officer, or representative of the entity Defendant identified with them, and each act or statement alleged against that individual was made within the course and scope of that agency or employment relationship, in furtherance of the entity's business, and for the entity's financial benefit. Each entity Defendant is therefore liable, under the doctrine of respondeat superior and ordinary principles of agency law, for the acts and statements of its agents alleged throughout this Complaint, including but not limited to the following:

a.    **Millcreek.** Long and Smith acted as principals, owners, and sales agents of Millcreek at all relevant times (Section III.B above). Long and Smith prepared, reviewed, or approved Millcreek's website, blog posts, and mass marketing e-mails to prospective investors, including Plaintiffs (Section IV.D above), and reviewed and approved the Offering Memorandum before it was disseminated to Plaintiffs (Section IV.E above), each in their capacities as Millcreek principals and in furtherance of Millcreek's business of marketing TIC interests for commission-based and volume-based compensation under its agreement with Millrock (Section IV.A above). Millcreek's agents, Bell and Rutherford, and their representations regarding the Property's benefits, cash flow, and demand were made in the course of, and in furtherance of, Millcreek's business of marketing TIC interests to retail investors. Millcreek is therefore liable for Long's and Smith's acts and statements alleged herein.

b.    **Intermountain.** Long acted as an agent and Executive Vice President of Colliers International Intermountain, LLC (d/b/a Colliers International – Utah) at all relevant times (Section III.B above), and all of Millcreek's sales agents, including Long and Bell, held their real estate licenses through Intermountain (Section IV.A above). Long reviewed and approved the Offering Memorandum in that capacity (Section IV.E

SECOND AMENDED COMPLAINT

above), and Intermountain received commissions on the Property's acquisition and sale under the MOU precisely because Long acted as Intermountain's agent in facilitating those transactions (Section IV.A above). Intermountain is therefore liable for Long's acts and statements alleged herein.

c.    **Millrock.** Smith and Long acted as principals, owners, and sales agents of Millrock at all relevant times (Section III.B above), and Smith's family is Millrock's majority owner and single largest investor (Section IV.K above). Smith and Long reviewed and approved the Offering Memorandum representing the Property's value at $9,500,000 (Section IV.E above) in their capacities as Millrock principals and for Millrock's direct financial benefit as the entity that purchased the Property for approximately $2,000,000 and profited from its resale to Plaintiffs. Millrock is therefore liable for Smith's and Long's acts and statements alleged herein.

d.    **SCES.** Destito acted as the principal and owner of SCES at all relevant times (Section III.B above), and served as Thart's sales agent and 1031 exchange accommodator in that capacity, holding and ultimately disbursing Thart's $699,628.45 in exchange proceeds toward the purchase of Thart's interest in the Property (Section III.A above). Destito's statements and conduct toward Thart, including the misrepresentations alleged in Section IV.G above, were made in the course of, and in furtherance of, SCES's business of providing exchange accommodation services to retail 1031 exchange clients such as Thart. SCES is therefore liable for Destito's acts and statements alleged herein.

e.    **CAMS Realty.** Mary Street acted as the managing member of CAMS Realty at all relevant times (Section III.B above), and served in that capacity as the individual responsible for CAMS Realty's role as lease administrator for the Property following Plaintiffs' purchases (Section IV.J above). Street's statements and conduct, including her November 15, 2023 characterization of her own role and her refusal to provide Plaintiffs access to the Property (Section IV.J above), were made within the course and scope of her role as CAMS Realty's managing member and in furtherance of the fees CAMS Realty collected for that role. CAMS Realty is therefore liable for Street's

SECOND AMENDED COMPLAINT

acts and statements alleged herein.

f.    **Mountain West.** Doug and Troy Scheel acted as agents and employees of Mountain West and acted within the scope of their agency and employment in their meetings, calls and emails with the McAllisters. Accordingly, Mountain West is liable for Doug and Troy Scheel's acts and statements as alleged herein.

## V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Securities Fraud Under Section 10(b) of the Exchange Act and Rule 10b-5(b) — By Plaintiffs Against Millrock, Millcreek, Long, Smith, and Intermountain, and Does 1–10)**

138.    Plaintiffs incorporate by reference the allegations set forth in Sections III, IV.A, IV.B, IV.C, IV.D, IV.E, IV.K, IV.L, and IV.P above (¶¶ 14–76, 114–115, 127–135) as though fully set forth herein. This Cause of Action is limited to the Offering Memorandum Misrepresentations and Marketing Misrepresentations described in Sections IV.D and IV.E, which Plaintiffs specifically allege were made, reviewed, or approved by Millrock, Millcreek, Long, Smith, and Intermountain.

