Brandon S. Reif (SBN 214706)
Rachel D. Dardashti (SBN 292126)
**REIF LAW GROUP, P.C.**
315 S. Beverly Drive, Suite 315
Beverly Hills, CA 90212
Telephone: (310) 494-6500
Email: docket@reiflawgroup.com
breif@reiflawgroup.com
rdardashti@reiflawgroup.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ANNE L. THART, an individual and trustee of THE ANNE L. THART LIVING TRUST DATED JULY 1, 1998; RUSSELL CHADWICK MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; AMY MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; JOSEPH A. PROCOPIO, an individual and trustee of THE JOSEPH A. PROCOPIO SR. FAMILY TRUST; GLENN T. PINDER, an individual and sole member of PINDER ENTERPRISES, LLP,

Plaintiffs,

vs.

COLLIERS INTERNATIONAL GROUP, INC., a Canadian corporation; COLLIERS INTERNATIONAL INTERMOUNTAIN, LLC, a Delaware limited liability company; MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1,

CASE NO.: 2:24-cv-10876-CV-E

**PLAINTIFFS' OPPOSITION TO DEFENDANTS DOUG SCHEEL, TROY SCHEEL, AND MOUNTAIN WEST COMMERCIAL, LLC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

LLC, a Utah limited liability company; KEVIN LONG, an individual; BRENT SMITH, an individual; DOUGLAS SCHEEL, an individual; TROY SCHEEL, an individual; MOUNTAIN WEST COMMERCIAL, LLC, a Utah limited liability company; MEGAN DESTITO, an individual; CAMS REALTY, LLC, a Utah limited liability company; KGL ADVISORS, LLC, a Utah limited liability company; SOUTHERN CALIFORNIA EXCHANGE SERVICES, LLC, a California limited liability company, and DOES 1-10, inclusive,

Defendants.

# TABLE OF CONTENTS

I. INTRODUCTION .......... 10
II. FACTUAL BACKGROUND .......... 11
A. The Agency Relationship .......... 11
B. The Property, the Undisclosed Fee, and Doug's Rejection of the Investment .......... 11
C. The Scheels Induced the Sale and Directed the Exchange Proceeds .......... 11
D. The January 6, 2023 Misrepresentations .......... 12
E. Amy Asked to See the Property and the Scheels Made Certain She Never Did .......... 12
F. Each Representation Was False, and the McAllisters Lost Everything .......... 13
III. LEGAL ARGUMENT .......... 14
A. The Motion Should Be Denied for Failure to Comply with L.R. 7-3 .......... 14
1. No Conference Took Place Seven Days Before Filing .......... 14
2. The August 18, 2026 Letter Sets Forth Limited Grounds for Dismissal .......... 15
3. Four of the Six Challenged Claims Were Never Discussed .......... 15
B. Standard on a Motion to Dismiss .......... 15
C. The Second Cause of Action Pleads Scienter .......... 16
1. Scienter Is Assessed Defendant-by-Defendant .......... 17
2. Troy Scheel .......... 17
3. Doug Scheel .......... 18
4. Mountain West .......... 20
D. The Sixth Cause of Action States Scheme Liability .......... 21
1. *Lorenzo* Abrogated the Rule Defendants Invoke .......... 22
2. The SAC Pleads Conduct Beyond the Statements .......... 23
3. Scienter .......... 24
4. Paragraph 182 Is Not Group Pleading .......... 25
E. The Ninth Cause of Action Is Not Duplicative .......... 25
1. Defendants' Authorities Do Not Support Dismissal .......... 26

2. Defendants Owed Fiduciary Duties as a Matter of Law .......... 26

3. Fiduciary Breach Is a Distinct Tort .......... 27

4. The SAC Pleads Loyalty Breaches .......... 28

5. The Relief Sought Differs .......... 28

6. Duplication Is Not a Rule 12(b)(6) Ground .......... 29

F. The Eleventh Cause of Action States Conversion .......... 29

1. The SAC Identifies a Specific, Identifiable Sum .......... 29

2. The SAC Alleges a Wrongful Act .......... 30

3. *Padhye* Is Distinguishable .......... 30

G. The Twelfth Cause of Action Satisfies Rule 9(b) .......... 31

H. The Fifteenth Cause of Action States a UCL Claim .......... 32

1. The Unlawful Prong .......... 32

2. The Unfair Prong .......... 33

3. The Fraudulent Prong .......... 33

I. Leave to Amend .......... 34

IV. CONCLUSION .......... 34

## TABLE OF AUTHORITIES

**Federal Cases**

*Alcatel-Lucent USA, Inc. v. Dugdale Commc'ns, Inc.*,
No. CV 09-2140PSGJCX, 2009 WL 3346784 (C.D. Cal. Oct. 13, 2009) ..................... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................... 14

*Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) ..................... 31

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ..................... 19

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ..................... 33

*Foman v. Davis*,
371 U.S. 178 (1962) ..................... 33

*Fontana v. Haskin*,
262 F.3d 871 (9th Cir. 2001) ..................... 15

*Hollinger v. Titan Capital Corp.*,
914 F.2d 1564 (9th Cir. 1990) ..................... 20

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ..................... 21

*In re Intuitive Surgical Sec. Litig.*,
759 F.3d 1051 (9th Cir. 2014) ..................... 18

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..................... 18

*In re RxSight, Inc. Sec. Litig.*,
No. 8:25CV01596-FWS-KES, 2026 WL 1480785 ..................... 19

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ..................... 15

*Joseph v. Zurich N. Am.*,
No. 8:24-CV-00724-MCS-KES, 2026 WL 1461124 (C.D. Cal. Mar. 4, 2026) ........... 13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........... 19

*LockandLocate, LLC v. Hiscox Ins. Co.*,
549 F.Supp.3d 1093 (C.D. Cal. 2021) ........... 32

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ........... 15

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019) ........... 21

*Malouf v. SEC*,
933 F.3d 1248 (10th Cir. 2019) ........... 23

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ........... 15

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 ........... 15

*Mindys Cosms., Inc. v. Dakar*,
611 F.3d 590 (9th Cir. 2010) ........... 29, 30

*National Specialty Pharmacy, LLC v. Padhye*,
734 F.Supp.3d 922 (N.D. Cal. 2024) ........... 29

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ........... 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ........... 19

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001) ........... 33

*Paul F. Newton & Co. v. Tex. Com. Bank*,
630 F.2d 1111 (5th Cir. 1980) ........... 20

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .......... 15, 19

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) .......... 19

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
375 U.S. 180 (1963) .......... 26

*SEC v. Criterion Wealth Mgmt. Servs., Inc.*,
599 F.Supp.3d 932 (C.D. Cal. 2022) .......... 26

*SEC v. Ficeto*,
839 F.Supp.2d 1101 (C.D. Cal. 2011) .......... 15

*Stoyas v. Toshiba Corp.*,
896 F.3d 933 (9th Cir. 2018) .......... 15

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) .......... 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .......... 15, 19

*Thomas, Head & Greisen Emps. Trust v. Buster*,
24 F.3d 1114 (9th Cir. 1994) .......... 26

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
655 F.3d 1039 (9th Cir. 2011) .......... 21

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... 15

**State Cases**

*Assilzadeh v. Cal. Fed. Bank*,
82 Cal.App.4th 399 (Ct. App. 2000) .......... 26

*Bardin v. DaimlerChrysler Corp.*,
136 Cal.App.4th 1255 (2006) .......... 32

*Broadway Victoria, LLC v. Norminton, Wiita & Fuster*,
10 Cal.App.5th 1185 (2017) .......... 25, 27

