Brandon S. Reif (SBN 214706)
Rachel D. Dardashti (SBN 292126)
**REIF LAW GROUP, P.C.**
315 S. Beverly Drive, Suite 315
Beverly Hills, CA 90212
Telephone: (310) 494-6500
Email: docket@reiflawgroup.com
breif@reiflawgroup.com
rdardashti@reiflawgroup.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ANNE L. THART, an individual and trustee of THE ANNE L. THART LIVING TRUST DATED JULY 1, 1998; RUSSELL CHADWICK MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; AMY MCALLISTER, an individual and trustee of THE MCALLISTER FAMILY TRUST; JOSEPH A. PROCOPIO, an individual and trustee of THE JOSEPH A. PROCOPIO SR. FAMILY TRUST; GLENN T. PINDER, an individual and sole member of PINDER ENTERPRISES, LLP,

Plaintiffs,

vs.

COLLIERS INTERNATIONAL GROUP, INC., a Canadian corporation; COLLIERS INTERNATIONAL INTERMOUNTAIN, LLC, a Delaware limited liability company; MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1,

CASE NO.: 2:24-cv-10876-CV-E

**PLAINTIFFS' OPPOSITION TO DEFENDANTS MILLROCK INVESTMENT FUND 1, LLC AND BRENT SMITH'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

<u>Hearing:</u>
Date: October 23, 2026
Time: 1:30 p.m.
Judge: Honorable Cynthia Valenzuela
Courtroom: Felicitas and Gonzalo Mendez United States Courthouse
350 West 1st Street
Los Angeles, CA 90012
Courtroom 10B, 10th Floor

LLC, a Utah limited liability company; KEVIN LONG, an individual; BRENT SMITH, an individual; DOUGLAS SCHEEL, an individual; TROY SCHEEL, an individual; MOUNTAIN WEST COMMERCIAL, LLC, a Utah limited liability company; MEGAN DESTITO, an individual; CAMS REALTY, LLC, a Utah limited liability company; KGL ADVISORS, LLC, a Utah limited liability company; SOUTHERN CALIFORNIA EXCHANGE SERVICES, LLC, a California limited liability company, and DOES 1-10, inclusive,

Defendants.

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ 3

TABLE OF AUTHORITIES ........ 5

I. PRELIMINARY STATEMENT ........ 8

II. STATEMENT OF RELEVANT ALLEGATIONS ........ 9

A. Millrock Built, Owned, And Priced The Offering; Smith Co-Owned And Controlled It. ........ 9

B. The Statements, The Speakers, And The Facts That Made Them False. ........ 9

1. The "Established Network" Representation. ........ 10

2. The "Well-Performing Vascular Surgery Portfolio" Representation. ........ 10

3. The "15-Year Sale Leaseback" Representation. ........ 10

4. The "Full Corporate Guarantee" Representation. ........ 10

5. The "Pandemic, Recession and Internet Resistant" Representation. ........ 10

6. The Valuation Representation. ........ 11

7. The "Landlord Responsibilities — None" Representation. ........ 11

8. The Website And Blog Representations — And The Omitted Track Record. ........ 11

C. The Collapse. ........ 12

III. LEGAL STANDARD ........ 12

IV. ARGUMENT ........ 13

A. The SAC Cures The Two Defects The Court Identified. ........ 13

1. The SAC Is No Longer A Shotgun Pleading. ........ 13

2. The SAC Links Each Statement To Millrock And Smith Individually. ........ 14

B. Millrock And Smith Are "Makers"; Alternatively, Millrock Is Liable As Principal. 15

1. Makers Under Janus. ........ 15

2. Defendants' Authorities Turn On The Statement-Specific Allegations The SAC Supplies. ........ 17

3. Agency Makes The Janus Dispute Academic As To Millrock. .......... 17

C. The Statements Are Material And Are Not Puffery. .......... 19

D. The Omitted Facts Rendered Defendants' Own Statements Misleading. .......... 19

E. The SAC Pleads Scienter With Particularity And Independent Of Falsity .......... 20

F. The Sixth Cause Of Action For Scheme Liability Is Adequately Pleaded. .......... 21

G. The Sixteenth Cause Of Action For Control-Person Liability Is Adequately Pleaded. .......... 23

H. Defendants' Premise That Every State-Law Claim "Sounds In Fraud" Is Wrong. 23

1. Rule 9(b) Does Not Reach Claims That Do Not Sound In Fraud. .......... 23

2. The Ninth And Tenth Causes Of Action Do Not Sound In Fraud. .......... 24

3. The Eleventh Cause Of Action For Conversion Is Adequately Pleaded. .......... 25

4. The Thirteenth And Fourteenth Causes Of Action Rest On Negligence .......... 26

5. The Seventh And Eighth Causes Of Action Reach Non-Fraud Conduct. .......... 26

6. The Fifteenth Cause Of Action Rests On Independent Prongs. .......... 27

I. Loss Causation Is Adequately Pleaded. .......... 27

J. Dismissal With Prejudice Is Unwarranted. .......... 27

V. CONCLUSION .......... 28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .......... 19

*Batwin v. Occam Networks, Inc.*, No. CV 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) .......... 23

*Cesario v. Biocept, Inc.*, No. 23-cv-1803-WQH-BLM, 2025 WL 525120 (S.D. Cal. Feb. 18, 2025) .......... 17

*Concha v. London*, 62 F.3d 1493 (9th Cir. 1995) .......... 24

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) .......... 12

*Destfino v. Reiswig*, 630 F.3d 952 (9th Cir. 2011) .......... 28

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) .......... 27

*ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023 (9th Cir. 2016) .......... 24, 25, 27

*Gibson v. City of Portland*, 165 F.4th 1265 (9th Cir. 2026) .......... 13, 14

*Hahn v. Select Portfolio Servicing, Inc.*, 424 F.Supp.3d 614 (N.D. Cal. 2020) .......... 27

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) .......... 18

*In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021) .......... 15

*In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015) .......... 17, 18, 21

*In re CytRx Corp. Sec. Litig.*, No. CV 14-1956-GHK, 2015 WL 5031232 (C.D. Cal. July 13, 2015) .......... 17