139.    The TIC interests in the Property were securities within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), for the reasons set forth in Section IV.C above.

140.    Millrock, Millcreek, Long, Smith, and Intermountain each made, or had ultimate authority over the content of, material misstatements and omissions of fact in connection with the purchase and sale of the TIC interests, including the Offering Memorandum Misrepresentations described in Section IV.E and the Marketing Misrepresentations described in Section IV.D, in violation of 17 C.F.R. § 240.10b-5(b).

141.    As set forth in Section IV.K above, Millrock, Millcreek, Long, and Smith acted with scienter, as demonstrated by, among other things, Smith's direct and substantial financial stake in Millrock as its majority owner, Millrock's undisclosed $2,000,000 acquisition price for a Property marketed to Plaintiffs at a $9,500,000

valuation, and Millrock's own knowledge — as the counterparty to the $2,000,000 FFE payment — that Pulse was an unproven start-up rather than the established tenant represented in the Offering Memorandum. As set forth in Section IV.L above, Intermountain separately acted with scienter, as demonstrated by its direct financial stake in Millrock's and Millcreek's sales volume, its contractual due-diligence obligations under the MOU and the material facts omitted from the package it helped assemble, and its institutional knowledge, as broker of record across Millrock's entire TIC platform, of Millrock's prior TIC failure before the Property was marketed to any Plaintiff.

142. The misrepresented and omitted information was material to Plaintiffs' evaluation of whether to invest in the Property, and Plaintiffs would not have invested had they known the true facts.

143. Plaintiffs justifiably relied on the misrepresentations and omissions of Millrock, Millcreek, Long, Smith, and Intermountain in deciding to invest in the Property.

144. As a direct and proximate result of Millrock's, Millcreek's, Long's, Smith's, and Intermountain's violations of the Exchange Act, Plaintiffs have suffered damages, including the loss of substantially all of their invested principal.

145. Plaintiffs are entitled to rescission, economic damages, disgorgement of profits, fees, and commissions, all applicable statutory remedies, prejudgment interest, and recoverable attorneys' fees and costs.

146. Plaintiff Thart seeks trebled damages under Cal. Civil Code § 3345 because Millrock, Millcreek, Long, Smith, and Intermountain knew or should have known that their conduct was directed at a senior citizen, and their conduct caused Thart substantial loss of retirement property.

## SECOND CAUSE OF ACTION

**(Securities Fraud Under Section 10(b) of the Exchange Act and Rule 10b-5(b) — By the McAllisters Against Doug Scheel, Troy Scheel, and Mountain West)**

147. The McAllisters incorporate by reference the allegations set forth in Sections

III, IV.A, IV.B, IV.C, IV.F, IV.M, and IV.P above (¶¶ 14–55, 77–94, 116, 127–135) as though fully set forth herein. This Cause of Action is limited to the January 6, 2023 and January 25, 2023 Misrepresentations described in Section IV.F, which the McAllisters specifically allege were made directly to them by Doug and Troy, as agents of Mountain West.

148.   The TIC interests in the Property were securities within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), for the reasons set forth in Section IV.C above.

149.   Doug and Troy, as agents of Mountain West, made material misstatements of fact directly to the McAllisters on January 6, 2023, and in prior telephone calls, in connection with the purchase and sale of the TIC interests — namely, the January 6, 2023 Misrepresentations — in violation of 17 C.F.R. § 240.10b-5(b).

150.   As set forth in Section IV.M above, Doug, Troy, and Mountain West acted with scienter, as demonstrated by, among other things, Doug and Troy's direct, particularized denial of compensation they had already contractually secured under a written Professional Referral Agreement with Millcreek predating that denial, Doug's pre-existing relationship of trust with the McAllisters arising from his prior brokerage of their commercial property, and the repeated, rehearsed nature of Doug and Troy's sales representations across multiple telephone calls predating the McAllisters' identification of the Property.

151.   The January 6, 2023 Misrepresentations were material to the McAllisters' evaluation of whether to invest in the Property, and the McAllisters would not have invested had they known the true facts.

152.   The McAllisters justifiably relied on the January 6, 2023 Misrepresentations in deciding to invest in the Property.