*Buehler v. Sbardellati*,
34 Cal.App.4th 1527 (Ct. App. 1995) .......... 25

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal.4th 163 (1999) .......... 32

*David Welch Co. v. Erskine & Tulley*,
203 Cal.App.3d 884 (1988) .......... 26

*Fischer v. Machado*,
50 Cal.App.4th 1069 (1996) .......... 29

*Haigler v. Donnelly*,
18 Cal.2d 674 (1941) .......... 28

*Hasso v. Hapke*,
227 Cal.App.4th 107 (2014) .......... 26

*Khoury v. Maly's of Cal., Inc.*,
14 Cal.App.4th 612 (1993) .......... 32

*Knox v. Dean*,
205 Cal.App.4th 417 (2012) .......... 28

*Knutson v. Foster*,
25 Cal.App.5th 1075 (2018) .......... 27

*Lazar v. Superior Court*,
12 Cal.4th 631 (1996) .......... 31

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150
Cal.App.4th 384 (2007) .......... 28

*Pereira v. Thompson*,
230 Or.App. 640 (2008) .......... 25

*S. Bay Chevrolet v. GMAC*,
72 Cal.App.4th 861 (1999) .......... 33

*Salahutdin v. Valley of Cal., Inc.*,
24 Cal.App.4th 555 (Ct. App. 1994) ....................26, 27

*Schnall v. Hertz Corp.*,
78 Cal.App.4th 1144 (2000) ....................32

*Stanley v. Richmond*,
35 Cal.App.4th 1070 (1995) ....................26

*Tarmann v. State Farm Mut. Auto. Ins. Co.*,
2 Cal.App.4th 153 (1991) ....................31

*Weiss v. Marcus*,
51 Cal.App.3d 590 (1975) ....................28

*Wyatt v. Union Mortg. Co.*,
24 Cal.3d 773 (1979) ....................19, 26

**Federal Statutes**

15 U.S.C. § 78u-4 ....................15, 16

**State Statutes**

Cal. Bus. & Prof. Code § 10176 ....................27

Cal. Civ. Code § 1573 ....................26, 28, 31

Cal. Civ. Code § 2079.13 ....................26

Cal. Civ. Code § 2079.16 ....................26

Cal. Civ. Code § 2224 ....................27, 28, 29

Cal. Civ. Code § 3294 ....................28

**Regulations**

17 C.F.R. § 240.10b-5 ....................23

# I. INTRODUCTION

Chad and Amy McAllister had never completed a 1031 exchange and relied on the men who had brokered their earlier purchase. Doug and Troy Scheel sold the McAllisters' warehouse, collected roughly $120,000 in commissions, and steered the entire $2,000,000 in proceeds into a single fractional interest in a building in Crockett, Texas.

On January 6, 2023, the Scheels told the McAllisters that the investment carried no risk, that the Property would be professionally managed, and, in response to a direct question, that they would receive no compensation. Each was false. Troy had signed an agreement entitling him to a 3% referral fee four months earlier. Doug had evaluated this same Property nine months earlier and declined to buy it for his own portfolio because the price per square foot was too high. When Amy said she was unwilling to commit $2,000,000 to a property she had never seen, Troy told her husband there was "no time for that" and asked him "[w]ho wears the pants in your marriage?" She never saw the building. Had she, she would have found it empty. The tenant never operated there at all - as Kevin Long admitted in writing after the default.

The Mountain West Defendants' Motion does not deny any of this. It argues instead that none of it matters. It says Doug's rejection of the Property reflects only that he "simply disagreed with the valuation" (Dkt. 168. at 5) - but a broker who privately concludes an asset is overpriced and then tells his own clients it is "worth more than the amount [they were] investing" has not disagreed about value; he has misstated it. It says Troy's referral agreement establishes "motive at most" (*id.*) - but Troy did not have a "motive" to deny his compensation. He denied it, and a contract he signed four months earlier proves he knew better. The Motion says the Mountain West Defendants cannot be liable because they never reviewed Millrock's books, Pulse's financial records, or a Texas creditor's filings. Under that rule, the less a salesman troubles to learn, the safer he becomes, and an agent may deny his own commission to his own client with impunity so long as he remains ignorant of everything else.

The Motion should be denied in its entirety.

## II. FACTUAL BACKGROUND

### A. The Agency Relationship

Chad and Amy McAllister own a cabinet and closet-solutions business in Washington, Utah. (Dkt. 163 ¶ 15.) They are not securities professionals, have no experience managing medical real estate, and had never completed a Section 1031 exchange. (¶¶ 15, 53, 80.) Doug and Troy are Utah real estate brokers and sales agents at Mountain West who "personally served as the McAllisters' own real estate agents." (¶¶ 25–26.) Doug represented the McAllisters in purchasing the very warehouse he and Troy later persuaded them to sell. (¶ 116(b).) Both held their licenses with Mountain West and acted within the scope of that agency. (¶¶ 27, 94, 137(f).)

### B. The Property, the Undisclosed Fee, and Doug's Rejection of the Investment

Millrock purchased the Crockett, Texas property from Spectre Innovations, LLC on October 11, 2022 for approximately $2,000,000, then sold fractional TIC interests to Plaintiffs on a stated valuation of $9,500,000, with no business justification for the markup beyond Defendants' commissions, fees, and profit. (¶¶ 42, 76.) The governing Memorandum of Understanding paid a 4% commission on all sales, "of which up to 3% may be paid to a cooperating or referring broker." (¶ 40.) On September 1, 2022, Troy signed a written Professional Referral Agreement with Millcreek obligating Millcreek to pay him a 3.0% referral fee for exactly the kind of referral he and Doug then made. (¶¶ 101, 116(a); Ex. B.) Plaintiffs allege on information and belief that Doug and Mountain West were parties to substantially similar arrangements. (¶ 101.) These fees did not appear in the Offering Memorandum or on the Buyer's Final Closing Statement. (¶¶ 73(g), 218.)

Separately, in or around April 2022, nine months before he pitched the Property to the McAllisters, Doug personally considered buying a TIC interest and declined because he determined, in his professional capacity as a broker, that the price per square foot was too high. (¶¶ 88, 116(e).) He never disclosed that evaluation to the McAllisters. (¶ 88.)

### C. The Scheels Induced the Sale and Directed the Exchange Proceeds

On or about August 13, 2022, Troy left Chad a voicemail about a buyer for the

McAllisters' commercial property; they accepted once the offer reached $2,000,000. (¶ 78.) Doug and Troy received approximately $120,000 in commissions on that sale. (¶ 116(b).) The McAllisters wanted to use part of the proceeds for a local business property and a new home. (¶ 79.) Doug and Troy instead recommended a 1031 exchange, told the McAllisters they were experts in such exchanges, advised them where to place the funds, and urged them toward Millcreek, emphasizing the identification deadlines and the tax consequences of missing them. (¶¶ 80–81.) When the McAllisters said they wanted to split the proceeds between two properties, Doug and Troy repeatedly told them that placing everything in the Crockett Property would secure their financial future. (¶ 82.) When Amy objected that the family still needed a property to house its business, they told her the McAllisters could simply borrow money to buy one later. (¶ 83.)