*In re New Century*, 588 F.Supp.2d 1206 (C.D. Cal. 2008) .......... 14

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) .......... 27

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) .......... 19

*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) .......... 15, 16, 17

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .......... 19, 20

*Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014) .......... 28

*Lorenzo v. SEC*, 587 U.S. 71 (2019) .......... 17, 22

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024) .......... 19

*Mandalevy v. BofI Holding, Inc.*, No. 17-cv-667-GPC-KSC,
2021 WL 794275 (S.D. Cal. Mar. 2, 2021) ....... 16
*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ....... 19
*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008) ....... 26
*Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) ....... 27
*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ....... 21, 23
*Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F.Supp.3d 1328 (C.D. Cal. 2014) ....... 23
*Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413 (C.D. Cal. 2012) ....... 26
*Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011) ....... 17
*Serenity Invs., LLC v. Sun Hung Kai Strategic Cap., Ltd.*,
182 F.4th 1124 (9th Cir. 2026) ....... 25
*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004) ....... 14
*State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*,
No. 3:24-cv-05739-TMC, 2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) ....... 17, 23
*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) ....... 12, 14, 15
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ....... 13, 20
*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976) ....... 19
*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
759 F.Supp.3d 926 (D. Ariz. Dec. 16, 2024) ....... 22
*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ....... 12
*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ....... 24
*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ....... 21, 28

**STATE CASES**

*Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal.App.4th 1138 (2005) ....... 25
*Greif v. Sanin*, 74 Cal.App.5th 412 (2022) ....... 25
*Horiike v. Coldwell Banker Residential Brokerage Co.*, 1 Cal.5th 1024 (2016) ....... 24

*Mahan v. Charles W. Chan Ins. Agency, Inc.*, 14 Cal.App.5th 841 (2017) ....................... 26

*Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal.App.5th 1131 (2016) ............................. 27

*Voris v. Lampert*, 7 Cal.5th 1141 (2019) ............................................................. 25

*Welco Elecs., Inc. v. Mora*, 223 Cal.App.4th 202 (2014) ............................................... 25

**FEDERAL STATUTES**

15 U.S.C. § 78u ............................................................................................ 21

Fed. R. Civ. P. 8 ........................................................................... 24, 25, 26, 27

Fed. R. Civ. P. 9 ..................................................................... 12, 15, 21, 23, 26

Fed. R. Civ. P. 10 ................................................................................... 12, 22

**STATE STATUTES**

Cal. Civ. Code § 2079 ..................................................................................... 24

Cal. Civ. Code §§ 2330, 2338 ............................................................................ 18

# I. PRELIMINARY STATEMENT

Millrock Investment Fund 1, LLC ("Millrock") bought a building in Crockett, Texas for approximately $2,000,000, routed $2,000,000 of the purchase price back to its own tenant to buy that tenant's equipment, and then sold fractional interests in the building to five retail investors at a $9,500,000 valuation supported by no appraisal. (SAC ¶¶ 42, 76, 122.) To sell them, Millrock and Brent Smith ("Smith", together with Millrock, "Millrock Defendants") approved a document telling investors that the tenant was an established "Pulse Healthcare System...made up of nine clinic locations" with "twelve healthcare providers," that the lease carried a "Full Corporate Guarantee from Pulse Healthcare," and that the building was a "Pandemic, Recession and Internet Resistant" asset. (SAC ¶¶ 65, 69, 70.) Smith approved marketing telling the same investors that the portfolio was "rock solid," "rigorously vet[ted]," and screened by a "team of experts" so that "[o]nly the best make it into our portfolio." (SAC ¶¶ 57, 62.)

None of it was true, and Millrock and Smith were the two defendants in the best position to know it. Millrock was the counterparty to the $2,000,000 payment that proves Pulse was an unfunded start-up. (SAC ¶¶ 114(e), 122.) Millrock paid the acquisition price and set the resale valuation. (SAC ¶¶ 42, 76.) Millrock's own first TIC offering had already failed before any Plaintiff invested, and the losses were rolled into a second deal rather than disclosed. (SAC ¶¶ 37, 73(a), 114(d).) Pulse never opened the surgery center, defaulted, and filed for bankruptcy; Plaintiffs lost more than 75% of their money. (SAC ¶¶ 119–123, 126.)

This Court dismissed the First Amended Complaint on two grounds: it was a shotgun pleading that did not identify which Millrock Defendant made which misrepresentation to whom, and it did not plead scienter independent of falsity. (Order at 18–20.) The Second Amended Complaint answers both. It splits one undifferentiated securities count into five speaker-specific counts; it incorporates only the identified factual sections into each count rather than the whole pleading; it quotes each challenged statement and explains why each was false; and it adds a seven-subpart, defendant-specific scienter section pleaded

expressly "independent of the falsity of the statements described above." (SAC ¶¶ 64, 65–73, 75, 114, 138.) Defendants respond that this is the same pleading with more names typed into it. The quoted statements, the dated admissions, and the itemized state-of-mind facts show otherwise. The Motion should be denied.

## II. STATEMENT OF RELEVANT ALLEGATIONS

### A. Millrock Built, Owned, And Priced The Offering; Smith Co-Owned And Controlled It.

Millrock was the sponsor, syndicator, and developer of the offering. It "develop[ed], syndicate[d], and sponsor[ed]" the investment, "select[ed] and purchase[d] the property," negotiated the lease and the guarantee, set the $9,500,000 valuation, and "was listed as the owner of the interests sold to each Plaintiff." (SAC ¶¶ 22, 38, 42, 51.) Millcreek "acted as Millrock's marketing agent" for the interests Millrock "syndicated, developed, and sponsored," and Millrock "controlled Millcreek and had the power to direct Millcreek's policies and decision-making." (SAC ¶¶ 21–22.) Millrock also "entered into a perpetual listing agreement with Intermountain" to sell interests in its properties. (SAC ¶¶ 37–38.)

Smith co-owned Millrock and Millcreek; his family trust is Millrock's "majority owner and single largest investor"; and Smith "and his family received profits from both." (SAC ¶ 24.) With Long, Smith "jointly controlled and operated both Millrock and Millcreek." (SAC ¶ 39.) Smith and Millrock "each reviewed and approved the contents of the Offering Memorandum" before it was "disseminated to Plaintiffs," and "[h]ad any of them objected...[the statements] would not have been distributed to Plaintiffs as stated." (SAC ¶¶ 64, 75.)