153.   As a direct and proximate result of Doug's, Troy's, and Mountain West's violations of the Exchange Act, the McAllisters have suffered damages, including the loss of substantially all of their invested principal.

SECOND AMENDED COMPLAINT

154.    The McAllisters are entitled to rescission, economic damages, disgorgement of profits, fees, and commissions, all applicable statutory remedies, prejudgment interest, and recoverable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

**(Securities Fraud Under Section 10(b) of the Exchange Act and Rule 10b-5(b) — By Plaintiff Thart Against Destito, SCES, Millcreek, and Intermountain)**

155.    Thart incorporates by reference the allegations set forth in Sections III, IV.A, IV.B, IV.C, IV.G, IV.N, and IV.P above (¶¶ 14–55, 95–101, 117–118, 127–135) as though fully set forth herein. This Cause of Action is limited to the oral and e-mail misrepresentations described in Section IV.G, which Thart specifically alleges were made directly to her by Destito, and by Trevor Webber as an agent of Millcreek and Intermountain (collectively, the "Destito and Webber Misrepresentations").

156.    The TIC interests in the Property were securities within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), for the reasons set forth in Section IV.C above.

157.    Destito made material misstatements of fact directly to Thart by telephone on August 4, 2022, and Webber, as an agent of Millcreek and Intermountain, made material misstatements of fact directly to Thart by e-mail on August 9, 2022 (with a copy to Destito), each in connection with the purchase and sale of the TIC interests — namely, that investing with Millcreek meant Thart would "buy an undivided interest in passive income," that the investment was "hands-off" and "risk-free," that the properties were purchased debt-free with a "corporate guarantee to protect you financially," and that the investment was recession-resilient — in violation of 17 C.F.R. § 240.10b-5(b). Millcreek and Intermountain are liable for Webber's statements under the doctrine of respondeat superior (Section IV.R above).

158.    As set forth in Section IV.N above, Destito and SCES acted with scienter. As set forth in Sections IV.K and IV.L above, Millcreek's and Intermountain's scienter with respect to Webber's statements is demonstrated by, among other things, the common

script Millcreek's agents used across all four transactions at issue and Millcreek's and Intermountain's undisclosed financial stake in the sale of TIC interests to Thart.

159. The Destito and Webber Misrepresentations were material to Thart's evaluation of whether to invest in the Property, and Thart would not have invested had she known the true facts.

160. Thart justifiably relied on the Destito and Webber Misrepresentations, including the blog post to which Webber directed her, in deciding to invest in the Property.

161. As a direct and proximate result of Destito's, SCES's, Millcreek's, and Intermountain's violations of the Exchange Act, Thart has suffered damages, including the loss of substantially all of her invested principal.

162. Thart is entitled to rescission, economic damages, disgorgement of profits, fees, and commissions, all applicable statutory remedies, prejudgment interest, and recoverable attorneys' fees and costs.

163. Thart seeks trebled damages under Cal. Civil Code § 3345 because Destito, SCES, Millcreek, and Intermountain knew or should have known that their conduct was directed at a senior citizen, and their conduct caused Thart substantial loss of retirement property.

### FOURTH CAUSE OF ACTION

**(Securities Fraud Under Section 10(b) of the Exchange Act and Rule 10b-5(b) — By Plaintiff Pinder Against Long, Millcreek, and Intermountain)**

164. Pinder incorporates by reference the allegations set forth in Sections III, IV.A, IV.B, IV.C, IV.H, IV.K, IV.L, and IV.P above (¶¶ 14–55, 102–103, 114–115, 127–135) as though fully set forth herein. This Cause of Action is limited to the oral misrepresentations described in Section IV.H, which Pinder specifically alleges were made directly to him by Long, as an agent of Millcreek and Intermountain (the "Long Misrepresentations").

165. The TIC interests in the Property were securities within the meaning of

Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), for the reasons set forth in Section IV.C above.

166.   Long, as an agent of Millcreek and Intermountain, made material misstatements of fact directly to Pinder by telephone in or about June 2022, in connection with the purchase and sale of the TIC interests — namely, that Millcreek was a reputable firm with a good track record and expertise in tenant-in-common investments, that medical buildings such as the Property were "solid," and that the tenant was an expanding medical group with strong financials — in violation of 17 C.F.R. § 240.10b-5(b). Millcreek and Intermountain are liable for Long's statements under the doctrine of respondeat superior (Section IV.R above).