### D. The January 6, 2023 Misrepresentations

At an in-person meeting at the Scheels' office in St. George, Utah on or around January 6, 2023, Doug and Troy told Chad that: (a) they had personally invested in Millcreek properties and could vouch for Millcreek; (b) there was no risk because the McAllisters could sell their interest at any time; (c) the Property would be professionally managed, such that the McAllisters need not personally deal with it; (d) when asked directly, that they would receive no compensation in connection with the sale; and (e) Doug would personally invest in the Property. (¶ 84.) They had made substantially the same statements by telephone on multiple prior occasions, before the McAllisters had identified the Property. (¶¶ 84, 116(c).) Chad executed the Purchase and Sale Agreement at the meeting. (¶ 84.) That same month, Doug and Troy reviewed the Offering Memorandum with Chad by telephone and encouraged the investment; on their recommendation, the McAllisters identified the Property within the 45-day window. (Dkt. 163 ¶ 74.)

### E. Amy Asked to See the Property and the Scheels Made Certain She Never Did

Amy reviewed the Offering Memorandum on Millcreek's website on January 6, 2023 and was unwilling to commit $2,000,000 to a property she had never seen. (¶ 85.) When Chad relayed that she wanted to visit, Troy did not arrange a visit, propose an

alternative, or explain why one was impossible. He said, "There's no time for that," then directed his response not to Amy but to her husband, asking "[w]ho wears the pants in your marriage?" and "[a]re you going to allow your wife to ruin this opportunity for you?" (¶ 85.) Worried she would lose the tax deferral and feeling pressure to agree, Amy signed on January 9, 2023. (¶ 86.) Before she signed, the McAllisters received an e-mail representing that "[t]he tenant is open, operating, and paying rent" — false when made, because the tenant never operated from the Crockett Property. (¶ 87.)

At the January 25, 2023 closing, Amy again told Doug she did not want to sign because she had never seen the Property. Doug "chuckled" while assuring her the investment was safe, was "worth more than the amount the McAllisters were investing," and would be professionally managed. (¶ 91.) He called it a "no-brainer" and "the deal of a lifetime," and again claimed he would personally buy in. (¶ 92.) Amy "reluctantly agree[d] to sign," and the McAllisters closed their $2,000,000 purchase of a 19.7121% interest that day. (¶¶ 15, 93.) After closing, when Plaintiffs sought to visit the Property to confirm its condition, Mary Street refused and would not provide keys. (¶ 111.)

**F. Each Representation Was False, and the McAllisters Lost Everything**

Pulse "never opened or operated a surgery center at the Property at all," and the tenant "never operated from the Crockett Property." (¶¶ 65, 87.) Long acknowledged in writing on November 15, 2023 that Pulse's principal "has not followed through on his plans to open the surgery center" (¶ 120), and confirmed on April 30, 2024 that "Spectre/Pulse was contractually obligated (and in fact paid $2 million) to open a surgery center. They have not." (¶ 122.) The Property was never professionally managed: CAMS Realty served only as a lease administrator with no on-site presence. (Dkt. 163 ¶¶ 90, 113.) And Doug and Troy did receive a 3% commission. (¶ 90.) Pulse stopped paying rent in October 2023 and filed for bankruptcy in June 2024. (¶¶ 119, 123.) The investors have since marketed the Property at under $2,000,000 and received no offers. (¶¶ 125, 132.) The McAllisters lost substantially all of their $2,000,000, received none of the promised income, and now personally bear the taxes, insurance, maintenance, and lease-administration fees Doug and

Troy told them they would never pay. (¶¶ 126, 133, 135, 153.)

## III. LEGAL ARGUMENT

### A. The Motion Should Be Denied for Failure to Comply with L.R. 7-3

Before reaching the merits, the Court should address a threshold defect. L.R. 7-3 required Defendants to confer with Plaintiffs' counsel - in person, by telephone, or by video - about the substance of this Motion at least seven days before filing it. Defendants did not do so. The only two conferences that occurred took place four days before and on the day of filing, and four of the six causes of action Defendants challenge were never the subject of any conference at all. Defendants' own declaration establishes these facts.

Defendants did not hold an L.R. 7-3 conference at least seven days before filing, and four of the six grounds raised were never the subject of any pre-filing conference. Their own declaration confirms the first live conference occurred on August 21, 2026—four days before filing—and that additional issues were first raised by email on August 22, 2026 and in a call on August 25, 2026, the day of filing. In these circumstances, courts in this District routinely deny or decline to consider motions that do not comply with L.R. 7-3. The Court should deny the motion in its entirety, or at minimum decline to consider the Ninth, Eleventh, Twelfth, and Fifteenth Causes of Action because no timely conference occurred as to those issues. *See Joseph v. Zurich N. Am.,* No. 8:24-CV-00724-MCS-KES, 2026 WL 1461124, at *1 (C.D. Cal. Mar. 4, 2026); *Alcatel-Lucent USA, Inc. v. Dugdale Commc'ns, Inc.,* No. CV 09-2140PSGJCX, 2009 WL 3346784, at *4 (C.D. Cal. Oct. 13, 2009).

#### 1. No Conference Took Place Seven Days Before Filing

The record shows no L.R. 7-3 conference at least seven days before filing and no timely meet-and-confer on four challenged claims. Defendants first conferred by Zoom on August 21, 2026—four days before filing—and raised the Ninth, Eleventh, Twelfth, and Fifteenth Causes of Action for the first time by email on August 22, 2026. Because L.R. 7-3 requires a substantive conference at least seven days before filing and because no conference ever occurred as to those four claims, the Court should deny the motion or,

at minimum, decline to consider the challenges to the Ninth, Eleventh, Twelfth, and Fifteenth Causes of Action.

**2. The August 18, 2026 Letter Sets Forth Limited Grounds for Dismissal**

The August 18, 2026 letter sets forth five distinct points: (1) scienter as to Mountain West; (2) allegations concerning Doug's alleged compensation and April 2022 decision; (3) statements characterized as "no risk", "no-brainer" and "deal of a lifetime"; (4) Rule 10b5(a) and (c) scheme liability; and (5) section 20(a). (Dkt. 168-1 ¶ 3 & Ex. A). The letter said nothing about the Ninth Cause of Action for breach of fiduciary duty, the Eleventh for conversion, the Twelfth for constructive fraud, and the Fifteenth for unfair competition. It also said nothing about scienter as to Troy Scheel. (*Id.*)

**3. Four of the Six Challenged Claims Were Never Discussed**

The Ninth, Eleventh, Twelfth, and Fifteenth causes of action surfaced for the first time on Saturday, August 22, 2026 - after the only substantive conference had already concluded, and three days before filing - in an email. (*Id.*, Ex. D at 2–3.) Plaintiffs' counsel objected in writing that "these are entirely new issues that you have raised for the first time on Saturday (before filing your motion on Tuesday)," and that they "were not addressed in any manner in your August 18, 2026 meet and confer letter or in our meet and confer call." (*Id.,* Ex. E at 1–2.) Counsel's declaration does not refute this.

Accordingly, Plaintiffs respectfully request that the Court deny the Motion without prejudice for failure to comply with L.R. 7-3. At a minimum, the Court should decline to consider the Motion as to the Ninth, Eleventh, Twelfth, and Fifteenth Causes of Action, as to which no conference of counsel occurred at any time before filing.