### B. The Statements, The Speakers, And The Facts That Made Them False.

Each representation below is quoted from the Offering Memorandum or the marketing materials Millrock and Smith reviewed and approved and that Millcreek disseminated as Millrock's agent. For each, the SAC pleads the affirmative falsity and the specific fact Defendants withheld that made the statement misleading.

**1. The "Established Network" Representation.**

The Offering Memorandum stated: "Pulse Healthcare System is made up of nine clinic locations across the state of Texas. The twelve healthcare providers at Pulse put one-on-one relationship with their patients at the core of what they do...Pulse prioritizes state-of-the-art resources." (SAC ¶ 65.) Pulse was an unproven start-up, not an operating nine-location network, and Millrock itself had to "provide[] $2,000,000 for equipment and startup costs" for it. (SAC ¶¶ 65, 122.) Pulse "never opened or operated a surgery center at the Property at all." (SAC ¶ 65.)

**2. The "Well-Performing Vascular Surgery Portfolio" Representation.**

The Offering Memorandum stated Pulse "includes a well-performing vascular surgery portfolio." (SAC ¶ 66.) Because "no surgery center ever operated at the Property," there was no performance to describe. (SAC ¶ 66.)

**3. The "15-Year Sale Leaseback" Representation.**

The Offering Memorandum represented a "15-Year Sale Leaseback on Triple Net (NNN) Leases." (SAC ¶ 68.) "Sale leaseback" told investors an established business had sold its own real estate and leased it back. In fact "$2,000,000 of the purchase price...funded by Plaintiffs' investment...was routed back to Pulse to pay for Pulse's own equipment and start-up costs," so "Plaintiffs' capital, not Pulse's, financed Pulse's tenancy." (SAC ¶ 68.) Investors could not see that they, not the tenant, bore the financing risk.

**4. The "Full Corporate Guarantee" Representation.**

The Offering Memorandum represented a "Full Corporate Guarantee from Pulse Healthcare." (SAC ¶ 69.) The guarantors' assets "had already been encumbered by a UCC lien filed by another creditor in July 2022, before Plaintiffs' purchases." (SAC ¶¶ 69, 123.) A guarantee backed by assets already pledged to a competing creditor is not "full."

**5. The "Pandemic, Recession and Internet Resistant" Representation.**

The Offering Memorandum described a "Pandemic, Recession and Internet

Resistant Tenant with 8 clinics throughout the Greater Houston area." (SAC ¶ 70.) The tenant "had no operating history through any economic cycle" and "was itself dependent on investor capital simply to open its doors." (SAC ¶ 70.) The Property sits in Crockett, a rural East Texas community "substantially removed from the 'Greater Houston area'" the document invoked. (SAC ¶ 73(d).)

**6. <u>The Valuation Representation.</u>**

The marketing materials listed the Property "at $9,505,147.83...at a 5.75% cap rate." (SAC ¶ 41.) Defendants omitted that "Millrock itself had purchased the Property for approximately $2,000,000 only shortly before marketing it to Plaintiffs at more than four times that price," and that "no independent appraisal" supported the figure. (SAC ¶ 73(e).)

**7. <u>The "Landlord Responsibilities — None" Representation.</u>**

The Offering Memorandum stated that "Landlord Responsibilities" were "None" and that "Insurance / Taxes/CAM/Utilities" were the "Responsibility of Tenant." (SAC ¶ 71.) No on-site manager was ever designated, and CAMS Realty's role was limited to lease administration. (SAC ¶¶ 71, 73(j).) After Pulse defaulted, Plaintiffs bore the taxes, insurance, and fees the document said would never fall on them. (SAC ¶¶ 71, 126.)

**8. <u>The Website And Blog Representations — And The Omitted Track Record.</u>**

Millcreek's website, which each Plaintiff reviewed before investing, stated: "Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer." (SAC ¶¶ 56–57.) A blog post "authored, reviewed, or approved by Long and Smith" represented: "Millcreek Commercial is not a brokerage. We own the properties that we syndicate. Our team of experts review hundreds of opportunities every month. Only the best make it into our portfolio," and that Millcreek "typically stays in our deals for the long term." (SAC ¶ 62.) E-mails sent "through Long, Smith, and non-party Andrew Bell" described the properties as suited to "investors looking for a safe, secure and stable investment" and stated "[h]ealthcare is a 'recession resilient' product." (SAC ¶ 59.) Long and Smith "prepared, revised, and/or approved each of Millcreek's blog posts and mass

marketing e-mails to prospective investors, including those directed at Plaintiffs." (SAC ¶ 63.)

What those statements concealed was the sponsor's actual record: Millrock's first TIC offering, a hotel, "had already failed" by 2020, with the losses rolled into a second deal (Pine Bluff) that was never disclosed; Millcreek-marketed tenant HSH Management defaulted in December 2022 and filed for bankruptcy within one to two months, before the McAllisters' January 2023 and Procopio's May 2023 purchases; and Defendants "conducted little to no due diligence" on Pulse. (SAC ¶¶ 37, 73(a), (c), 114(d), (f).) Millrock owned the Property — Millcreek did not — and no principal or family member of either stayed in the deal. (SAC ¶ 62.)

### C. The Collapse.

Pulse stopped paying rent in October 2023. (SAC ¶ 119.) On November 15, 2023, Long admitted in writing that Pulse's principal "ha[d] not followed through on his plans to open the surgery center," and Plaintiffs confirmed the next day that the Property had never operated as a surgery center. (SAC ¶¶ 120, 129.) On April 30, 2024, Long disclosed for the first time that Millrock had "provided $2,000,000 for equipment and startup costs" to Pulse. (SAC ¶¶ 122, 130.) Pulse filed for bankruptcy in June 2024. (SAC ¶ 123.) Plaintiffs have since marketed the Property below $2,000,000 and received no offers. (SAC ¶¶ 125, 132.)

## III. LEGAL STANDARD

On a Rule 12(b)(6) motion the Court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." (*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).) Exhibits to the pleading are part of it. (Fed. R. Civ. P. 10(c); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).) Rule 9(b) is satisfied by pleading "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." (*Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).)

Three of the elements Defendants attack cannot be resolved against Plaintiffs on the

pleadings. Scienter is judged on whether "*all* of the facts alleged, taken collectively," give rise to a strong inference — "not whether any individual allegation, scrutinized in isolation, meets that standard." (*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–323 (2007).)