167.   As set forth in Sections IV.K and IV.L above, Long's, Millcreek's, and Intermountain's scienter is demonstrated by, among other things, the common script Millcreek's agents, including Long, used across all four transactions at issue, Long's and Smith's direct financial stake in Millrock's and Millcreek's operations, and Millcreek's and Intermountain's undisclosed prior TIC failures and tenant defaults.

168.   The Long Misrepresentations were material to Pinder's evaluation of whether to invest in the Property, and Pinder would not have invested had he known the true facts.

169.   Pinder justifiably relied on the Long Misrepresentations in deciding to invest in the Property.

170.   As a direct and proximate result of Long's, Millcreek's, and Intermountain's violations of the Exchange Act, Pinder has suffered damages, including the loss of substantially all of his invested principal.

171.   Pinder is entitled to rescission, economic damages, disgorgement of profits, fees, and commissions, all applicable statutory remedies, prejudgment interest, and recoverable attorneys' fees and costs.

SECOND AMENDED COMPLAINT

## FIFTH CAUSE OF ACTION

**(Securities Fraud Under Section 10(b) of the Exchange Act and Rule 10b-5(b) — By Plaintiff Procopio Against Millcreek and Intermountain)**

172.   Procopio incorporates by reference the allegations set forth in Sections III, IV.A, IV.B, IV.C, IV.I, IV.L, and IV.P above (¶¶ 14–55, 104–110, 115, 127–135) as though fully set forth herein. This Cause of Action is limited to the e-mail misrepresentations described in Section IV.I, which Procopio specifically alleges were made directly to him by Rutherford, as an agent of Millcreek and Intermountain (the "Rutherford Misrepresentations").

173.   The TIC interests in the Property were securities within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), for the reasons set forth in Section IV.C above.

174.   Rutherford, as an agent of Millcreek and Intermountain, made material misstatements of fact directly to Procopio by e-mail on April 14, 2023, in connection with the purchase and sale of the TIC interests — namely, that Millcreek properties, including the Property, were "high-grade commercial properties" under "corporate-guaranteed lease terms" with "little to no landlord responsibilities," reflected a "proven track record," would generate cash flow "immediately upon closing," and were in "VERY high demand" — in violation of 17 C.F.R. § 240.10b-5(b). Millcreek and Intermountain are liable for Rutherford's statements under the doctrine of respondeat superior (Section IV.R above).

175.   Rutherford's and Millcreek's scienter is set forth in Section IV.I above, including their knowledge that Millrock purchased the Property for $2,000,000 and resold it for $9,500,000 with no commensurate increase in value; their awareness of prior failures in Millcreek's and Rutherford's TIC syndication efforts, including the bankruptcy of HSH properties, the failure of the hotel investment, and lawsuits naming Rutherford personally for fraud in connection with the Noah's Ark tenant-in-common investments he sold; their knowledge that Millcreek had been unable to fully sell interests in the Property

for nearly one year and that sales had markedly slowed across its TIC properties, rendering the claimed "VERY high demand" false; their knowledge that distributions paid to Procopio were funded from other investors' capital rather than the Property's own cash flow; and Rutherford's subsequent indictment, on August 28, 2023, for securities fraud in connection with the Noah's Ark tenant-in-common investments, to which he later pled guilty to wire fraud.

176.    The Rutherford Misrepresentations were material to Procopio's evaluation of whether to invest in the Property, and Procopio would not have invested had he known the true facts.

177.    Procopio justifiably relied on the Rutherford Misrepresentations in deciding to invest in the Property.

178.    As a direct and proximate result of Rutherford's, Millcreek's, and Intermountain's violations of the Exchange Act, Procopio has suffered damages, including the loss of substantially all of his invested principal.

179.    Procopio is entitled to rescission, economic, disgorgement of profits, fees, and commissions, all applicable statutory remedies, prejudgment interest, and recoverable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

**(Securities Fraud Under Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) — By Plaintiffs Against All Defendants and Does 1–10)**

180.    Plaintiffs incorporate by reference the allegations set forth in Sections III and IV above as though fully set forth herein.

181.    The TIC interests in the Property were securities within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), for the reasons set forth in Section IV.C above.