**B. Standard on a Motion to Dismiss**

On a Rule 12(b)(6) motion the Court accepts all well-pleaded factual allegations as true and asks only whether the complaint contains "sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Dismissal is appropriate "only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med.*

*Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). The Court considers the complaint "in its entirety," including documents incorporated by reference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "Pleadings need suffice only to put the opposing party on notice of the claim"; "[s]pecific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief." *Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001). Rule 9(b) does not require a plaintiff to "provide every factual detail supporting its fraud claim"; it is enough to allege each defendant's role, the specific fraudulent acts, and why they are fraudulent. *SEC v. Ficeto*, 839 F.Supp.2d 1101, 1105 (C.D. Cal. 2011), *abrogated on other grounds by Stoyas v. Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018). Under the PSLRA the Court undertakes a "dual inquiry": whether any allegation standing alone creates a strong inference of scienter, and whether the allegations do so collectively. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009). Either sequence is permissible so long as the Court does not "unduly focus on the weakness of individual allegations to the exclusion of the whole picture." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012).

**C. The Second Cause of Action Pleads Scienter**

Defendants challenge only scienter. *See Loos v. Immersion Corp.*, 762 F.3d 880, 886–87 (9th Cir. 2014) (elements). A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That state of mind is an intent "to deceive, manipulate, or defraud," or deliberate recklessness — "an extreme departure from the standards of ordinary care" posing a danger of misleading buyers "either known to the defendant or … so obvious that the actor must have been aware of it." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). The inference "need not be … of the 'smoking-gun' genre," *Tellabs*, 551 U.S. at 324, and allegations are read together, because courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective," *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

**1. Scienter Is Assessed Defendant-by-Defendant**

Defendants argue the SAC fails because it does not allege that Doug or Troy "participated in Millrock's acquisition of the Property, determined the offering price, reviewed Pulse's financial records, knew of the alleged UCC lien, [or] participated in preparing the Offering Memorandum." (Mot. at 5; *see also* Mot. at 8.) That is not the test. The PSLRA requires particularized scienter "with respect to each act or omission alleged to violate this chapter" as to "*the defendant*." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). Scienter attaches to the deception charged against the particular defendant, not to every fact concealed by every other participant.

The Second Cause of Action rests on on its face to "the January 6, 2023 and January 25, 2023 Misrepresentations described in Section IV.F, which the McAllisters specifically allege were made directly to them by Doug and Troy, as agents of Mountain West." (Dkt. 163 ¶ 147.) Consistent with that limitation, ¶ 147 incorporates only Sections III, IV.A–C, IV.F, IV.M, and IV.P. It does not incorporate Sections IV.D or IV.E (the marketing campaign and the Offering Memorandum) or IV.K and IV.O (Millrock's acquisition, the routing of proceeds, and the post-default disclosures). The conduct Defendants insist Doug and Troy knew nothing about is conduct this claim does not rely on.

The Second Cause of Action asserts primary liability against Doug and Troy for their direct misrepresentations to their clients and vicarious liability against Mountain West under respondeat superior for those same in-scope statements. (Dkt. 163 ¶¶ 5, 25–26, 84(a)–(e), 91–92, 94, 137, 149.) These theories do not require Doug, Troy, or Mountain West to have known Millrock's purchase price, Pulse's finances, or third-party liens; the claim targets the agents' own misstatements and omissions to Plaintiffs within the scope of their agency. Defendants' contrary rule would immunize the agent who lies to his client's face, so long as he takes care to remain ignorant of the syndicator's books.

**2. Troy Scheel**

On January 6, 2023, in response to a direct question, Troy told the McAllisters that he and Doug would receive no compensation. (¶¶ 5, 84(d).) Four months earlier he had

signed a written agreement entitling him to a 3.0% referral fee. (¶¶ 101, 116(a); Ex. B.) Mountain West thereafter received and processed those commissions. (¶ 94.) This is not an inference drawn from position or opportunity; it is a dated, signed contract predating the denial. An affirmative, particularized denial of compensation the speaker had already contractually secured is direct evidence the denial was knowingly false, not negligent. (¶ 116(a).) Defendants' brief does not address that sequence.

A holistic review confirms the inference. At the same meeting Troy said the investment carried "no risk" (¶¶ 5, 84(b)), was "safe" and "secure" and would set the McAllisters up for retirement (¶ 82), and, when Amy objected that the family still needed a business property, that they could simply borrow later (¶ 83). He refused Amy's request to inspect and redirected her objection to her husband (¶ 85), foreclosing the one step that would have revealed the building was empty. Coupled with their categorical assurances and the undisclosed commission agreement, these facts support a strong inference of deliberate recklessness.

Defendants' answer to the referral agreement is that it establishes "motive at most." (Dkt. 168 at 5–6.) A defendant's written agreement to be paid is not circumstantial evidence of his motive to deny payment. It is proof that he knew the denial was untrue.

**3. Doug Scheel**

Doug made the same representations, and the SAC pleads his scienter independently. As to compensation, Plaintiffs allege on information and belief that Doug was party to a substantially similar arrangement, and plead the basis for that belief - that he jointly represented the McAllisters with Troy and that Mountain West received and processed the commissions. (Dkt. 163 ¶¶ 101, 116(a)–(b).) Rule 9(b) permits pleading on information and belief where the facts lie peculiarly within the opposing party's knowledge and the complaint states the basis; the compensation Mountain West paid its agents is such a fact.

Independently, Doug's statements that the investment was "risk free" and "the deal of a lifetime" are contradicted by his own contemporaneous evaluation. In April 2022 he considered acquiring an interest in this same Property and declined because the price per

square foot was too high. (¶¶ 88–89, 116(e).) He never disclosed that assessment (¶ 88), and on January 25, 2023 told Amy the Property was "worth more than the amount the McAllisters were investing" (¶ 91). He also reviewed the Offering Memorandum with Chad and, on the strength of that review, encouraged the investment. (¶ 74.) He cannot have honestly believed what he said.

Defendants offer a competing inference: that Doug "simply disagreed with the valuation or investment profile of the Property." (Dkt. 168 at 5.) That is not a competing inference; it is Plaintiffs' allegation. Plaintiffs contend Doug privately rejected the Bluffdale TICs valuation - and then told the McAllisters the opposite. An agent who concludes an asset is overpriced, keeps that conclusion from his clients, and assures them it is "worth more than the amount [they are] investing" has not made a valuation judgment. He made a false statement of fact about the one subject his clients retained him to assess.

Defendants argue that Doug's valuation shows only a "subjective valuation judgment" (Dkt. 168 at 5), and that "no risk," "no-brainer," and "deal of a lifetime" are non-actionable opinion (*Id.* at 6). These address two different elements, and neither succeeds. As to materiality, this Court has already held that claims the Property was risk-free are "clearly material." (Dkt. 152 at 17:16–19.)

As to puffery, Defendants omit the controlling qualifier: "general statements of optimism" made against "a clearly pessimistic backdrop" may form the basis of a securities fraud claim. *In re Intuitive Surgical Sec. Litig.*, 759 F.3d 1051, 1060 (9th Cir. 2014). The question is whether the statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). The backdrop was pessimistic and Defendants knew it: the tenant never operated at the Property, and Doug had already concluded it was overpriced. Telling unsophisticated retail investors that a vacant, overpriced building carried "no risk" created exactly that false impression.

Defendants cite no authority that an opinion cannot support scienter because the law is contrary. One who touts positive information must do so without misleading, "including

disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016)). *Schueneman* reversed a dismissal where defendants expressed confidence in a drug's approval by reference to animal studies while withholding a contrary study they knew of. 840 F.3d at 705–08. Doug did the same: he vouched for the Property's value while withholding his own adverse valuation. *See also In re RxSight, Inc. Sec. Litig.*, No. 8:25CV01596-FWS-KES, 2026 WL 1480785, at *7 (C.D. Cal. May 21, 2026) (holding securities fraud complaint adequately alleged scienter where defendants took actions inconsistent with their stated beliefs).