## IV. ARGUMENT

### A. The SAC Cures The Two Defects The Court Identified.

#### 1. The SAC Is No Longer A Shotgun Pleading.

The Court dismissed the FAC as a shotgun pleading under *Gibson v. City of Portland*, 165 F.4th 1265, 1288–90 (9th Cir. 2026), identifying two of the four *Gibson* types as present: a complaint "where each count adopts the allegations of all preceding counts," and one that "asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." (Order at 18 & n.7 (quoting *Gibson*, 165 F.4th at 1288).) The SAC eliminates both.

As to the first, the SAC abandons global incorporation. The First Cause of Action incorporates only eight identified sections — "Sections III, IV.A, IV.B, IV.C, IV.D, IV.E, IV.K, IV.L, and IV.P...(¶¶ 14–76, 114–115, 127–135)" — and then states expressly that it "is limited to the Offering Memorandum Misrepresentations and Marketing Misrepresentations described in Sections IV.D and IV.E." (SAC ¶ 138.) The Court and Defendants need not hunt through the pleading; the count identifies its own factual predicate by section and paragraph range.

As to the second, the SAC no longer asserts one undifferentiated fraud count against every defendant. The FAC's single Rule 10b-5(b) count against twelve defendants is now five separate counts, each limited to an identified set of speakers. (SAC, First through Fifth Causes of Action.) The First Cause of Action — the only Rule 10b-5(b) claim against Millrock and Smith — runs against five defendants tied to one document and one marketing campaign that the SAC alleges each of them reviewed and approved. (SAC ¶¶ 64, 75, 138.) Defendants characterize that as the same defect with a smaller group. (Mot. 8.) But *Gibson*'s concern is whether the pleading specifies "which of the defendants are

responsible for which acts or omissions." (*Gibson*, 165 F.4th at 1288.) The SAC answers that question for every statement at issue.

### 2. **The SAC Links Each Statement To Millrock And Smith Individually.**

*Swartz* forbids "lump[ing] multiple defendants together" and requires plaintiffs to "differentiate their allegations" and "identify the role of each defendant in the alleged fraudulent scheme." (*Swartz*, 476 F.3d at 764–765.) It imposes "no absolute requirement" that a complaint identify statements "made by each and every defendant." (*Id.* at 764.) The pleading *Swartz* condemned was "shot through with general allegations that the 'defendants' engaged in fraudulent conduct." (*Id.*) The SAC is its opposite.

Defendants' own authority supplies the governing test: "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue." (*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004); *accord In re New Century*, 588 F.Supp.2d 1206, 1223–24 (C.D. Cal. 2008) (sustaining claims against officers connected to the documents at issue).) The SAC supplies those linking facts three times over.

*First*, Millrock and Smith "each reviewed and approved the contents of the Offering Memorandum" before dissemination, and "[h]ad any of them objected...[the statements] would not have been distributed to Plaintiffs as stated." (SAC ¶¶ 64, 75.) That is approval plus veto over both content and dissemination — not a generalized averment that a group "participated." *Second*, Millrock is the entity that selected and bought the Property, chose Pulse, negotiated the lease and guarantee, set the $9,500,000 valuation, and was "listed as the owner of the interests sold to each Plaintiff." (SAC ¶¶ 22, 38, 42, 51.) Those are Millrock's acts alone. *Third*, Smith "authored, reviewed, or approved" the identified blog posts, was one of three people through whom the identified e-mails were sent, and "jointly controlled and operated both Millrock and Millcreek" with Long. (SAC ¶¶ 39, 59, 62–63.)

Defendants object that the SAC does not allege the date on which Smith reviewed

the Offering Memorandum or how his review "differed from that of other parties." (Mot. 9.) Rule 9(b) requires neither. It requires the "time, place, and specific content of the false representations" and the "identities of the parties to the misrepresentations" (*Swartz*, 476 F.3d at 764) — not a minute-by-minute account of an internal approval process whose details lie exclusively with Defendants.

Defendants place particular weight on SAC ¶ 59, arguing that it re-pleads the FAC and adds only the phrase "including Plaintiffs." (Mot. 3, 9.) Smith's liability does not rest on ¶ 59. It rests on the two blog posts he "authored, reviewed, or approved" and on the Offering Memorandum he approved before dissemination — allegations the FAC did not contain and the Order therefore never evaluated. (SAC ¶¶ 62–64, 75.) Those allegations supply what the Court found missing: the "to whom" is each of the five Plaintiffs, who "personally visited and reviewed" the website and the identified blog posts "before deciding to invest"; the "when" is bounded by each Plaintiff's pleaded purchase date, from Pinder's October 2022 closing through Procopio's May 2023 purchase; and the "what" is quoted verbatim. (SAC ¶¶ 14–18, 56–57, 62–63.) The ¶ 59 e-mails describe the "Pulse Healthcare Systems portfolio," of which the Property is a part. (SAC ¶¶ 41, 59.) Paragraph 59 also does independent work: it alleges that Smith *himself* sent the portfolio e-mails, which bears on scheme liability and on scienter. (Parts IV.E, IV.F.)

### B. Millrock And Smith Are "Makers"; Alternatively, Millrock Is Liable As Principal.

#### 1. Makers Under Janus.

The maker of a statement is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." (*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).) A statement may have more than one maker; the Ninth Circuit has held a defendant "is at least one alleged maker" where it has ultimate authority over the statement. (*In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021).) The SAC pleads that Millrock and Smith "each reviewed and approved" the Offering Memorandum and that "[h]ad any of them objected...[the

statements] would not have been distributed." (SAC ¶¶ 64, 75.) Approval coupled with veto is authority over "whether and how to communicate" the statement. (*See Mandalevy v. BofI Holding, Inc.*, No. 17-cv-667-GPC-KSC, 2021 WL 794275, at *6 (S.D. Cal. Mar. 2, 2021) (a plaintiff "need not plead that the defendant directly issued the allegedly misleading statement," only facts showing "the power and authority to control the content and issuance of the statement").)