182.    Defendants, and each of them, participated in the fraudulent scheme described in Section IV, which encompassed conduct beyond the specific misrepresentations and omissions identified in the First, Second, Third, Fourth, and Fifth

Causes of Action, including: Millrock's acquisition of the Property for $75,000 immediately followed by its sale to Plaintiffs at a $9,500,000 valuation with no independent support; Millrock's undisclosed diversion of $2,000,000 of the purchase proceeds back to Pulse, mischaracterized as "FFE", to manufacture the appearance of an established, creditworthy tenant; Millcreek, Intermountain and CIGI's efforts to sell the interests to Plaintiffs with misrepresentations and omissions of key and material facts; the undisclosed Professional Referral Agreements paying 3% commissions to Doug, Troy, Destito, and Mountain West; and CAMS Realty's and Street's post-sale concealment of the true nature of their "management" role, each in violation of 17 C.F.R. §§ 240.10b-5(a) and (c).

183.   KGL is further liable on the grounds that it is the agent, alter ego and same enterprise as Millcreek and Long.

184.   As set forth in Sections IV.K, IV.L, IV.M, and IV.N above, Defendants acted with scienter.

185.   The scheme was material to Plaintiffs' evaluation of whether to invest in the Property, and Plaintiffs would not have invested had they known the true facts.

186.   Plaintiffs justifiably relied on Defendants' scheme, and the misrepresentations and omissions made in furtherance of it, in deciding to invest in the Property.

187.   As a direct and proximate result of Defendants' violations of the Exchange Act, Plaintiffs have suffered damages, including the loss of substantially all of their invested principal.

188.   Plaintiffs are entitled to rescission, economic damages, disgorgement of profits, fees, and commissions, all applicable statutory remedies, prejudgment interest, and recoverable attorneys' fees and costs.

189.   Plaintiff Thart seeks trebled damages under Cal. Civil Code § 3345.

SECOND AMENDED COMPLAINT

## SEVENTH CAUSE OF ACTION

**(Financial Elder Abuse — By Plaintiff Anne Thart Against Millrock, Millcreek, Intermountain, Long, Smith, Destito, SCES, and CAMS Realty, and Does 1–10)**

190.    Thart incorporates by reference the allegations set forth in Sections III, IV.A through IV.E, IV.G, IV.J, and IV.N above as though fully set forth herein.

191.    Thart qualifies as a senior citizen under California law, having been 65 years of age or older at all relevant times.

192.    California's financial elder abuse statute defines "financial abuse" to occur when a person or entity (i) takes, secretes, appropriates, obtains, or retains any interest in real or personal property for a wrongful use, (ii) assists in doing so, or (iii) does so through undue influence or duress. Millrock, Millcreek, Intermountain, Long, Smith, Destito, SCES, and CAMS Realty are liable under (i) and/or (ii) of this statute.

193.    Millrock, Millcreek, Intermountain, Long, Smith, Destito, and SCES put their own financial interests ahead of Thart's; failed to disclose the undisclosed commissions and conflicts of interest described in Sections IV.D, IV.E, and IV.G; pursued an unduly high-risk, high-cost investment strategy while representing it as safe and stable; and misstated, misrepresented, or omitted the risks of the investment as detailed above. Thart relied on these representations.

194.    A conclusive presumption of financial abuse arises under Cal. Welf. & Inst. Code § 15610.30(b) because Millrock, Millcreek, Intermountain, Long, Smith, Destito, SCES, and CAMS Realty knew or should have known that their conduct was likely to be harmful to an elderly California resident.

195.    Millrock, Millcreek, Intermountain, Long, Smith, Destito, SCES, and CAMS Realty, and their co-conspirators, exerted undue influence over Thart given the substantial disparity in financial and operational sophistication between Thart and the expertise these Defendants represented that they possessed.

196.    As a direct and proximate result of the foregoing financial elder abuse, Thart

SECOND AMENDED COMPLAINT

has suffered damages.

197.   Thart seeks attorneys' fees and costs under Cal. Welf. & Inst. Code § 15657.5(a), emotional distress and pain-and-suffering damages under Cal. Civil Code § 3333 and Cal. Welf. & Inst. Code § 15657.5(b)(1), trebled damages under Cal. Civil Code § 3345, and punitive and exemplary damages under Cal. Civil Code § 3294.

## EIGHTH CAUSE OF ACTION

**(Financial Exploitation of a Vulnerable Adult — By Plaintiff Glenn Pinder Against Millrock, Millcreek, Intermountain, Long, Smith, and CAMS Realty, and Does 1–10)**

198.   Pinder incorporates by reference the allegations set forth in Sections III, IV.A through IV.E, IV.H, IV.J, IV.K, and IV.L above as though fully set forth herein.