The same facts establish subjective falsity. An opinion is actionable where the speaker did not hold the belief professed, or where the statement omits facts about the speaker's knowledge concerning the opinion that conflict with what a reasonable investor would take from it. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–89 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (applying *Omnicare* to Rule 10b-5). This is not a stray fact cutting the other way; it is the speaker's own analysis of the very asset he was valuing, withheld from clients to whom he owed an independent duty of disclosure. *Wyatt v. Union Mortg. Co.*, 24 Cal.3d 773, 782 (1979).

Finally, *Tellabs* requires weighing competing inferences, and Defendants' innocent explanation - that Doug "simply disagreed with the valuation" (Mot. at 5) - cannot account for why he then told his clients the opposite, why Troy denied compensation he had contracted for in writing, or why Amy's request to inspect was refused rather than accommodated. The inference of deliberate recklessness is at least as compelling as any opposing inference, which is all the PSLRA requires. *S. Ferry*, 542 F.3d at 782.

**4. Mountain West**

Defendants argue the allegations against Mountain West are "entirely derivative" and that the SAC does not separately allege Mountain West knew anything. (Mot. at 6.) The premise is accurate; the conclusion does not follow. Respondeat superior liability is

derivative by definition. The Ninth Circuit held en banc in *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) (en banc), that brokerages may be held vicariously liable for securities violations by their representatives and that Section 20(a) does not supplant the common-law doctrine: the agent is primarily liable "based on proof of his actions or omissions, and on scienter when required," while "the principal who acts through the agent … is secondarily liable." *Id.* The operative scienter is the agent's.

*Hollinger* also disposes of the defense Mountain West raises. Permitting a brokerage "to avoid secondary liability simply by showing ignorance, purposeful or negligent, of the acts of its registered representative" would contravene Congress's intent to protect the public, "particularly unsophisticated investors, from fraudulent practices." *Id.* (quoting *Paul F. Newton & Co. v. Tex. Com. Bank*, 630 F.2d 1111, 1118–19 (5th Cir. 1980)). Mountain West's entire submission is a showing of ignorance. The SAC pleads each element of the doctrine (Dkt. 163 ¶¶ 25–27, 94, 101, 137, 137(f)), and Defendants have conceded the point: "[w]ithout allegations establishing scienter on the part of Doug or Troy, Plaintiffs fail to plead scienter on the part of Mountain West." (Mot. at 6.) The two rise and fall together. Independently, Mountain West "processed and received commissions on the sale and is charged with knowledge of its own agents' compensation arrangements." (¶ 116(d).) Whatever it knew of Pulse, it knew what it paid its own agents - the very fact Doug and Troy denied. (¶¶ 84(d), 116(a).)

Defendants' position reduces to the proposition that a brokerage may collect its agents' commissions while disclaiming knowledge of the arrangements that generated them. Mountain West is not a bystander to the compensation at issue; it is the entity that processed and received it. (¶¶ 94, 101, 116(d).) Whatever Mountain West knew about Pulse's balance sheet or a lien filed in Texas, it knew what it paid Doug and Troy — and that is the precise fact they denied on January 6, 2023.

### D. The Sixth Cause of Action States Scheme Liability

Defendants' challenge rests on a legal premise the Ninth Circuit has expressly held abrogated, stated in their brief without any citation. Their remaining arguments are

answered by material their brief never confronts: they say the SAC alleges no conduct beyond the January 6 statements, but ¶ 182 alleges in terms that the scheme "encompassed conduct *beyond* the specific misrepresentations and omissions" pleaded elsewhere; they say scienter is unpled, but ¶ 184 incorporates a five-subparagraph scienter section addressed to these three Defendants alone; and they say the claim lumps Defendants together, but the paragraph they quote names Doug, Troy, and Mountain West specifically.

**1. *Lorenzo* Abrogated the Rule Defendants Invoke**

Defendants assert, without citation, that "[f]or a defendant to be liable as part of a fraudulent scheme, the scheme must also encompass conduct beyond mere misrepresentations or omissions." (Dkt. 168 at 7.) That is a near-verbatim rendering of *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011). Defendants omit the citation, and fail to address that it is no longer good law.

The omission is telling. Defendants' brief supplies citations for its every other proposition. For this one - the premise on which their entire challenge to the Sixth Cause of Action depends - it supplies none. That is because the sentence cannot be cited to any authority that remains good law in this Circuit.

In *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101–02 (2019), the Supreme Court rejected the contention that Rules 10b-5(a) and (c) are "violated only when conduct other than misstatements is involved," explaining that the subsections are "broad and overlapping, not narrow and mutually exclusive," and holding that disseminating false statements violates subsections (a) and (c) even where the disseminator did not "make" them. The Ninth Circuit has since held that the "argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*," and that "*Lorenzo* abrogated our contrary holding in *WPP*." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 & n.10 (9th Cir. 2021). On that basis it *reversed* the dismissal of Rule 10b-5(a) and (c) claims the district court had treated as redundant. *Id.* Defendants' theory that this claim "merely repackages" the Second Cause of Action is the argument *Alphabet* holds foreclosed. Overlap is not a defect; it is what the Rule contemplates.

**2. The SAC Pleads Conduct Beyond the Statements**

The Sixth Cause of Action incorporates the whole of Sections III and IV (Dkt. 163 ¶ 180) - unlike the Second, which is limited to the January 6 and January 25 Misrepresentations (*id.* ¶ 147). The following conduct is therefore before the Court, and none of it is a statement to the McAllisters.

**Executing the referral agreement.** Troy contracted in secret with the syndicator whose product he and Doug were about to sell to their own clients, four months before the sale. (Dkt. 163 ¶¶ 101, 116(a); Ex. B.) That is conduct, not speech.

**Taking the fee from Plaintiffs' funds and keeping it off the documents.** referral compensation was paid from Plaintiffs' invested funds and such payments were omitted from both the Offering Memorandum and the Buyer's Final Closing Statement. That concealment in transaction documents the buyers signed constitutes deceptive 'acts, practices, or a course of business' within Rule 10b-5(c). (*Id.* ¶¶ 73(g), 94, 218.)

**Controlling the exchange proceeds.** Doug and Troy solicited the sale of the McAllisters' property, collected roughly $120,000 on it, then directed where the exchange funds went and pressed the 45-day deadline until the McAllisters identified this Property. (*Id.* ¶¶ 74, 78, 80–81, 116(b).) Steering a client's 1031 proceeds into a syndication on which one is secretly compensated is participation in the mechanics of the scheme.

**Disseminating the Offering Memorandum.** Doug and Troy reviewed the Offering Memorandum with Chad and encouraged the investment. (*Id.* ¶ 74.) Under *Lorenzo*, one who conveys another's false statements to investors violates subsections (a) and (c) whether or not he "made" them. 139 S. Ct. at 1101–02. Defendants' insistence that Doug and Troy did not prepare the Offering Memorandum (Mot. at 5, 9) is beside the point - *Lorenzo* reaches non-makers precisely because they are not liable under subsection (b).

**Preventing the inspection that would have exposed the scheme.** The SAC alleges not an isolated refusal but a course of conduct running from before the January 6 meeting through and past closing. Amy objected when the Scheels pressed the McAllisters to place the entire $2,000,000 into one asset (*id.* ¶ 83); objected again when she was unwilling to

commit that sum to a property she had never seen (*id.* ¶ 85); was told "[t]here's no time for that" and had her objection recast to her husband as a marital failing (*id.* ¶ 85); was handed a false written assurance that "[t]he tenant is open, operating, and paying rent" in place of the inspection (*id.* ¶ 87); was laughed at when she raised the objection a third time at closing (*id.* ¶¶ 91–92); and, after closing, was refused keys to the Property altogether (*id.* ¶ 111).