Defendants argue Millrock merely "supplied the underlying subject matter of the Offering Memorandum." (Mot. 14:5.) That inverts *Janus*. There, the Court identified the Fund — the issuer on whose behalf the prospectus existed — as the maker, and held the investment adviser that actually drafted and administered the prospectus was *not* a maker because its work was "subject to the ultimate control" of the Fund and performed "on behalf of another." (*Janus*, 564 U.S. at 142–143, 146–147.) Millrock occupies the Fund's position, not the adviser's: the Offering Memorandum existed to sell Millrock's interests in Millrock's property, and Millrock was "listed as the owner of the interests sold to each Plaintiff." (SAC ¶ 22.) Defendants improperly invoke a decision that shielded an agent because ultimate authority lay with the principal to shield the principal from liability.

Defendants' remaining argument is that the SAC contradicts itself: because ¶ 38 assigns marketing to Millcreek and broker-of-record status to Intermountain, "authority over marketing content and dissemination mechanics belonged to Millcreek and Intermountain, not Millrock." (Mot. 14.) That reads ¶ 38 as a division of authority when it is a division of labor — and the distinction is the holding of *Janus*. The adviser there drafted and administered the prospectus; the Fund, which did neither, was the maker, because the adviser's work was "subject to the ultimate control" of the Fund. (*Janus*, 564 U.S. at 142–143.) Defendants' reading would make the drafting agent the maker and the principal immune. Nor are ¶¶ 64 and 75 "threadbare recitals." They allege conduct — review and approval of the document's contents before dissemination — and a consequence: had either objected, the statements "would not have been distributed to Plaintiffs as stated." That is a factual allegation about who could stop the document, and it is what the *ZoomInfo* plaintiffs

did not plead when they asserted only that the defendants "controlled the content" of another entity's statements.

**2. Defendants' Authorities Turn On The Statement-Specific Allegations The SAC Supplies.**

*Cesario* and *ZoomInfo* dismissed maker allegations that failed to connect a defendant to a particular statement. (*Cesario v. Biocept, Inc.*, No. 23-cv-1803-WQH-BLM, 2025 WL 525120, at *13 (S.D. Cal. Feb. 18, 2025); *State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*, No. 3:24-cv-05739-TMC, 2025 WL 3013683, at *18 (W.D. Wash. Oct. 28, 2025).) *Reese* found no attribution where there was "no allegation that BPXA...had ultimate authority over the Trust's SEC filings." (*Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011).) Here the document is Millrock's own. And *In re CytRx* dismissed maker claims as to third-party promotional articles because plaintiffs pleaded only "generalized control allegations" "[w]ithout specific allegations about each...Defendants' purported level of control over the drafting and release of each" article — while *sustaining* maker liability for the documents those same officers actually signed and filed. (*In re CytRx Corp. Sec. Litig.*, No. CV 14-1956-GHK, 2015 WL 5031232, at *7 (C.D. Cal. July 13, 2015).) The SAC pleads what *CytRx* found missing: statement-specific review, approval, veto, and ownership. (SAC ¶¶ 22, 42, 64, 75.)

**3. Agency Makes The Janus Dispute Academic As To Millrock.**

*Janus* decides only whether a defendant itself "made" a statement for purposes of direct Rule 10b-5(b) liability; the Supreme Court later confirmed that *Janus* "said nothing about" other routes to liability. (*Lorenzo v. SEC*, 587 U.S. 71, 81 (2019).) Because the Exchange Act supplies no imputation rule, "courts have looked to agency principles," and Section 20(a) "was not intended to supplant the application of agency principles in securities cases." (*In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015).) Sitting en banc, the Ninth Circuit held that in securities cases "the agent who personally committed the wrong is primarily liable...[and] the principal who acts through the agent (assuming the agent is acting within the scope of his agency) is secondarily

liable." (*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577–1578 (9th Cir. 1990) (en banc).) A corporation is therefore "responsible...for a misleading statement made by an employee or other agent who has actual or apparent authority," and the agent's scienter is imputed to the principal. (*In re ChinaCast*, 809 F.3d at 476.)

The consequence is that even if the Court concludes Millcreek or Intermountain, rather than Millrock, is the "maker" of a given statement, Millrock remains answerable for it as the principal. The SAC pleads the agency directly: Millcreek "acted as Millrock's marketing agent" for the very interests Millrock "syndicated, developed, and sponsored," and Millrock "controlled Millcreek and had the power to direct Millcreek's policies and decision-making." (SAC ¶¶ 21–22.) The MOU attached as Exhibit A confirms it: "The Fund has a marketing company (Millcreek Commercial Properties) to brand the TIC properties," and "The Fund has a separate agreement with Millcreek Commercial Properties (MCP) where MCP is compensated for marketing and client services based on the sales volume of the fund." (SAC Ex. A at 1–2.) Intermountain served as Millrock's broker of record under a "perpetual listing agreement," marketing and selling Millrock's own offering. (SAC ¶¶ 37–38.) The SAC pleads these relationships expressly, alleging that Defendants "acted as alter egos, agents, employees, partners, joint venturers, and co-conspirators of one another," and that Millrock is liable for the acts of Smith and Long as Millrock principals. (SAC ¶¶ 33, 137(c).) The website, blog, and e-mail statements, and the Offering Memorandum itself, fall squarely within those agencies, and Smith's approvals are chargeable to Millrock directly under ¶ 137(c) without resort to Millcreek's agency at all. California law is in accord. (Cal. Civ. Code §§ 2330, 2338.)

This theory requires neither Millrock's own maker status nor independent proof of Millrock's scienter, because the agent's making and the agent's scienter are imputed to the principal. (*In re ChinaCast*, 809 F.3d at 476.) And because respondeat superior is a common-law doctrine distinct from Section 20(a), Section 20(a)'s good-faith defense does not apply to it. (*Hollinger*, 914 F.2d at 1577.)

### C. The Statements Are Material And Are Not Puffery.

A fact is material where there is "a substantial likelihood that...disclosure...would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information." (*Basic Inc. v. Levinson*, 485 U.S. 224, 231–232 (1988).) A tenant's operating history, the strength of a guarantee, and a property's valuation are the facts on which a net-lease investment turns. (*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38–39 (2011); *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976).) An "established" nine-location network, a "Full Corporate Guarantee," a "15-Year Sale Leaseback," and a "$9,505,147.83...5.75% cap rate" are "capable of objective verification" and are the antithesis of puffery. (*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–1009 (9th Cir. 2018).) So are the sponsor's vetting and track-record claims, which "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." (*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017).)