199.   Pinder qualifies as an elder adult under Utah law, having been 65 years of age or older at all relevant times.

200.   Utah's financial exploitation statute, Utah Code § 76-5-111.4(2)(a), imposes liability on a person or entity in a position of trust and confidence with a vulnerable adult who, by deception, obtains or uses the vulnerable adult's assets for the benefit of someone other than the vulnerable adult. Utah Code § 26B-6-213 affords a private right of action to a vulnerable adult who suffers harm or loss from such exploitation.

201.   Millrock, Millcreek, Intermountain, Long, and Smith put their own financial interests ahead of Pinder's; failed to disclose the conflicts of interest, undisclosed commissions, and risks described in Sections IV.A through IV.E; and misstated, misrepresented, concealed, or omitted the true condition of the investment. Pinder relied on these representations, including through his trusted relationship with Millcreek via his wife's grandson, Andrew Bell.

202.   Millrock, Millcreek, Intermountain, Long, and Smith exerted undue influence over Pinder given the substantial disparity in financial and operational sophistication between Pinder and the expertise these Defendants represented that they possessed.

203.   As a direct and proximate result of the foregoing exploitation, Pinder has suffered harm and financial loss.

204.   Pinder seeks attorneys' fees and costs under Utah Code § 26B-6-213(3), emotional distress and pain-and-suffering damages, and punitive and exemplary damages.

## NINTH CAUSE OF ACTION

**(Breach of Fiduciary Duty — By Plaintiffs Against Millcreek, Intermountain, Long, Smith, Mountain West, Doug, Troy, Destito, SCES, and CAMS Realty, and Does 1–10)**

205.   Plaintiffs incorporate by reference the allegations set forth in Sections III and IV above as though fully set forth herein.

206.   Millcreek, Intermountain, Long, Smith, Mountain West, Doug, Troy, Destito, SCES, and CAMS Realty each owed Plaintiffs fiduciary duties arising from their roles as licensed real estate brokers or agents (Intermountain, Millcreek, Long, Smith, Doug, Troy, Mountain West, and CAMS Realty); as a qualified intermediary and 1031 exchange accommodator entrusted with Plaintiffs' exchange funds (Destito and SCES); as agents performing duties requiring a securities license (all such Defendants); as agents otherwise acting on Plaintiffs' behalf regarding the TIC investments; as recipients of substantial compensation from funds paid by Plaintiffs; and by virtue of the disparity in age, experience, and sophistication between Plaintiffs and these Defendants, which necessarily invited Plaintiffs' trust and reliance.

207.   Millcreek, Intermountain, Long, Smith, Mountain West, Doug, Troy, Destito, SCES, and CAMS Realty breached their fiduciary duties by failing to disclose the material information described in Sections IV.D through IV.J, including the risks of the investment, the true creditworthiness and lack of operating history of Pulse, the failure to conduct adequate due diligence, undisclosed conflicts of interest and referral commissions, and the true nature of CAMS Realty's post-sale role.

208.   As a direct and proximate result of these breaches, Plaintiffs have suffered

damages.

209.   Plaintiffs are entitled to rescission, economic and noneconomic damages, disgorgement of profits, fees, and commissions, prejudgment interest, and recoverable attorneys' fees and costs.

210.   Plaintiff Thart seeks trebled damages under Cal. Civil Code § 3345, and Plaintiffs seek punitive and exemplary damages under Cal. Civil Code § 3294 based on Defendants' intentional, malicious, fraudulent, or oppressive conduct.

**TENTH CAUSE OF ACTION**

**(Aiding and Abetting Breach of Fiduciary Duty — By Plaintiffs Against Millrock and Intermountain, and Does 1–10)**

211.   Plaintiffs incorporate by reference the allegations set forth in Sections III, IV.A, IV.B, IV.F through IV.J above as though fully set forth herein.

212.   As to any Defendant who did not itself owe Plaintiffs a fiduciary duty, that Defendant aided and abetted the breaches of fiduciary duty described in the Ninth Cause of Action.

213.   Millrock and Intermountain, with knowledge of the fiduciary duties owed to Plaintiffs by Millcreek, Long, Smith, Mountain West, Doug, Troy, Destito, SCES, and CAMS Realty, knowingly and substantially assisted those Defendants' breaches by, among other things, distributing sales materials concerning the Property, referring Plaintiffs to the Property, recommending the investment, and providing assurances to Plaintiffs concerning their participation.