That is deceptive conduct, not deceptive speech. Rule 10b-5(c) reaches "any act, practice, or course of business which operates … as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(c). A practice of deflecting, belittling, and ultimately denying an investor access to the asset she was buying, by the selling agents before closing and the designated "manager" after, is a course of business within the plain terms of the Rule. Because Pulse never operated at the Property at any time (Dkt. 163 ¶¶ 65, 87, 120, 122), the building Amy asked twice to see stood empty; had she been permitted the visit, she would have found no tenant and no income stream. Defendants' conduct is what stood between her and that discovery.

Persuasive authority is directly on point. In *Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019), the Tenth Circuit applied *Lorenzo* and held that an adviser's failure to disclose or correct an undisclosed compensation arrangement, while investors understood him to be independent, constituted a fraudulent scheme under Rules 10b-5(a) and (c). That is this case: Doug and Troy told the McAllisters that they would receive no compensation (¶ 84(d)), while a signed fee agreement sat unmentioned (¶¶ 101, 116(a)).

**3. Scienter**

Defendants' scienter argument here duplicates the argument addressed in Part III.B.1 above. The claim expressly incorporates Section IV.M for scienter (*id.* ¶ 184), which pleads facts independent of falsity as to these Defendants: the referral agreement predating the denial of compensation (*id.* ¶ 116(a)); Doug's pre-existing relationship of trust with the McAllisters (*id.* ¶ 116(b)); identical categorical assurances repeated across multiple calls before the Property was identified (*id.* ¶ 116(c)); Mountain West's processing of its own agents' commissions (*id.* ¶ 116(d)); and Doug's April 2022 conclusion that the Property

was overpriced (*id.* ¶ 116(e)).

**4. Paragraph 182 Is Not Group Pleading**

Three times in their own brief Defendants quote the clause identifying these Defendants' role: ¶ 182 alleges as part of the scheme "the undisclosed Professional Referral Agreements paying 3% commissions to Doug, Troy, … and Mountain West." (Mot. at 8, 9.) Read in full, ¶ 182 identifies five discrete categories of conduct and assigns each to different participants: Millrock's acquisition and immediate resale at a $9,500,000 valuation with no independent support; Millrock's diversion of $2,000,000 back to Pulse as "FFE"; Millcreek's, Intermountain's, and CIGI's solicitation of Plaintiffs; the undisclosed referral agreements; and CAMS Realty's post-sale concealment. Defendants' real objection is that ¶ 182 also describes conduct attributed to *other* defendants. That is not group pleading; it is the description of a scheme, which by definition involves multiple participants performing different functions.

Defendants' own authority states the test: a plaintiff suing multiple defendants must "identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007). *Swartz* does not require that each participant's role be pleaded in isolation from the others; it requires that each defendant be informed of his own. The SAC does that in ¶ 182 and again in Sections IV.F and IV.M, which ¶ 180 incorporates and which address these Defendants alone. As to Mountain West, the SAC pleads respondeat superior rather than undifferentiated participation. (Dkt. 163 ¶¶ 94, 137).

Defendants quote Paragraph 182 three separate times. (Dkt. 168 at 8, 9.) Each time they quote the clause naming Doug, Troy, and Mountain West, and each time they stop before the language that defeats their argument - the allegation that the scheme "encompassed conduct *beyond* the specific misrepresentations and omissions identified in the First, Second, Third, Fourth, and Fifth Causes of Action." (¶ 182.)

**E. The Ninth Cause of Action Is Not Duplicative**

Defendants do not dispute that Doug and Troy were the McAllisters' own agents or that a real estate agent owes his principal fiduciary duties. Their sole argument is that the

Ninth Cause of Action is duplicative of the Thirteenth. (Dkt. 168 at 11.)

**1. Defendants' Authorities Do Not Support Dismissal**

Defendants' only California authority is *Buehler v. Sbardellati*, 34 Cal.App.4th 1527 (Ct. App. 1995), and they quote it against themselves. The footnote they rely on states that "there is authority for the view the breach of fiduciary duty theory is separate from the professional negligence theory," and expressly "leav[es] any resolution of this separate cause of action question to another case." *Id.* at 1544 n.9. A court's stated refusal to decide a question is not a holding that it comes out Defendants' way.

The balance of their authority is five out-of-state *legal malpractice* decisions. (Mot. at 10.) None applies California law or involves a real estate broker who took an undisclosed commission from the opposite side of his client's transaction and denied it when asked. *Pereira,* cited in support, states the distinction that defeats the motion: the claims "are distinct" because "[a]n attorney negligence claim concerns competence [and] a breach of fiduciary claim concerns loyalty." *Pereira v. Thompson*, 230 Or.App. 640, 656 (2008).

*Broadway Victoria, LLC v. Norminton, Wiita & Fuster*, 10 Cal.App.5th 1185, 1194 (2017) supplies the test: "[b]eyond mere allegations of professional negligence, a cause of action for breach of fiduciary duty requires some further violation of the obligation of trust, confidence, and/or loyalty." The claim there failed only on *nonsuit after the plaintiff's case-in-chief*, not on the pleadings, because the plaintiff offered no evidence beyond the evidence supporting its malpractice claim.

Taken together, Defendants' authorities do not merely fail to support dismissal; they supply the rule that defeats it. *Buehler* declines to decide the question. *Pereira* states the competence-versus-loyalty distinction on which Plaintiffs rely. And the one California decision to address the issue squarely, *Broadway Victoria*, is nowhere in their brief — perhaps because it announces a test the Second Amended Complaint satisfies, and because it was decided on nonsuit after a full evidentiary presentation rather than on the pleadings.

**2. Defendants Owed Fiduciary Duties as a Matter of Law**

"A broker's fiduciary duty to his client requires the highest good faith and undivided

service and loyalty." *Assilzadeh v. Cal. Fed. Bank*, 82 Cal.App.4th 399, 414 (Ct. App. 2000). The duty is statutory as well: an agent in a real property transaction owes "a fiduciary duty of utmost care, integrity, honesty, and loyalty." Cal. Civ. Code § 2079.16; *see id.* § 2079.13 (commercial real property). *Assilzadeh* describes the scope:

> The broker as a fiduciary has a duty to learn the material facts that may affect the principal's decision. … The agent's duty to disclose material information to the principal includes the duty to disclose reasonably obtainable material information. … The broker must place himself in the position of the principal and ask himself the type of information required for the principal to make a well-informed decision.

*Id.* at 414–15; *accord Salahutdin v. Valley of Cal., Inc.*, 24 Cal.App.4th 555, 562–63 (Ct. App. 1994); *Wyatt*, 24 Cal. 3d at 782. The SAC pleads that relationship on six independent grounds, including these Defendants' roles as licensed brokers, as agents performing duties requiring a securities license, and as recipients of substantial compensation from funds paid by Plaintiffs. (Dkt. 163 ¶ 206; *see* ¶¶ 25–27, 94.) Because the TIC interests were securities (*id.* ¶¶ 44–55, 181), the authorities governing securities professionals apply with equal force. *See Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114, 1122 (9th Cir. 1994) ("An investment advisor is always a fiduciary."); *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191–94 (1963); *SEC v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F.Supp.3d 932, 951 (C.D. Cal. 2022); *Hasso v. Hapke*, 227 Cal.App.4th 107, 140 (2014).