### D. The Omitted Facts Rendered Defendants' Own Statements Misleading.

Plaintiffs do not rest on pure omissions. Rule 10b-5(b) "covers half-truths" — "representations that state the truth only so far as it goes, while omitting critical qualifying information." (*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).) Once a defendant "tout[s] positive information...they [are] bound to...disclos[e] adverse information that cuts against the positive information." (*Khoja*, 899 F.3d at 1009.) The SAC ties every omission to an affirmative statement it rendered misleading:

- The undisclosed $2,000,000 payment to Pulse and Pulse's start-up status made the "established" network (¶ 65) and "sale leaseback" (¶ 68) representations half-truths.
- The undisclosed July 2022 UCC lien made the "Full Corporate Guarantee" a half-truth (¶ 69).
- The undisclosed ~$2,000,000 acquisition price and the absence of any appraisal made the $9,500,000 valuation a half-truth (¶ 73(e), (i)).

- The undisclosed track record — the failed hotel TIC, the HSH default, and the absence of meaningful diligence — made "rock solid," "rigorously vet[ted]," "team of experts," and "recession resilient" half-truths (¶¶ 57, 62, 73(a), (c)).

This is the structure the Ninth Circuit sustained in *Khoja*, where the issuer touted interim results while omitting that they were unreliable. (*Khoja*, 899 F.3d at 1009–1010.) Because the same concealment underlies the state-law claims, those omissions support them as well. (SAC ¶¶ 73, 193, 207, 231.)

### E. The SAC Pleads Scienter With Particularity And Independent Of Falsity.

Defendants dissect SAC ¶ 114 subpart by subpart and dismiss each in isolation as "status and motive." (Mot. 11–12.) *Tellabs* forecloses that method: a court must assess "all the allegations holistically," "not whether any individual allegation, scrutinized in isolation, meets that standard." (*Tellabs*, 551 U.S. at 322–323.) Taken together, and pleaded expressly "independent of the falsity of the statements described above" (SAC ¶ 114), the allegations support a cogent inference of deliberate recklessness.

The core allegation is not status. Millrock was the counterparty to the $2,000,000 payment that funded Pulse's equipment and start-up costs. (SAC ¶¶ 114(e), 122.) A landlord that must buy its tenant's surgical equipment knows its tenant is not an operating nine-location network — and Millrock knew it at the October 11, 2022 closing, before any Plaintiff but Pinder had closed and before four of the five had invested at all. (SAC ¶¶ 14–17, 42, 122.) Long's April 30, 2024 e-mail is Defendants' own written confirmation of that transaction. (SAC ¶ 122.) Likewise, Millrock set the $9,500,000 valuation knowing what it had paid and knowing it had obtained no appraisal. (SAC ¶¶ 73(e), 114(b).) These are not inferences about what a large organization must have known; they are facts about transactions Millrock itself executed.

The remaining subparts are particularized and time-anchored. Millrock's first TIC offering failed in 2020, more than two years before the earliest Plaintiff purchase, and the losses were rolled into Pine Bluff rather than disclosed — giving Millrock and Smith a

documented incentive, predating every purchase, to keep new capital flowing. (SAC ¶¶ 37, 114(d).) HSH Management defaulted in December 2022 and filed for bankruptcy within one to two months, before the McAllisters' January 25, 2023 and Procopio's May 2023 purchases. (SAC ¶ 114(f).) And Smith was copied on the September 3, 2020 MOU, which set out in quantified detail the 2% acquisition and 4% sale commission architecture — giving him "specific, contemporaneous, documented knowledge" that accurate marketing of the Property's value ran directly against his own financial interest. (SAC ¶ 114(g).) Four unaffiliated agents then used nearly identical scripted language with five investors in a one-year window, supporting the inference that Long and Smith, who trained those agents, distributed a script they knew did not match the Property's risk profile. (SAC ¶ 114(c).)

Defendants' contrary authority does not fit. *Zucco Partners* rejected confidential-witness allegations that lacked personal knowledge and rested on "vague hearsay"; here the knowledge is Millrock's own, documented in its principal's written admission. (*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).) In *No. 84 Employer-Teamster*, by contrast, a controlling owner's financial stake, insufficient standing alone, became sufficient together with other particularized facts. (*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944-945 (9th Cir. 2003).) That is this case. Separately, the scienter of Millcreek's principals acting within the scope of their authority is imputed to Millrock as principal. (*In re ChinaCast*, 809 F.3d at 476.)

**F. <u>The Sixth Cause Of Action For Scheme Liability Is Adequately Pleaded.</u>**

Plaintiffs accept the standard this Court has already set. The PSLRA's statement-specific requirement, 15 U.S.C. § 78u-4(b)(1), does not govern a scheme claim that does not rest on misstatements, but the "required state of mind" standard of § 78u-4(b)(2)(A) does, and Rule 9(b) applies. (Order at 22 & n.8.) Plaintiffs plead to that standard, as Section IV.E above demonstrates.

Rule 10b-5(a) and (c) reach "conduct beyond misrepresentations or omissions

actionable under Rule 10b-5(b)." (*Lorenzo*, 587 U.S. at 79–80; *see also In re Alphabet*, 1 F.4th at 709.) The claim requires a manipulative or deceptive act, scienter, a connection to a securities purchase, reliance, loss, and loss causation. (*United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F.Supp.3d 926 (D. Ariz. Dec. 16, 2024).) Because the mechanism of a scheme is ordinarily unknown to plaintiffs, allegations of its "nature, purpose, and effect" and of "the roles of the defendants" suffice. (*Id.*)

The SAC pleads deceptive conduct distinct from the statements themselves: Millrock purchased the Property for approximately $2,000,000 and resold fractional interests at a $9,500,000 valuation with no independent support (SAC ¶¶ 42, 76); it routed $2,000,000 of the purchase proceeds back to Pulse, characterized as "FFE," "to manufacture the appearance of an established, creditworthy tenant" (SAC ¶¶ 122, 182); and it structured and sponsored the sale of securities through entities that were "never...registered or licensed with the SEC, FINRA, or any other securities regulator." (SAC ¶¶ 22, 54.) Structuring a transaction so that investor capital secretly finances the tenant whose independent credit is the investment's selling point is a deceptive act, not a misstatement. Smith's own conduct is separately actionable. Paragraph 59 alleges that Smith personally sent prospective investors, "including Plaintiffs," e-mails marketing the Pulse portfolio as "safe, secure and stable" and "recession resilient" — the same script four other agents used with the other Plaintiffs. (SAC ¶¶ 59, 114(c).) Disseminating false statements with intent to defraud violates Rule 10b-5(a) and (c) whether or not the disseminator is the "maker." (*Lorenzo*, 587 U.S. at 78–80.)[1]