214.   As a direct and proximate result of Millrock's and Intermountain's aiding and abetting, Plaintiffs have suffered damages.

215.   Plaintiffs are entitled to rescission, economic and noneconomic damages, disgorgement of profits, fees, and commissions, prejudgment interest, and recoverable attorneys' fees and costs, and Plaintiff Thart seeks trebled damages under Cal. Civil Code § 3345 and Plaintiffs seek punitive damages under Cal. Civil Code § 3294

SECOND AMENDED COMPLAINT

## ELEVENTH CAUSE OF ACTION

### (Conversion — By Plaintiffs Against All Defendants and Does 1–10)

216.    Plaintiffs incorporate by reference the allegations set forth in Sections III, IV.E, IV.J, and IV.O above as though fully set forth herein.

217.    Millrock and its principals Long and Smith, without authorization, wrongfully exercised control over Plaintiffs' invested funds by diverting $2,000,000 of the purchase proceeds back to Pulse under the guise of "FFE" costs, and CAMS Realty and Street wrongfully exercised control over Plaintiffs' funds through escalating, undisclosed management fees, in each case for Defendants' own benefit and in conscious disregard of Plaintiffs' rights.

218.    Further, each of the Defendants diverted Plaintiffs' invested funds to themselves as commissions and fees without proper disclosure to Plaintiffs.   They purposefully concealed commissions paid by failing to include commissions and fees disrupted on the Buyer's Final Closing Statement or in the Offering Memoranda.

219.    As a direct and proximate result, Plaintiffs have suffered damages.

220.    Plaintiffs are entitled to the return of their converted funds or the fair market value thereof as of the date of conversion, plus interest, costs, and other relief the Court deems just, and Plaintiff Thart seeks trebled damages under Cal. Civil Code § 3345 and Plaintiffs seek punitive damages under Cal. Civil Code § 3294.

## TWELFTH CAUSE OF ACTION

### (Constructive Fraud — By Plaintiffs Against Millcreek, Intermountain, Long, CAMS Realty, Doug and Troy Scheel, Mountain West and Does 1–10)

221.    Plaintiffs incorporate by reference the allegations set forth in Sections III and IV above as though fully set forth herein.

222.    Defendants, and each of them, were fiduciaries of Plaintiffs acting as real estate agents, brokers, securities intermediaries, and/or accommodators entrusted with Plaintiffs' retirement funds, and held themselves out as having superior knowledge of real estate and investment matters.

SECOND AMENDED COMPLAINT

223.   Defendants knew or should have known of the risks associated with the investment, Pulse's lack of creditworthiness and operating history, the funds diverted to Pulse, the actual acquisition cost of the Property, the failure to conduct adequate due diligence, the limited ability to resell or re-lease the Property, and the undisclosed conflicts of interest and commissions described above, and misled Plaintiffs by providing inaccurate and incomplete information.

224.   As a direct and proximate result, Plaintiffs have suffered damages, and Plaintiff Thart seeks trebled damages under Cal. Civil Code § 3345 and Plaintiffs seek punitive damages under Cal. Civil Code § 3294.

## THIRTEENTH CAUSE OF ACTION

### (Professional Negligence — By Plaintiffs Against All Defendants and Does 1–10)

225.   Plaintiffs incorporate by reference the allegations set forth in Sections III and IV above as though fully set forth herein.

226.   Defendants owed Plaintiffs a duty of reasonable care in their capacities as licensed real estate brokers, agents, and/or accommodators, including a duty to conduct reasonable due diligence on the Property and its tenant and to disclose material facts affecting the investment.

227.   Defendants breached that duty by failing to conduct adequate due diligence on Pulse, failing to verify that a surgery center was operating at the Property, and failing to disclose the facts set forth in Section IV above.

228.   As a direct and proximate result, Plaintiffs have suffered damages.

## FOURTEENTH CAUSE OF ACTION

### (Negligent Misrepresentation — By Plaintiffs Against All Defendants and Does 1–10)

229.   Plaintiffs incorporate by reference the allegations set forth in Sections III and IV above as though fully set forth herein.

230.   Defendants had a duty to fully and fairly disclose all facts materially

69

affecting the condition of the Property, the viability of the investment, and the legitimacy of Pulse and its guarantors.