### 3. Fiduciary Breach Is a Distinct Tort

"Breach of fiduciary duty is a species of tort distinct from a cause of action for professional negligence." *Stanley v. Richmond*, 35 Cal.App.4th 1070, 1086 (1995); *accord David Welch Co. v. Erskine & Tulley*, 203 Cal.App.3d 884, 890 (1988). Indeed, "a breach of a fiduciary duty usually constitutes constructive fraud," and "there is no clear line establishing when a fiduciary's breach of the duty of care will be merely negligent and when it may be characterized as constructive fraud." *Salahutdin*, 24 Cal.App.4th at 563; *see* Cal. Civ. Code § 1573. California does not collapse fiduciary breach into negligence; it treats it as sounding in constructive fraud.

The distinction carries consequences. Damages differ: courts have "consistently applied the broader measure of damages for fiduciary fraud, refusing to limit damages to the 'out of pocket' measure," so that "the faithless fiduciary shall make good the full amount of the loss of which his breach of faith is a cause." *Salahutdin*, 24 Cal.App.4th at 566–67. Causation differs: an intentional breach of fiduciary duty is analyzed under the substantial-factor standard rather than the "but for" standard governing negligence-based malpractice. *Knutson v. Foster*, 25 Cal.App.5th 1075, 1093–94 (2018). Two claims carrying different damages measures and different causation standards are not the same.

**4. The SAC Pleads Loyalty Breaches**

The Thirteenth Cause of Action alleges a "duty of reasonable care," breached by "failing to conduct adequate due diligence on Pulse, failing to verify that a surgery center was operating at the Property, and failing to disclose the facts set forth in Section IV." (Dkt. 163 ¶¶ 226–227.) Those are failures of *competence*. The Ninth Cause of Action alleges those breaches *and also* "undisclosed conflicts of interest and referral commissions" (¶ 207) - a category with no counterpart anywhere in ¶¶ 225–228. Those are failures of *loyalty*, and ¶ 205 incorporates all of Sections III and IV in support of them: the secret 3% commission taken after an express denial (*id*. ¶¶ 84(d), 90, 101, 116(a)); Doug's concealed adverse valuation (¶¶ 88–89, 91, 116(e)); the false claim that the agents' own money rode alongside the clients' (¶¶ 84(a), 84(e), 92); and conflicted advice on both sides of the trade, having collected roughly $120,000 on the sell side while steering the entire proceeds into a single asset paying a further undisclosed 3% (¶¶ 79–82, 101, 116).

An agent's undisclosed profit from his principal's transaction is the paradigm breach of loyalty, actionable without regard to the standard of care. Cal. Civ. Code § 2224; Cal. Bus. & Prof. Code § 10176(g). Every one of these allegations describes conduct a fully competent broker could commit. That is precisely why they are not duplicative, and why they satisfy the "further violation" requirement *Broadway Victoria* prescribes.

**5. The Relief Sought Differs**

The two claims do not plead the same damages. The Thirteenth alleges only that

"Plaintiffs have suffered damages." (¶ 228.) The Ninth seeks rescission, economic *and noneconomic* damages, disgorgement of profits, fees, and commissions, and prejudgment interest (¶ 209), together with punitive damages under Civil Code § 3294 (¶ 210). Disgorgement and a constructive trust over a secret profit are available for disloyalty irrespective of the standard of care, Cal. Civ. Code § 2224, and punitive damages are recoverable for constructive fraud but not mere negligence, *id.* § 1573. Comparative fault, a defense to negligence, has no application to intentional disloyalty. Dismissal would not remove a redundancy; it would remove remedies.

**6. Duplication Is Not a Rule 12(b)(6) Ground**

Every decision Defendants cite was resolved on a developed record; none dismissed a fiduciary claim on the pleadings. Rule 8(d)(2) and (3) permit alternative and even inconsistent claims, and a plaintiff need not elect among overlapping theories before discovery. At the pleading stage the SAC alleges a fiduciary relationship (¶¶ 25–27, 206), breaches of loyalty distinct from any want of care (¶¶ 84, 88–92, 101, 116, 207), and resulting damage (¶ 208). That is all that *Knox v. Dean*, 205 Cal.App.4th 417, 432 (2012), Defendants' own authority on the elements, requires. To the extent the Court reads ¶¶ 206–207 as asserting duties owed to Thart, Pinder, or Procopio (Mot. at 10 n.2), Plaintiffs will clarify by amendment; as to these Defendants the duty pleaded arises from the agency relationship with the McAllisters.

**F. The Eleventh Cause of Action States Conversion**

**1. The SAC Identifies a Specific, Identifiable Sum**

Money is subject to conversion where "there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment"; what is barred is a "generalized claim for money." *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal.App.4th 384, 395 (2007). "[I]t is not necessary that each coin or bill be earmarked." *Weiss v. Marcus*, 51 Cal.App.3d 590, 599 (1975); *accord Haigler v. Donnelly*, 18 Cal.2d 674, 681 (1941). An agent who receives a principal's funds and applies them to his own use is liable in conversion. *Fischer v.*

*Machado*, 50 Cal.App.4th 1069, 1072–74 (1996).

Plaintiffs allege conversion of a specific, identifiable fund: $2,000,000 in 1031-exchange proceeds segregated by a qualified intermediary and disbursed at a single closing to acquire a 19.7121% interest. The undisclosed referral commissions were taken from that fund, not from general assets, at the time of closing. (Dk. 163 ¶¶ 94, 218.) The inability to state each Defendant's precise cut is a consequence of Defendants' concealment (¶¶ 73(g), 218); the SAC pleads the measure - 3.0% of the transaction (¶¶ 101, 116(a)).

**2. The SAC Alleges a Wrongful Act**

Defendants characterize the claim as an attack on "[r]eceipt of compensation for services rendered" in transactions Plaintiffs "voluntarily entered into." (Dkt. 168 at 12.) They omit what makes the taking wrongful: Doug and Troy told the McAllisters they would receive no compensation while Troy held an agreement for compensation. (Dkt. 163 ¶¶ 84(d), 101, 116(a).) The wrongful act is the ***undisclosed*** diversion of referral compensation from Plaintiffs' segregated 1031 funds after Defendants denied they would receive it. Consent induced by concealment is not consent; the secret profit remained Plaintiffs' property when it was taken. *Mindys Cosms., Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010).

Defendants' framing, that this is a claim about "[r]eceipt of compensation for services rendered" in "transactions that Plaintiffs voluntarily entered into" (Mot. at 12), assumes away the allegation. The McAllisters did not voluntarily enter a transaction in which their agents took a 3% commission. They entered a transaction in which their agents told them, when asked, that they would take nothing. (¶ 84(d).) Compensation an agent conceals from his principal is not compensation "for services rendered." It is a secret profit, which equity treats as the principal's from the moment it is taken. Cal. Civ. Code § 2224.

**3. *Padhye* Is Distinguishable**

In *National Specialty Pharmacy, LLC v. Padhye*, 734 F.Supp.3d 922, 929 (N.D. Cal. 2024), the complaint "did not identify any particular property that was allegedly converted" and alleged no "specific act to wrongfully convert any property." The SAC does both. (¶

218.) Defendants' own authority also forecloses their premise that each Defendant's act must be pleaded in isolation: "Where the conversion is the result of the acts of several persons, which, though separately committed, all tend to the same end, there is a joint conversion…. If the principal is a wrong-doer, the agent is a wrong-doer also." *Mindys*, 611 F.3d at 601. Should the Court conclude that ¶ 216 does not incorporate the Sections describing these Defendants' conduct, the defect is one of cross-reference, and Plaintiffs request leave to amend ¶ 216 to incorporate Sections IV.F, IV.G, and IV.M.