Defendants also contend the SAC fails to plead when, to whom, and how the statements were disseminated. (Mot. 10.) It does. As set out in Part IV.A.2 above, the SAC

[1] The $75,000 figure in ¶ 182 and the approximately $2,000,000 figure in ¶¶ 2 and 42 both derive from Long's April 30, 2024 e-mail, which states that Millrock "paid $75,000 for the existing clinic equipment and provided $2,000,000 for equipment and startup costs." (SAC ¶ 122.) The e-mail allocates nothing to the real property. On Defendants' own account, the consideration bought equipment and a start-up tenant's costs, not real estate value — the omission pleaded at ¶¶ 68 and 73(h).

identifies the documents, the speakers, the channels, the five recipients, and each Plaintiff's purchase date. (SAC ¶¶ 3, 14–18, 56–59, 62–64, 75.)

### G. <u>The Sixteenth Cause Of Action For Control-Person Liability Is Adequately Pleaded.</u>

Section 20(a) requires a primary violation and that "the defendant exercised actual power or control over the primary violator"; culpable participation is a defense, not a pleading element. (*No. 84 Employer-Teamster*, 320 F.3d at 945.) The SAC alleges Millrock "controlled Millcreek and had the power to direct...Millcreek's policies, communications, website content, agent training, and agent conduct, and [was] involved in Millcreek's day-to-day operations, including preparation of the Offering Memorandum." (SAC ¶¶ 22, 237.) That is operational control, not the bare controlling-shareholder status held insufficient in *ZoomInfo*. (2025 WL 3013683, at *26.)

Defendants answer that the SAC pleads none of the "traditional indicia of control" — "a prior lending relationship, owning stock in the target company, or having a seat on the board." (Mot. 15 (quoting *Batwin v. Occam Networks, Inc.*, No. CV 07-2750, 2008 WL 2676364, at *25 (C.D. Cal. July 1, 2008)).) The question is whether the defendant possessed the actual power to control the person primarily liable. (*See Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F.Supp.3d 1328, 1371 n.195 (C.D. Cal. 2014).) The SAC pleads something more direct: Millrock and Millcreek were run by the same people. Long organized both entities; Millcreek's four member entities were controlled by Smith, Spencer Taylor, Jerald Adam Long, and Kevin Long; and Smith and Long "jointly controlled and operated both Millrock and Millcreek." (SAC ¶¶ 35–36, 39.) Common ownership and common management are control in substance.

### H. <u>Defendants' Premise That Every State-Law Claim "Sounds In Fraud" Is Wrong.</u>

#### 1. <u>Rule 9(b) Does Not Reach Claims That Do Not Sound In Fraud.</u>

A claim is subject to Rule 9(b) in its entirety only where the plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the

basis of a claim." (*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).) Where a plaintiff "allege[s] some fraudulent and some non-fraudulent conduct," "only the allegations of fraud are subject to Rule 9(b)," and the remaining allegations "need satisfy only the ordinary notice pleading standards of Rule 8(a)." (*Id.* at 1104–1105.) Even a deficient fraud averment is not fatal; the court must "disregard" it and "then ask whether a claim has been stated." (*Id.* at 1105.) The Ninth Circuit applied that two-track rule in a securities case materially like this one, sustaining the "state law fraud claim...under...Rule 9(b)" while testing nonfraud state law claims for conversion, unjust enrichment, unfair competition, aiding and abetting fraud, and conspiracy under Rule 8(a)(2). (*ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1032 (9th Cir. 2016).)

### 2. **The Ninth And Tenth Causes Of Action Do Not Sound In Fraud.**

The Ninth Circuit has "decline[d] to extend Rule 9(b) to breach of fiduciary duty claims" that do not allege fraud, explaining that "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage" and often lie in the fiduciary's exclusive possession. (*Concha v. London*, 62 F.3d 1493, 1502–1503 (9th Cir. 1995).) The SAC's fiduciary claim rests on duties arising from Smith's role "as a sales agent at both Millcreek and Millrock," Defendants' action on Plaintiffs' behalf, and their receipt of compensation out of Plaintiffs' funds. (SAC ¶¶ 24, 206.) Defendants' contention that a seller's agent owes a buyer nothing is a merits argument that cannot be resolved now: an associate licensee "stands in the shoes" of the brokerage and owes the duties the brokerage owes, and whether a given representation was exclusively seller-side or dual is a question of fact. (*Horiike v. Coldwell Banker Residential Brokerage Co.*, 1 Cal.5th 1024, 1035–1038 (2016).) In all events, a listing agent owes a prospective buyer a duty to disclose facts materially affecting value. (Cal. Civ. Code § 2079; *Horiike*, 1 Cal. 5th at 1039.)

Defendants' argument that Millrock owes Plaintiffs no fiduciary duty does not reach the Tenth Cause of Action, which is pleaded for defendants who owe none. Aiding and abetting a breach of fiduciary duty requires knowledge of the breach and substantial

assistance, not a duty of the defendant's own. (*Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal.App.4th 1138, 1144 (2005).) The SAC pleads both: "[a]s to any Defendant who did not itself owe Plaintiffs a fiduciary duty, that Defendant aided and abetted the breaches," by "distributing sales materials concerning the Property, referring Plaintiffs to the Property, recommending the investment, and providing assurances to Plaintiffs concerning their participation." (SAC ¶¶ 212–13.)

### 3. **<u>The Eleventh Cause Of Action For Conversion Is Adequately Pleaded.</u>**

Conversion "is a strict liability tort" resting "neither in the knowledge nor the intent of the defendant," so "questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial." (*Greif v. Sanin*, 74 Cal.App.5th 412, 441 (2022).) The Ninth Circuit recently reached the same conclusion, holding that under California law conversion "does not require bad faith, knowledge, or even negligence." (*Serenity Invs., LLC v. Sun Hung Kai Strategic Cap., Ltd.*, 182 F.4th 1124, 1130 (9th Cir. 2026).) The claim therefore requires no averment of fraud and is tested under Rule 8(a). (*ESG Capital*, 828 F.3d at 1038.) Money may be converted where "a specific, identifiable sum" is misappropriated; it need not have been held in trust. (*Voris v. Lampert*, 7 Cal.5th 1141, 1151 (2019); *Welco Elecs., Inc. v. Mora*, 223 Cal.App.4th 202, 208 (2014).)