231. Defendants made the false representations detailed in Section IV above. To the extent any Defendant honestly, but unreasonably, believed such representations were true when made, that Defendant is liable for negligent misrepresentation.

232. Defendants intended that Plaintiffs rely, and Plaintiffs reasonably did rely, on these representations, which was a substantial factor in causing Plaintiffs' harm.

## FIFTEENTH CAUSE OF ACTION

### (Violation of California's Unfair Competition Law — By Plaintiffs Against All Defendants and Does 1–10)

233. Plaintiffs incorporate by reference the allegations set forth in Sections III and IV above as though fully set forth herein.

234. Defendants' conduct described above violated Business and Professions Code §§ 17200 et seq. and 17500 et seq., constituting unlawful, unfair, and fraudulent business practices, including the deliberate withholding of material information and a pattern of misconduct across multiple Millcreek-marketed properties.

235. Plaintiffs are entitled to restitution and injunctive relief.

## SIXTEENTH CAUSE OF ACTION

### (Control Person Liability Under Section 20(a) of the Exchange Act — By Plaintiffs Against CIGI, Intermountain, Millrock, and Long, and Does 1–10)

236. Plaintiffs incorporate by reference the allegations set forth in the First, Third through Fifth, and Sixth Causes of Action, Sections III.B (¶¶ 19–20), IV.B, IV.D, IV.E, and IV.L above as though fully set forth herein.

237. Intermountain, Millrock, and Long each controlled Millcreek and had the power to direct or cause the direction of Millcreek's policies, communications, website content, agent training, and agent conduct, and were involved in Millcreek's day-to-day operations, including preparation of the Offering Memorandum and Millcreek's website and e-mail communications. CIGI, in turn, controlled Intermountain by establishing the

SECOND AMENDED COMPLAINT

governing policies and marketing guidelines Intermountain was required to follow in conducting the business alleged herein, including the preparation and dissemination of marketing materials such as the Offering Memorandum (Section IV.B above). Intermountain separately controlled Long individually: Intermountain employed Long as an Executive Vice President, held Long's real estate license, and had the contractual and practical authority to direct, supervise, and discipline Long's conduct, including his preparation and approval of the Offering Memorandum and marketing materials described in Sections IV.D and IV.E above (Section III.B above). CIGI, in turn, controlled Long's conduct derivatively by establishing the governing policies and marketing guidelines Long was required to follow, as Intermountain's agent, in preparing and disseminating those materials.

238.    Intermountain, Millrock, and Long were culpable participants in Millcreek's violations of the Exchange Act alleged herein, and knew or should have known of those violations and failed to act in good faith to prevent them. CIGI was a culpable participant in, or at minimum failed to act in good faith to prevent, Intermountain's violations of the Exchange Act alleged herein, as further described in Section IV.L above. Intermountain was separately a culpable participant in, or at minimum failed to act in good faith to prevent, Long's individual violations of the Exchange Act, given Intermountain's direct employment relationship with, and supervisory authority over, Long. CIGI was similarly a culpable participant in, or at minimum failed to act in good faith to prevent, Long's violations, given CIGI's role in establishing the marketing guidelines under which Long prepared the materials at issue.

239.    Intermountain, Millrock, and Long are therefore liable, as control persons, for Millcreek's primary violations of the Exchange Act. CIGI is therefore liable, as a control person, for Intermountain's primary violations of the Exchange Act. Intermountain and CIGI are therefore also liable, as control persons, for Long's individual primary violations of the Exchange Act.

71

SECOND AMENDED COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally:

1. Rescission of the transactions at issue;

2. Economic and noneconomic damages according to proof;

3. Trebled damages according to proof at trial pursuant to Cal. Civil Code § 3345;

4. Restitution, including the return of all fees, commissions, transaction costs, and disgorgement of profits;

5. A declaration or final order rescinding the sale of the Property to Plaintiffs;

6. Pre-judgment and post-judgment interest;

7. Punitive and exemplary damages according to proof;

8. Reasonable attorneys' fees and costs of suit as permitted by statute or law; and

9. Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial in the above-entitled action.

Dated: July 28, 2026

**REIF LAW GROUP, P.C.**

*Brandon S. Reif*

Brandon S. Reif
Rachel D. Dardashti

Attorneys for Plaintiffs

72

SECOND AMENDED COMPLAINT