**G. The Twelfth Cause of Action Satisfies Rule 9(b)**

Defendants argue that Plaintiffs "lump all the defendants together" and abandon the "who, what, when, where, and how" elements. (Dkt. 168 at 13–14.) The opposite is true.

**Who.** Douglas Scheel and Troy Scheel, individually and by name. (¶¶ 25–26, 84.) Not "Defendants" generally.

**Their authority to speak.** Both were licensed real estate agents of Mountain West who "personally served as the McAllisters' own real estate agents" and acted within the scope of that agency. (¶¶ 25–27, 94, 137(f).)

**To whom.** Chad McAllister at the January 6 meeting (¶ 84); Chad again by telephone on multiple prior occasions (¶¶ 84, 116(c)); Amy directly on January 25 (¶¶ 91–92); and Amy through Chad on January 6 (¶ 85).

**When.** January 6, 2023; January 9, 2023; January 25, 2023; and identified prior calls predating the McAllisters' identification of the Property. (¶¶ 84–87, 91–92, 116(c).)

**Where and how.** In person at the Scheels' office in St. George, Utah, and by telephone. (¶¶ 74, 84–85.)

**What was said.** Five representations, itemized: that they had personally invested in Millcreek properties and could vouch for Millcreek; that there was no risk because the interest could be sold at any time; that the Property would be professionally managed; that they would receive no compensation; and that Doug would personally invest. (¶ 84(a)–(e).) Plus that the investment was a "no-brainer," "deal of a lifetime," and "worth more than the amount the McAllisters were investing." (¶¶ 91–92.)

**Why it was false.** Troy had a signed 3% referral agreement (¶¶ 101, 116(a)); Doug had rejected the Property as overpriced nine months earlier (¶¶ 88–89, 116(e)); no manager was ever designated or present (¶¶ 73(j), 113); and the tenant never operated at the Property at all (¶¶ 65, 87, 120, 122).

That is the *Lazar* checklist, satisfied item by item. *Lazar v. Superior Court*, 12 Cal.4th 631, 645 (1996); *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153, 157 (1991). Defendants' reliance on those cases assumes a pleading that identifies no speaker; this one names the speakers, their words, their dates, and their locations.

Defendants also overstate what Rule 9(b) demands. Their own authority is explicit: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). That is doubly true here, because constructive fraud requires no intent to deceive at all: it is "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault … by misleading another to his prejudice." Cal. Civ. Code § 1573. The SAC pleads precisely that. (¶¶ 222–223.)

Defendants assert that the "who, what, when, where, and how" elements are "entirely done away with" in Plaintiffs' "conclusory, all-encompassing allegations." (Dkt. 168 at 14.) The assertion cannot be reconciled with their own brief. Eight pages earlier, Defendants recite the statements they say are unidentified: that "the investment presented 'no risk,' was a 'no-brainer,' and was 'the deal of a lifetime.'" (*Id*. at 6.) Four pages before that, their Factual Background states that "Doug and Troy made certain oral statements concerning the investment, including statements regarding risk, management of the Property, the ability to later sell an ownership interest, and compensation in connection with the transaction." (*Id.* at 2–3.) A party that can summarize the representations, attribute them to two named speakers, and quote them verbatim has been given fair notice of what it is accused of saying.

### H. The Fifteenth Cause of Action States a UCL Claim

#### 1. The Unlawful Prong

Defendants say Plaintiffs must "allege the specific law violated" and have not. (Mot. at 14 (citing *Khoury v. Maly's of Cal., Inc.*, 14 Cal.App.4th 612, 616 (1993)).) The UCL's unlawful prong is satisfied because at least one predicate violation is adequately pled and unchallenged at this stage: the Thirteenth (professional negligence) and Fourteenth (negligent misrepresentation) Causes of Action. They sustain the unlawful prong, independent of the federal securities and fiduciary-duty predicates. *See LockandLocate, LLC v. Hiscox Ins. Co.*, 549 F.Supp.3d 1093, 1103 (C.D. Cal. 2021). Because the unlawful prong "borrows violations of other laws and treats them as independently actionable" (Dkt. 168 at 14), the claim survives so long as one predicate survives.

**2. The Unfair Prong**

Defendants quote *Cel-Tech* for the proposition that "unfair" means conduct threatening an incipient antitrust violation. (*Id*. at 15.) They omit the footnote attached to that very passage: "This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers …." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 187 n.12 (1999). Plaintiffs are retail investors, not competitors of Mountain West; the antitrust-tethering test has no application.

The applicable tests come from Defendants' own authorities. Conduct is unfair if it "offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," *Bardin v. DaimlerChrysler Corp.*, 136 Cal.App.4th 1255, 1260 (2006), or if its utility is outweighed by "the gravity of the harm to the alleged victim," *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144, 1166 (2000). Selling a $2,000,000 interest in a vacant building to unsophisticated retail investors, while denying a commission already contracted for, concealing an adverse valuation, and refusing the buyer's request to inspect, satisfies either formulation. (Dkt. 163 ¶¶ 126, 135, 153.)

**3. The Fraudulent Prong**

Defendants correctly state that this prong requires "only … a showing that members of the public are likely to be deceived" and does not refer to common law fraud. (Dkt. 168

at 14–15 (citing *S. Bay Chevrolet v. GMAC*, 72 Cal.App.4th 861, 888 (1999)).) They then assert there are "no specific allegations that Mountain West, Doug, or Troy made any representation to anyone." (Dkt. 168 at 15.) Paragraph 84 identifies five representations, made on a stated date, at a stated place, to a named person. The prong requires no intent, no reliance, and no proof of actual deception. Telling retail investors that an investment carries "no risk" and that the selling agents will receive "no compensation," when those agents hold a signed 3% fee agreement, is likely to deceive.

### I. Leave to Amend

Rule 15(a) directs that leave to amend "shall be freely given when justice so requires," a policy "to be applied with extreme liberality," and absent prejudice or a strong showing under the *Foman* factors "there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051–52 (9th Cir. 2003) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)); *see Foman v. Davis*, 371 U.S. 178, 182 (1962). That liberality is "especially important in the context of the PSLRA," where "drafting a cognizable complaint can be a matter of trial and error." *Eminence Cap.*, 316 F.3d at 1052.

Defendants can identify no prejudice. No trial date is set, and the amendments Plaintiffs would make are narrow and would not disturb the case schedule.

## IV. CONCLUSION

Defendants ask this Court to hold that an agent may tell his clients he will be paid nothing while holding a signed agreement to be paid 3%; may recommend as risk-free an asset he privately rejected as overpriced; may refuse his client the one inspection that would have revealed an empty building; and may answer for none of it because he never read the syndicator's books. Neither the PSLRA, nor Rule 9(b), nor California agency law permits that result.

Plaintiffs respectfully request that the Court deny the Motion in its entirety. Should the Court grant any portion of it, Plaintiffs respectfully request that it do so without prejudice and with leave to amend.

Dated: September 4, 2026

**REIF LAW GROUP, P.C.**

Brandon S. Reif

Brandon S. Reif
Rachel D. Dardashti

Attorneys for Plaintiffs