Defendants' "voluntary transfer" argument assumes what is disputed. A transfer induced by misrepresentation is not a voluntary relinquishment of the owner's interest, and consent obtained by fraud does not defeat conversion. (*See Welco*, 223 Cal.App.4th at 208–209.) Their timing argument likewise misreads the claim. Pinder's purchase closed on October 11, 2022 — the same day as the acquisition and the $2,000,000 payment. (SAC ¶¶ 17, 42, 122.) And the claim is not limited to that payment: the SAC separately alleges that "each of the Defendants diverted Plaintiffs' invested funds to themselves as commissions and fees without proper disclosure," concealed by omitting those amounts from the closing statements and the Offering Memorandum (SAC ¶ 218), and that distributions paid to Procopio "were made from other investor funds" (SAC ¶ 109). Those

diversions occurred at and after each Plaintiff's own closing. Whether and when particular dollars were taken is a factual question unsuited to resolution on the pleadings.

**4. The Thirteenth And Fourteenth Causes Of Action Rest On Negligence.**

Negligence-based claims fall outside Rule 9(b)'s enumerated terms and are governed by Rule 8(a). (*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008).) These claims are pleaded in the alternative: "[t]o the extent any Defendant honestly, but unreasonably, believed such representations were true when made, that Defendant is liable for negligent misrepresentation." (SAC ¶ 231.) California negligent misrepresentation requires only that the defendant "lacked any reasonable ground for believing" the statement true, an objective standard, and therefore sounds primarily in negligence. (*Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 417–418 (C.D. Cal. 2012).) Professional negligence turns on breach of the standard of care; the SAC pleads a duty arising from Defendants' roles as licensed brokers and specific breaches: failing to investigate Pulse, failing to verify that a surgery center was operating, and failing to disclose. (SAC ¶¶ 226–27.)

**5. The Seventh And Eighth Causes Of Action Reach Non-Fraud Conduct.**

California's Elder Abuse Act imposes liability where property is taken "for a wrongful use or with intent to defraud, or both," or "by undue influence" — distinct theories, only one of which is fraud. (*Mahan v. Charles W. Chan Ins. Agency, Inc.*, 14 Cal.App.5th 841, 856 (2017).) "Wrongful use" requires only that the defendant "knew or should have known that [its] conduct is likely to be harmful to the elder." (*Id.* at 866.) The SAC pleads that theory: that Defendants "put their own financial interests ahead of" Thart's, "knew or should have known that their conduct was likely to be harmful to an elderly California resident," and "exerted undue influence over" her. (SAC ¶¶ 193–95.) The Utah financial-exploitation claim rests likewise on exploitation and undue influence rather than common-law fraud. (SAC ¶¶ 200–02.)

**6. The Fifteenth Cause Of Action Rests On Independent Prongs.**

The UCL's three prongs each "provide[] a separate and distinct theory of liability," and only the "unlawful" prong requires a predicate violation. (*Hahn v. Select Portfolio Servicing, Inc.*, 424 F.Supp.3d 614, 634–35 (N.D. Cal. 2020).) The "unlawful" prong "borrows violations of other laws...and makes those unlawful practices actionable." (*Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal.App.5th 1131, 1142 (2016).) The SAC pleads a predicate that does not sound in fraud: Millrock, Millcreek, Intermountain, and CIGI offered and sold securities while "never...registered or licensed with the SEC, FINRA, or any other securities regulator." (SAC ¶¶ 22, 54.) Consistent with the two-track rule, *ESG Capital* sustained a UCL unfair-practices claim under Rule 8(a)(2). (*ESG Capital*, 828 F.3d at 1038.)

**I. Loss Causation Is Adequately Pleaded.**

Plaintiffs "need only show a 'causal connection' between the fraud and the loss...by tracing the loss back to 'the very facts about which the defendant lied,'" and "[d]isclosure of the fraud is not a sine qua non." (*Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–754 (9th Cir. 2018).) The SAC traces the loss to the concealed facts: the start-up tenant never opened and defaulted, the guarantee proved illusory, and the overvalued building drew no offers. (SAC ¶¶ 127–35.) Defendants do not argue otherwise. Any reliance on *Oracle* is misplaced; that decision reviewed a summary judgment record, not a pleading. (*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 383 (9th Cir. 2010).)

**J. Dismissal With Prejudice Is Unwarranted.**

Leave to amend is governed by "extreme liberality," and dismissal with prejudice is improper unless it is clear "that the complaint could not be saved by amendment." (*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051–1052 (9th Cir. 2003).) The SAC is not a re-filing of the FAC. It restructured the securities counts by speaker, replaced global incorporation with targeted incorporation, itemized and quoted each challenged statement, and added a new defendant-specific scienter section and loss-causation

allegations. *Loos* and *Zucco* involved plaintiffs who re-pleaded the same facts after repeated opportunities; Plaintiffs here answered the Court's guidance with new allegations drawn from Defendants' own documents and admissions. (*Loos v. Immersion Corp.*, 762 F.3d 880, 890–891 (9th Cir. 2014); *Zucco Partners, LLC,* 552 F.3d at 995–998). *Destfino* is also inapplicable: leave was denied there because plaintiffs told repeatedly to differentiate among defendants filed successive complaints that did not. (*Destfino v. Reiswig*, 630 F.3d 952, 958–959 (9th Cir. 2011).) The SAC did differentiate between the defendants as set forth above.

## V. <u>CONCLUSION</u>

Millrock bought the building, chose the tenant, wrote the check that equipped it, set the price, owned the interests, and approved the document that sold them. Smith co-owned and controlled the entities that did it and approved the marketing that carried it to investors. Those are not group allegations; they are facts about two defendants, pleaded by paragraph and quoted by sentence. The Motion should be denied in its entirety. In the alternative, Plaintiffs respectfully request leave to amend.

Dated: October 2, 2026

**REIF LAW GROUP, P.C.**

Brandon S. Reif

Brandon S. Reif
Rachel D. Dardashti

Attorneys for Plaintiffs